20 A.3d 1018

RAYMOND ARTHUR ABBOTT, A MINOR, BY HIS GUARDIAN AD LITEM, FRANCES ABBOTT; ARLENE FIGUEROA, FRANCES FIGUEROA, HECTOR FIGUEROA, ORLANDO FIGUEROA AND VIVIAN FIGUEROA, MINORS, BY THEIR GUARDIAN AD LITEM, BLANCA FIGUEROA; MICHAEL HADLEY, A MINOR, BY HIS GUARDIAN AD LITEM, LOLA MOORE; HENRY STEVENS, JR., A MINOR, BY HIS GUARDIAN AD LITEM, HENRY STEVENS, SR.; CAROLINE JAMES AND JERMAINE JAMES, MINORS, BY THEIR GUARDIAN AD LITEM, MATTIE JAMES; DORIAN WAITERS AND KHUDAYJA WAITERS, MINORS, BY THEIR GUARDIAN AD LITEM, LYNN WAITERS; CHRISTINA KNOWLES, DANIEL KNOWLES AND GUY KNOWLES, JR., MINORS, BY THEIR GUARDIAN AD LITEM, GUY KNOWLES, SR.; LIANA DIAZ, A MINOR, BY HER GUARDIAN AD LITEM, LUCILA DIAZ; AISHA HARGROVE AND ZAKIA HARGROVE, MINORS, BY THEIR GUARDIAN AD LITEM, PATRICIA WATSON; AND LAMAR STEPHENS AND LESLIE STEPHENS, MINORS, BY THEIR GUARDIAN AD LITEM, EDDIE STEPHENS,

PLAINTIFFS–MOVANTS, v. FRED G. BURKE, COMMISSIONER OF EDUCATION; EDWARD G. HOFGESANG, NEW JERSEY DIRECTOR OF BUDGET AND ACCOUNTING; CLIFFORD A. GOLDMAN, NEW JERSEY STATE TREASURER; AND NEW JERSEY STATE BOARD OF EDUCATION, DEFENDANTS–RE-SPONDENTS.

Argued January 5, 2011—Remanded January 13, 2011—Special Master's Report Filed March 22, 2011—Reargued April 20, 2011—Decided May 24, 2011.

334 

*David G. Sciarra,* Executive Director, Education Law Center, argued the cause for movants (*Mr. Sciarra, Gibbons,* and *White & Case,* attorneys; *Mr. Sciarra, Lawrence S. Lustberg, Elizabeth A. Athos, Theresa S. Luhm, Eileen M. Connor, John D. Rue, Brandon C. Freeman, Gregory G. Little,* and *Derrick F. Moore,* members of the New York bar, on the briefs).

*Peter G. Verniero,* Special Counsel, argued the cause for respondents (*Paula T. Dow,* Attorney General of New Jersey, attorney; *Nancy Kaplen,* Assistant Attorney General, of counsel; *Ms. Kaplen, Robert T. Lougy, Michelle Lyn Miller,* Assistant Attorneys General, *Shannon M. Ryan, Lisa D. Kutlin,* and *Michael C. Walters,* Deputy Attorneys General, on the briefs).

*Stephen R. Fogarty* submitted a brief on behalf of amici curiae Montgomery Township Board of Education and Piscataway Township Board of Education (*Fogarty & Hara,* attorneys; *Mr. Fogarty* and *Jane Gallina–Mecca,* of counsel; *Mr. Fogarty, Ms. Gallina–Mecca,* and *Cameron R. Morgan,* on the brief).

*Richard E. Shapiro* submitted a brief on behalf of amici curiae Boards of Education of City of Bridgeton, City of Burlington, City of East Orange, Jersey City Public Schools, City of Perth Amboy, Town of Phillipsburg, and City of Trenton.

*John D. Rue* submitted a brief on behalf of amici curiae Disability Rights New Jersey, Alliance for the Betterment of Citizens with Disabilities, Cherry Hill Special Education Parent Teacher Association, New Jersey Down Syndrome Government Affairs Committee, New Jersey Speech–Language–Hearing Association, Special Education Clinic at Rutgers University School of Law–Newark, Special Education Leadership Council, and Statewide Parent Advocacy Network (*White & Case,* attorneys; *Mr. Rue, Jayashree Mitra,* a member of the New York bar, and *Mary A. Ciccone,* on the brief).

*Avidan Y. Cover* submitted a brief on behalf of amici curiae New Jersey State Conference of the NAACP, New Jersey Black Issues Convention, and Paterson Education Fund (*Seton Hall University School of Law Center for Social Justice,* attorney).

*Arsen S. Zartarian,* Deputy General Counsel, submitted a letter brief on behalf of amicus curiae State-operated School District of the City of Newark.

*Kathleen Naprstek Cerisano* submitted a letter brief on behalf of amicus curiae New Jersey Education Association (*Zazzali, Fagella, Nowak, Kleinbaum & Freidman,* attorneys).

Justice LaVECCHIA delivered the opinion of the Court.

■ The schoolchildren who comprise the plaintiff class in the *Abbott v. Burke* litigation have been denominated victims of a violation of constitutional magnitude for more than twenty years.[1] Because of the severity of their constitutional deprivation, that class of pupils was determined to be deserving of special treatment from the State. Remedial orders were imposed to provide the education funding and services required to ameliorate the pupils' constitutional deprivation. The State has for decades recognized the special status of that plaintiff class of pupils,[2] and its compliance with this Court's remedial orders demonstrates the State's long recognition that plaintiffs' constitutionally based remedies have imbued them with status akin to that given to wards of the State. In sum, the Abbott plaintiffs have been the long-standing beneficiaries of specific judicial remedial orders, which were entered to correct proven constitutional deprivations that the State was unable to correct on its own, and which specifically directed the method by which the amount of funding to their school districts was to be calculated and provided by the State.

It was against that backdrop that the State applied to this Court two years ago, asking to be relieved of the orders that required parity funding and supplemental funding for children in the so-

---

[1] The New Jersey Constitution charges the State with the fundamental responsibility to educate schoolchildren: "The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years." *N.J. Const.* art. VIII, § 4, ¶ 1. In *Abbott v. Burke*, 119 *N.J.* 287, 384–85, 575 *A.2d* 359 (1990) (*Abbott II*), this Court held that students in the poorest urban districts were deprived of their constitutional right to a thorough and efficient education due to the State's failure to provide adequate financial resources for their educational programming.

[2] Indeed, the State's brief to us in this matter acknowledges the substantiated and long-standing finding of a constitutional violation that pertains to children educated in the Abbott school districts, arguing therein that "[t]he critical distinction between the Abbott districts and every other district in the State is the historical finding of a constitutional violation."

called "Abbott districts" (in combination, "the parity remedy") in exchange for providing funding to those districts in accordance with the School Funding Reform Act of 2008 (SFRA), *L.* 2007, *c.* 260 (*N.J.S.A.* 18A:7F–43 to –63). The State persuaded us to give it the benefit of the doubt that SFRA would work as promised and would provide adequate resources for the provision of educational services sufficient to enable pupils to master the Core Curriculum Content Standards (CCCS). Accordingly, we granted the State relief from those remedial orders that bound it to the parity remedy for the pupils from Abbott districts, and authorized the State to implement in Abbott districts SFRA's level of funding. *Abbott v. Burke,* 199 *N.J.* 140, 971 *A.*2d 989 (2009) (*Abbott XX*).

It is now undisputed that the State has failed to fully fund SFRA in Fiscal Year (FY) 2011. The record in this matter shows generally that the cuts to school aid funding, in districts of various needs, have been instructionally consequential and significant.

The exchange of remedial orders correcting constitutional deprivations for the State's alternative—SFRA funding—did not alter the constitutional underpinnings to the replacement relief. Our grant of relief in *Abbott XX* was clear and it was exacting. It came with the express caveats of required full funding, and a mandatory retooling of SFRA's formulaic parts at designated mileposts in the formula's implementation. When we granted the State the relief it requested, we were not asked to allow, and did not authorize, the State to replace the parity remedy with *some* version of SFRA or an underfunded version of the formula. In respect of the failure to provide full funding under SFRA's formula to Abbott districts, the State's action amounts to nothing less than a reneging on the representations it made when it was allowed to exchange SFRA funding for the parity remedy. Thus, the State has breached the very premise underlying the grant of relief it secured with *Abbott XX.*

Plaintiffs have sought relief under *Rule* 1:10–3.[3] They have just cause to seek vindication of litigants' rights. Like anyone else, the State is not free to walk away from judicial orders enforcing constitutional obligations.

In resisting the plaintiffs' present application, the State argues that we must defer to the Legislature because the legislative authority over appropriations is plenary pursuant to the Appropriations Clause of the Constitution. *See N.J. Const.* art. VIII, § 2, ¶ 2. Although it is true that past decisions of this Court have recognized the Legislature's authority to work a modification of other statutes through the adoption of an annual appropriations act,[4] a different question is presented here. The State seeks, through the legislative power over appropriations, to diminish the Abbott pupils' right to funding required for their receipt of a thorough and efficient education after representing to this Court that it would not do so in order to achieve a release from the parity remedy requirement. In such circumstances, the State may not use the appropriations power as a shield from its responsibilities.

We hold that the Appropriations Clause creates no bar to judicial enforcement when, as here, 1) the shortfall in appropriations purports to operate to suspend not a statutory right, but rather a constitutional obligation, 2) which has been the subject of more than twenty court decisions or orders defining its reach and establishing judicial remedies for these plaintiffs for its breach, 3)

---

[3] *Rule* 1:10–3 provides that "a litigant in any action may seek relief by application in the action." A proceeding to enforce litigants' rights is a means to "coerce [a party] into compliance with the court's order...." *Essex Cnty. Welfare Bd. v. Perkins,* 133 *N.J.Super.* 189, 195, 336 *A.2d* 16 (App.Div.), *certif. denied,* 68 *N.J.* 161, 343 *A.2d* 449 (1975); *see Loigman v. Twp. Comm. of Middletown,* 308 *N.J.Super.* 500, 503–04, 706 *A.2d* 262 (App.Div.1998) ("*R[ule]* 1:10–3 is still an appropriate vehicle for a party who, armed with a judgment ..., alleges a violation of that judgment.").

[4] See *City of Camden v. Byrne,* 82 *N.J.* 133, 411 *A.2d* 462 (1980) and *Karcher v. Kean,* 97 *N.J.* 483, 479 *A.2d* 403 (1984).

where the harm being visited is not some minor infringement of the constitutional right but a real, substantial, and consequential blow to the achievement of a thorough and efficient system of education to the plaintiff pupils of the Abbott districts, and 4) where the formula the State has underfunded was one created by the State itself, and made applicable to the plaintiff pupils of Abbott districts, in lieu of prior judicial remedies, by this Court on application by the State based on specific representations that the statutory scheme of SFRA would be fully funded at least as to the Abbott pupils, and fully implemented as to those districts. In those circumstances, the State, having procured judicial relief based on specific representations, will not be heard to argue that the Appropriations Clause power leaves the plaintiff children of the Abbott districts without an effective remedy.

Although we are sympathetic to the difficulties that the State's failure to abide by its statutory formula for education funding has caused to children in districts statewide, we are limited in our ability to order relief in this matter. We can grant relief in litigants' rights only to the plaintiff class of children from Abbott districts for whom we have a historical finding of constitutional violation and for whom we had specific remedial orders in place through *Abbott XX*. Accordingly, for the State's undisputed failure to adhere to the specific relief authorized in *Abbott XX*, our present disposition granting relief and ordering full funding of SFRA in FY 2012 can reach no broader than to the plaintiffs granted relief in the earlier proceedings in these school funding cases, namely the schoolchildren of the Abbott districts.

I.

We turn to address specifically the context of this present application before the Court. Based on the State's undisputed failure to fund school districts in FY 2011 in accordance with SFRA's formula, plaintiffs have returned to this Court seeking relief in aid of litigants' rights. The steps that preceded the imposition of the school aid reductions through the FY 2011

Appropriations Act were a subject of the parties' jointly stipulated facts, which presented preliminary information as a backdrop to this application.[5]

On March 16, 2010, the Governor delivered the FY 2011 Budget Message. At that time, spending for the upcoming year was projected to increase 28.6% over FY 2010, and revenues were projected to fall. The state aid to school districts was projected to grow by $1.8 billion, or 16% of the total budget gap for the year. And, the FY 2010 budget had relied upon several types of non-recurring revenues that would not be available in FY 2011.

The Legislature passed an annual appropriations bill for FY 2011 on June 29, 2010, and the Governor signed the Appropriations Act into law the same day. *L.* 2010, *c.* 35. The Appropriations Act reduced spending from FY 2010 by $2.7 billion, or 8.3%, with cuts implemented across all departments of state government. Although the FY 2011 Appropriations Act increased school aid in the aggregate,[6] school aid for kindergarten through twelfth grade (K–12) programming was actually reduced from FY 2010 to FY 2011 by $1,081,558,312.[7] Critically, the FY 2011 Appropria-

---

[5] The Special Master's Opinion/Recommendations to the Supreme Court, submitted by the Honorable Peter E. Doyne, A.J.S.C., on March 22, 2011, and attached as an appendix to this decision, further details the economic climate that led to school aid reductions, and the manner in which those cuts were implemented. *Appendix* at 381, 407–14, 20 *A.*3d at 1048–49, 1064–70. We thank Judge Doyne for serving as our Special Master and creating a detailed record for this Court's review. Discussion of his Opinion/Recommendations appears throughout this decision and all citations thereto are to the *Appendix.*

[6] The jointly stipulated facts provide that "[i]n FY 2010, adjusted school aid appropriations of $10.1 billion represented 33.9% of total adjusted line item appropriations." "The FY 2011 Appropriations Act appropriated $10.308 billion for school aid, an increase of $227.7 million in State resources[.]" Although it appears that state funding was raised by only $208 million, the parties have stipulated to a $227.7 million increase in total school aid from FY 2010 to FY 2011.

[7] The parties have stipulated that "[t]he total amount of [K–12] State aid in FY2010 was $7,930,342,303." "The total amount of [K–12] State aid in FY2011 was $6,848,783,991."

tions Act modified the K–12 school aid formula, and allotted $1.601 billion less to districts than SFRA would have if optimally funded.[8]

The state aid reductions for FY 2011 resulted from a series of calculations and several modifications to the original SFRA formula.[9] First, the Appropriations Act altered three components of SFRA's formula: the Consumer Price Index (CPI); the State Aid Growth Limit; and allocation of Educational Adequacy Aid. Specifically, the FY 2011 Appropriations Act set the CPI to zero for all districts, although pursuant to the original SFRA formula, the CPI would have been 1.6%. *See Appendix* at 408, 20 *A.*3d at 1064. The State Aid Growth Limit was also set at zero for all districts, whereas SFRA's original formula set the limits at 10% for districts already spending above adequacy and 20% for those districts spending below adequacy. *See N.J.S.A.* 18A:7F–47(d). A third factor, Educational Adequacy Aid, was held for all districts at the 2009–2010 level, despite its original purpose under the formula "to bring the Abbott districts meeting certain criteria, which were spending below adequacy, up to adequacy within three years of SFRA's implementation through a combination of increased local levy and additional State aid." *Appendix* at 408, 20 *A.*3d at 1064–65 (citing *Abbott XX, supra,* 199 *N.J.* at 229, 971 *A.*2d 989). An initial allocation figure was calculated for each district using the modified formula, and, as a result of the adjustments to SFRA's parameters, state aid was reduced by $520,276,732.

As a second step, the Appropriations Act calculated a reduction amount for each district equivalent to the lesser of either: (a) 4.994% of the district's adopted 2009–2010 general fund budget, or

---

[8] If SFRA had been funded as enacted, the districts would have received $8.451 billion in K–12 school aid as compared to the $6.849 billion allocated under the FY 2011 Appropriations Act. *Appendix* at 407–08, 20 *A.*3d at 1063–64. The parties have stipulated to a difference of $1.601 billion between full SFRA funding and actual FY 2011 appropriations.

[9] For an explanation of the statutory formula and its operative components, see *infra* note 13.

(b) the sum of its 2010–2011 initial allocation of state aid pursuant to the modified formula described above (the "4.994% reduction"). Next, the reduction amount derived from step two was subtracted from the modified SFRA formula figure calculated in step one.[10] *Appendix* at 408–09, 20 *A.*3d at 1064–65. The resulting figure was the state aid allocated to each district for FY 2011. *Appendix* at 409, 20 *A.*3d 1065. The decrease in state aid from the 4.994% reductions to the districts' general fund budgets amounted to an additional loss of $1.081 billion. *Ibid.*

The sum of both types of reductions, namely $1.601 billion, represents the total amount by which the original SFRA formula was underfunded for FY 2011. The resulting shortfall was spread across various SFRA aid categories, including Adjustment Aid, Transportation Aid, Security Aid, Equalization Aid, Special Education Categorical Aid, Educational Adequacy Aid, and Choice Aid.[11] In a statement issued by the Office of Legislative Services (OLS), the budget was described as one that "departs significantly from the funding provision of [SFRA]."

Prior to enactment of the Appropriations Act, plaintiffs wrote to the Attorney General requesting that the State either adjust aid levels to comply with SFRA, or move before this Court for relief

---

[10] As a result of this calculation, fifty-nine districts received no state school aid in FY 2011.

[11] "[T]he Commissioner [of Education] was authorized to establish a hierarchy of the formula aid categories, and the 4.994% reduction of formula aid in each district was accomplished in accordance with this hierarchy." "The hierarchy established by the Commissioner, as modified by subsequent budget resolution, reduced a district's aid in the following order: (1) Adjustment [A]id, (2) Transportation [A]id, (3) Security [A]id, (4) Equalization [A]id, and (5) Special Education [C]ategorical [A]id." The hierarchy "required reducing the first category to zero before carrying over any reduction amount left to the subsequent category, and so on, until the reduction amount was fully exhausted." *Appendix* at 410, 20 *A.*3d at 1066. If the aid reduction was exhausted before reaching any of the categories, the remaining categorical aid was not reduced. *Ibid.* Although not addressed in the hierarchy as stipulated by the parties, the record reflects two additional categories of school aid, Educational Adequacy Aid and Choice Aid, that were impacted by the state aid reductions. *Ibid.*

from *Abbott XX*. When the Attorney General's response indicated that the State would not proceed with an application that was not believed to be necessary, plaintiffs filed the present motion in aid of litigants' rights, on June 8, 2010, alleging that the State's budget reduction violated this Court's judgment in *Abbott XX*.

## II.

Two years ago when this Court issued its twentieth judgment or order in the course of this state's school funding controversy, our opinion reflected an acute awareness of the long duration of this litigation:

Today we are almost a decade into the twenty-first century, and nearly twenty years have passed since this Court found that the State's system of support for public education was inadequate as applied to pupils in poorer urban districts. *Abbott v. Burke*, 119 *N.J.* 287, 295 (1990) (*Abbott II*). Finding that more severely disadvantaged pupils require more resources for their education, the Court held that the State must develop a funding formula that would provide all children, including disadvantaged children in poorer urban districts, with an equal educational opportunity as measured by the Constitution's thorough and efficient clause. *Id.* at 374, 384–86. A later decision added that the funding needed to be coupled to a set of educational program standards. *Abbott v. Burke*, 136 *N.J.* 444 (1994) (*Abbott III*).

[*Abbott XX, supra*, 199 *N.J.* at 144, 971 *A.2d* 989 (parallel citations omitted).]

But the *Abbott XX* application was different in kind. This time the State was directly applying to this Court seeking to reopen the matter. The State came proudly bearing the message that it "ha[d] heeded our call to create a funding formula based on curriculum content standards and to demonstrate that the formula addresses the needs of disadvantaged students everywhere, thereby achieving constitutional compliance." *Id.* at 145, 971 *A.2d* 989.

In January of 2008, the Legislature had enacted, and the Governor had signed, a new school funding formula: SFRA. The State claimed its formula satisfied constitutional requirements for at-risk children—the children with the greatest challenges and needs in terms of educational resources—wherever such pupils attended school. According to the State, at-risk children were not restricted to Abbott districts. Demographic alterations among

school districts had caused changes in the distribution of at-risk children, resulting in many more districts having significant populations of at-risk children to educate.

But, although the State already had implemented its "new" formula with the adoption of its annual appropriations act for FY 2009 (covering the 2008–09 school year), it did not provide funding to the Abbott districts in accordance with SFRA's funding formula because, as its application to this Court acknowledged, prior remedial orders issued in this litigation bound the State and controlled the provision of state aid to pupils in Abbott districts. It was clear that the State well understood the binding nature of the prior remedial orders. Nevertheless, to underscore the background of the matter, in addressing the State's application seeking approval to provide SFRA's funding to Abbott districts in lieu of following the extant remedial orders, we recounted the litigation history that had brought us to that crossroads. *See Abbott v. Burke,* 196 *N.J.* 544, 560–63, 960 *A.*2d 360 (2008) (*Abbott XIX* ).

A.

The background to the education funding remedy in place at the time of the State's application, which was set forth in *Abbott XIX,* bears repeating for our present purposes. It begins with the 1990 decision in *Abbott II,* and shows the forbearance with which this Court awaited, for years, the State's development of a constitutionally sound method of funding for disadvantaged pupils before specific remedial orders had to be imposed:

> In *Abbott II,* the State presented the Public School Education Act of 1975 (the Act) as a school funding formula that would satisfy the constitutional requirement of a thorough and efficient education. The Court reviewed the Act after it had been examined through the development of a full record.... [and] found the funding formula to be constitutionally inadequate. Importantly, the Court further found that "funding alone will not achieve the constitutional mandate" for the pupils in districts having high concentrations of poor children; that "without educational reform, ... money may accomplish nothing; and that in these [poorer] districts substantial far-reaching change in education [was] absolutely essential to success."

The Court ordered the remedy of *"certain funding"* to be provided to the special needs districts, .... [and] used the successful I and J districts—the most affluent suburban districts—as a benchmark it could identify for success. As was later underscored in *Abbott IV*,[12] the Court in *Abbott II*, looked to those districts it deemed were likely to be providing a level of education that was consistent with the Constitution. The Court ordered that the funding must approximate the average net current expense budgets of the I and J districts .... Further, the [C]ourt ordered that the funding be adequate to provide for the special educational needs of students in poorer districts.

Four years later, in *Abbott III*, the Court considered the Quality Education Act (QEA), enacted by the Legislature in 1990 in response to *Abbott II*.... [However, that] new funding formula failed to implement key aspects of the *Abbott II* decision, which directed that there be certainty in the funding for the special needs districts, among other requirements.

In response to *Abbott III*'s rebuff of the QEA funding approach, the State turned its attention to the creation of comprehensive content standards for a thorough and efficient education from which a standard of fiscal support could be built. Thereafter, the Legislature, working with the Executive Branch, enacted the Comprehensive Educational Improvement and Financing Act of 1996 (CEIFA).

In *Abbott IV*, the Court addressed the constitutionality of CEIFA, declaring upon examination of the statute's educational content provisions that, with the enactment of CEIFA, the Legislature had taken a major step in detailing the components and meaning of a constitutional education, an effort that "strongly warrant[ed] judicial deference." The Court ultimately concluded that the CCCS established in CEIFA provided a constitutionally acceptable definition of a thorough and efficient education.

That said, the Court was unable to approve the fiscal standards adopted in CEIFA to support the CCCS because the standards were based on costs in a hypothetical school district that supposedly served as a model for all school districts. The Court noted that the "model" did not account for the characteristics of special needs districts. Furthermore, the Court also found that those special needs were not adequately provided for through CEIFA's categorical aid for supplemental programs—demonstrable effective program aid (DEPA)—because DEPA funding also was not calculated based on a study of the special needs of the high concentrations of poor students attending Abbott districts....

Faced with no viable alternative legislative or administrative solution to the funding dilemma, the Court ordered the parity remedy. The Court resorted to the I and J district average as an objective and reasonable indicator of resources needed to achieve the CCCS. The parity remedy was recognized, even at the time, as an "interim" remedy, albeit the Court's "chosen interim remedy." The door was left open, however, for an alternative funding approach. The Court allowed that the Legislative and Executive Branches could devise an adequate alternative funding remedy so long as the State could show, convincingly, that a thorough and

---

12 *Abbott v. Burke*, 149 *N.J.* 145, 693 *A.*2d 417 (1997) (*Abbott IV*).

efficient education can be met through expenditures lower than parity, or if the State showed that the I and J districts' spending contained inefficiencies.

[*Abbott XIX, supra,* 196 *N.J.* at 560–63, 960 *A.*2d 360 (alteration in original) (emphasis added) (internal citations omitted).]

When the State made application to this Court in respect of SFRA—its newest effort to conform to a constitutionally satisfactory method of funding for pupils in special needs districts (now denominated Abbott districts)—the State already was implementing SFRA's funding formula in school districts throughout the state, *except* where it was constrained by the Abbott remedial orders issued as a result of our past findings of constitutional violation as to the Abbott plaintiff class. The existence of the remedial orders, issued for the benefit of the plaintiff class of Abbott schoolchildren, was of singular importance. It was the reason the State had to secure approval to alter the obligations imposed by those judicial orders. And, it played another consequential role in that it was the crucial fact that prevented the State from obtaining all the relief that it sought.

The State's motion to this Court in the fall of 2008 had asked us to review the constitutionality of SFRA. Specifically, the State's application sought: 1) a declaration that SFRA satisfied the requirements of the thorough and efficient clause of Article VIII, § 4, ¶ 1 of the New Jersey Constitution, and 2) an order relieving the State from the requirements imposed by this Court's prior remedial orders concerning funding for Abbott districts. *Abbott XIX, supra,* 196 *N.J.* at 549, 960 *A.*2d 360.

Our immediate response, before even conducting a hearing on the formula's soundness, reflected that the matter was first and foremost, a controversy with precise parties and carefully delineated proofs of constitutional violations that had provided the basis for the exacting remedial orders that the litigation had spawned. We said the following:

The State comprehends the unique procedural circumstances before us because its application includes a request to be relieved from compliance with this Court's prior remedial orders. The State also asks that we declare the new SFRA funding formula constitutional. The State made the policy choice to provide state funding to public school districts in the current fiscal year consistent with SFRA.

We cannot give an advisory opinion on SFRA's statewide constitutionality. *The Abbott v. Burke litigation does not provide this Court with jurisdiction to address the statute's applicability to students not before the Court.* However, we do have jurisdiction to determine whether SFRA is constitutional as applied to pupils in the Abbott districts. Moreover, the existing decisions and orders of this Court must serve as the starting point for any discussion of the constitutionality of SFRA as applied to the pupils who are the beneficiaries of those rulings.

Because those decisions have dictated, to date, how a constitutional level of state funding for the pupils in Abbott districts is to be provided, SFRA's constitutionality, which otherwise would be presumptive, must be approached differently. Through their pending applications the State and plaintiffs ask that we confront the intersection of the Legislature's new funding formula with our prior decisions. In essence, the question is whether the formula should be permitted to replace the funding methodology previously ordered.

[*Abbott XIX, supra,* 196 *N.J.* at 551–52, 960 *A.*2d 360 (emphasis added).]

With that limitation to the proceedings having been fixed, there followed a remand to an experienced and respected trial court judge, appointed as special master for this Court. That remand resulted in the preparation of a comprehensive record on SFRA's development and a full hearing on the criticisms of the formula. In the end, a comprehensive explanation and critique of those challenges was returned to us. *Abbott XX, supra,* 199 *N.J.* at 176–250, 971 *A.*2d 989. There is no need to explain again the minute details of the formula. Suffice it to say that it is a weighted formula, of many parts and layers.[13] It was carefully constructed

---

[13] SFRA is a weighted funding formula designed to calculate school aid allocations for individual districts using both wealth-equalized and categorical aid components. The centerpiece of the SFRA formula is the wealth-equalized Adequacy Budget, which begins with a base per-student cost that is tied to the CPI. To that base cost SFRA adds specific weights accounting for institutional needs that increase the cost of educating students: "1) grade level, and whether the pupil is 2) an at-risk pupil (defined as one eligible for a free- or reduced-price lunch), 3) a Limited English Proficiency (LEP) pupil, or 4) a special education student of mild, moderate, or severe classification." *Abbott XX, supra,* 199 *N.J.* at 152, 971 *A.*2d 989. Once the base cost and requisite enhancements have been identified, additional resources are provided to subsidize certain special education expenses. In sum, the Adequacy Budget is comprised of four components: "1) a base aid amount for elementary, middle, and high school students, 2) additional weights for at-risk and LEP students, and vocational districts, 3) two-thirds of the census based costs for special education, and 4) all census-based costs for speech-only special education." *Id.* at 153, 971 *A.*2d 989

to account for the myriad needs and cost considerations relevant when devising a permanent formula to perennially provide school districts with predictable amounts of sufficient resources that should permit the provision of educational services sufficient to enable pupils of all types everywhere to master the CCCS.

## B.

In the *Abbott XX* proceedings before this Court that followed the remand hearing, we heard plaintiffs' objections to the formula, as well as the State's defense of its effort in developing the formula and its assertions that SFRA could accomplish all that its designers intended. The Attorney General herself made a rare appearance on behalf of the State and made representations that were both remarkable and singularly persuasive, for as our ruling stated, the *Abbott XX* decision was, in no small way, a matter of trust between the branches of government. *See Abbott XX, supra,* 199 *N.J.* at 146, 168–69, 172, 971 *A.*2d 989.

When the Court asked for assurance that the formula would be followed and necessary adjustments forthcoming if additional monies were called for by that examination, the Attorney General told this Court:

> [Attorney General] Milgram: I want to talk for one moment about the question that you raise about if there is necessary funding will the State basically comply with that—will the [L]egislature[?] What I will tell you is that the [L]egislature has been a partner with the [D]epartment [of Education] for the past five years. I have personally seen it.
>
> If you look at the legislation that came out, unlike CEIFA[,] the legislation that came out in the SFRA tracks almost to the letter the Department of Education's recommendations for the school funding formula along with the enhancements that they'd made and the recommendations of the national experts. That's what came out in this formula. *If the Court is concerned about the Abbott School Districts,*

---

(citation omitted). In addition to the wealth-equalized Adequacy Budget, SFRA's comprehensive formula provides for the allocation of Equalization Aid, Categorical Aid, Preschool Aid, Extraordinary Aid, Adjustment Aid, and Education Adequacy Aid, the operation of which is described in *Abbott XX, supra,* 199 *N.J.* at 155–57, 971 *A.*2d 989.

*order that the formula must always be fully funded as to the Abbott School Districts.*

Acknowledging the economic downturn that had gripped the state since the formula's development, the Attorney General went on to reassure the Court that the State could fund SFRA and to invite specific protection for the Abbott districts:

> [Attorney General] Milgram: ... *[I]f the Court is concerned about the Abbott School Districts under this formula, say that the formula is constitutional to the extent that it is always fully funded as to the Abbott School Districts. That's a reasonable way for the Court to have the assurances that you're looking for about what's going to happen in the future....*
>
> The budget is the wors[t,] I think[,] it's probably been in the State of New Jersey for decades. We are in dire fiscal circumstances, and it is funded. This school funding formula is funded. *And if you want the assurance to make sure that it's funded next year related to the Abbotts then find that for it to be constitutional it has to be fully funded as to [SFRA].*
>
> [ (Emphases added).]

Against the backdrop of the arguments and briefs of counsel and based on the record developed before the Special Master, accompanied by his proposed findings and conclusions of law, we set forth the basis for our holding. We said that although we could not be sure about the as-yet untested SFRA formula, we were persuaded to give the State the benefit of the doubt that SFRA would operate as promised. *See Abbott XX, supra,* 199 *N.J.* at 168–69, 172, 971 *A.*2d 989. We accepted the State's argument that SFRA's carefully developed formula was designed to deliver sufficient resources to provide pupils of all needs with resources for appropriate educational services to enable them to master the CCCS. Thus, solely for purposes of considering the State's application to alter the methodology for the provision of funding to the Abbott districts, we declared SFRA to be, presumptively, constitutionally adequate and valid to the extent that the record permitted its review, stating our holding precisely as follows:

> We therefore hold that SFRA's funding formula may be applied in Abbott districts, with the following caveats. Our finding of constitutionality is premised on the expectation that the State will continue to provide school funding aid during this and the next two years at the levels required by SFRA's formula each year. Our holding further depends on the mandated review of the formula's weights and other

operative parts after three years of implementation. *See N.J.S.A.* 18A:7F–46(a), (b), –51(a), –55(f), –57(a), –59.

[*Id.* at 146, 971 A.2d 989.]

The relief granted to the State was thus conditioned on two express mandates. The first required that the SFRA formula be fully funded. The second mandate, requiring a "look-back" and retooling of SFRA after its reexamination, underscored the importance to the Court of that first requirement of full funding. It also served another purpose. It was no small matter that our decision expressly took into account that SFRA's initial three-year period of implementation would be subject to rigorous review due to its requirement for reexamination, and adjustment if necessary, to component parts of the formula. That point was critical to this Court's extension of trust and expectation of good faith and commitment from the other two branches of government. *Id.* at 169, 971 A.2d 989 ("Our finding that that approach is not constitutionally infirm is tethered to the State's commitment diligently to review the formula after its initial years of implementation and to adjust the formula as necessary based on the results of that review."); *see also id.* at 146, 167, 174, 971 A.2d 989. On one level, the look-back obviously required funding in compliance with the formula as enacted. The required retooling could only happen based on a dissection of how the statute's formula actually worked once implemented. Moreover, it emphasized to the State the clear expectation that compliance with SFRA, in all respects regarding Abbott districts, was the condition on which constitutionality was premised. The Court acted on the basis of information at hand, but we emphasized that

a state funding formula's constitutionality is not an occurrence at a moment in time; it is a continuing obligation. Today's holding issues in the good faith anticipation of a continued commitment by the Legislature and Executive to address whatever adjustments are necessary to keep SFRA operating at its optimal level.

[*Id.* at 146, 971 A.2d 989.]

Thus, based on the record before us, we granted the State's request to implement SFRA's formula funding in Abbott districts in lieu of continued compliance with then-existing remedial orders

governing funding to those districts. *Id.* at 145–46, 971 *A.*2d 989. We further allowed the State to utilize SFRA during its initial three-year implementation period without the added safety net of supplemental funding as previously had been required in Abbott districts.[14] *Id.* at 172–74, 971 *A.*2d 989. The Special Master had been concerned about SFRA's implementation in Abbott districts during the initial three years of the formula's operation if those districts did not have the added assurance of the resources that continued supplemental funding would provide. He had recommended that we require the assurance of supplemental funding during the first three years of SFRA's implementation. *Id.* at 248–49, 971 *A.*2d 989. However, the State strenuously urged instead that SFRA be permitted to be implemented as designed, as a unitary system of school funding, and we granted the State its request in full. *Id.* at 174, 971 *A.*2d 989.

Stripped to its essence, the decision and order entered in 2009 reflected a quid pro quo. The State asked to be relieved of binding judicial decrees in exchange for providing predictable school funding based on the statute it carefully had developed and enacted. Although in *Abbott XX* we could not say that the State had produced a formula that would guarantee students adequate funding to support a thorough and efficient education as measured by the CCCS, the State was allowed to effectuate SFRA's formula with the expectation that it could deliver to Abbott pupils all that the State assured. *Id.* at 175, 971 *A.*2d 989. Indeed, our holding in *Abbott XX* was a good-faith demonstration of deference to the political branches' authority, not an invitation to retreat from the hard-won progress that our state had made toward guaranteeing the children in Abbott districts the promise of educational opportunity.

---

[14] In addition to ordering funding at levels commensurate with the expenditures in wealthy suburban districts, the Court mandated supplemental funding to address the specific educational challenges facing poorer urban school districts and to "redress their disadvantages." *Abbott II, supra,* 119 *N.J.* at 386, 575 *A.*2d 359. The Court reiterated that obligation in *Abbott IV, supra,* 149 *N.J.* at 189–90, 693 *A.*2d 417.

Regrettably, the State did not honor its commitment.

## III.

As noted, in their initial motion papers, plaintiffs sought to have this Court order that additional funding in accordance with SFRA's formula requirements be forthcoming for the current year. Plaintiffs since have withdrawn that request and instead state that they seek "compliance" with this Court's decision and holding in *Abbott XX* going forward, that is in respect of the next and future fiscal years.

The State resists that request, arguing that separation of powers requires this Court to defer to the appropriations determinations made by the other branches and, in the alternative, that the funding cuts do not render the funding levels constitutionally insufficient. With respect to its appropriation power argument, the State asserts that fiscal distress necessitated cuts to state school aid from the aggregate amount that SFRA would have required and that its allocation of those cuts, as among districts, is the exclusive purview of the legislative and executive branches. In any event, the State urges that the method selected by the Governor and Legislature to allocate the reduction in state school aid was fair and equitable, made in good faith, and should have permitted districts to absorb the state aid loss without negatively affecting student achievement. Its argument concludes with its contention that the level of state school aid in FY 2011 has not breached the constitutional standard for a thorough and efficient system of education.

After the submission of briefs, which were extended by mutual consent of the parties, we heard oral arguments on January 5, 2011. Following those arguments, on January 13, 2011, we issued an Order of limited remand to the Special Master who had aided the Court in connection with the State's *Abbott XX* application. Although there was no question that SFRA had not been funded at the levels called for by the formula, the Court sought additional information and so instructed Special Master Peter E. Doyne,

A.J.S.C., to consider "whether school funding through SFRA, at current levels, can provide for the constitutionally mandated thorough and efficient education for New Jersey school children." The Order placed the burden on the State to demonstrate "that the present level of school funding distributed through the SFRA formula can provide for a thorough and efficient education as measured by the [C]ore [C]urriculum [C]ontent [S]tandards in districts with high, medium, and low concentrations of disadvantaged students."

Thereafter, the State moved for clarification of the Order and for more time. The State requested a declaration that the Special Master was permitted to consider the fiscal challenges facing the State in his assessment of the constitutionality of SFRA as currently funded. The application was denied by Order dated February 1, 2011, the Court again expressly noting that it was retaining for its own consideration "the question of what effect, if any, the State's fiscal condition may have on plaintiffs' entitlement to relief in aid of litigants' rights." That said, our Order recognized that "the Special Master [was] authorized to entertain any and all evidence as he sees fit in the proper completion of his assigned task . . . ."

On February 11, 2011, the proceedings before the Special Master began. After eight days of hearings in which the Special Master heard testimony from ten witnesses and received in evidence numerous documents and exhibits, he issued his opinion with recommendations to the Court on March 22, 2011.

As per his charge, the Special Master reported on the level and impact of the cuts to school aid in districts of high, medium, and low concentrations of at-risk pupils.[15] He received and considered

---

[15] For the purposes of the remand proceedings in the instant matter, the parties adopted the following district designations based on the concentration of "at-risk" pupils: high concentration districts are those with a population of at-risk students greater than 40%; medium concentration districts are those with a population of at-risk students between 20% and 40%; and low concentration districts have a population of at-risk students less than 20%. *Appendix* at 405, 20

testimony from superintendents of school districts of all three classifications, the majority of whom were presented by the State. The testimony revealed that as a result of the $1.601 billion shortfall from full funding of SFRA, Abbott districts lost a total of $402.4 million or $1,425 per pupil. The districts with high concentrations of at-risk children, of which the Abbott districts were a subset, lost $687 million or $1,530 per pupil. *Appendix* at 460, 20 *A*.3d at 1095–96. Medium concentration districts lost $329 million or $1,158 per pupil, and low concentration districts lost $585 million or $944 per pupil. *Ibid.*

In his evaluation of that testimony, the Special Master concluded that although the districts absorbed the funding reductions in differing ways, the superintendents were nearly unanimous in their concern that they could not properly deliver the CCCS to all students with the reduced levels of state aid. The superintendents testified to eliminating teaching positions, limiting course offerings, increasing class sizes, and facing administrative burdens, which all contributed to the perceptions that they were failing in their delivery of the CCCS to their students, and in particular to at-risk pupils. *Appendix* at 430–44, 455–56, 20 *A*.3d at 1078–86, 1092–94. The Special Master's report distilled the evidence received during the hearings to four major findings:

1. If the SFRA formula had been fully funded for [FY 2011] an additional $1.6 billion would have been required;

2. Despite the State's best efforts, the reductions fell more heavily upon our high risk districts and the children educated within those districts;

3. The aid reductions have moved many districts further away from "adequacy"; and

4. The greatest impact of the reductions fell upon our at[-]risk students.

[*Appendix* at 464, 20 *A*.3d at 1098.]

---

*A*.3d at 1063. For the purposes of the remand proceeding, the definition of "at-risk" refers to those students eligible for free or reduced-price lunch. *Id.* at 396 n. 10, 20 *A*.3d at 1058 n. 10 (citing *Abbott XX, supra,* 199 *N.J.* at 152, 971 *A*.2d 989).

The Special Master reported that "[t]he loss of teachers, support staff and programs is causing less advantaged students to fall farther behind and they are becoming demonstrably less proficient." *Appendix* at 443, 20 *A.*3d at 1086. In sum, he concluded that the State failed to meet its burden to show that a thorough and efficient education can be provided, consistent with the CCCS, through the levels of SFRA funding provided in the FY 2011 Appropriations Act. *Appendix* at 466, 20 *A.*3d at 1099–1100. With the benefit of that record and report by the Special Master, and the supplemental briefs of the parties, we again conducted oral arguments on plaintiffs' motion. That information and argument informs our consideration of plaintiffs' application.

## IV.

We turn now to evaluate plaintiffs' motion in aid of litigants' rights. A *Rule* 1:10–3 motion is an appropriate vehicle for a party who alleges a violation of a judgment. *See Loigman v. Twp. Comm. of Middletown,* 308 *N.J.Super.* 500, 503–04, 706 *A.*2d 262 (App.Div.1998). This Court has granted motions in aid of litigants' rights in prior *Abbott* decisions, where, for example, the State failed to act consistent with its representations regarding the manner it claimed it would fulfill a mandate of this Court. *Abbott v. Burke,* 163 *N.J.* 95, 100–01, 748 *A.*2d 82 (2000) (*Abbott VI* ).

Here we have a failure of such a nature. The State made a conscious and calculated decision to underfund the SFRA formula when enacting the FY 2011 Appropriations Act. It was not inadvertent or a mistaken exercise of governmental authority. It directly contravened representations made by the State when procuring relief from prior judicial remedial orders that even the dissenters recognize were binding on the State. Thus, for the Abbott districts, it was an action by the State that directly contravened the judgment in *Abbott XX,* which had authorized the State to substitute full SFRA funding for the parity remedy in those districts.

When this Court permitted the substitution of our prior orders, which remediated a constitutional violation, with the State's alternative of SFRA funding, it did not alter the constitutional underpinnings to the replacement relief. Our grant of relief was clear and it was exacting: It came with express mandates. We required full funding, and a retooling of SFRA's formula's parts, at the designated mileposts in the formula's implementation. When we granted the State the relief it requested, this Court did not authorize the State to replace the parity remedy with some underfunded version of SFRA.

The State has breached the very premise underlying the grant of relief it secured with *Abbott XX*. By doing so, it has breached the *Abbott XX* judgment that carried ongoing responsibilities and obligations owed by the State to the Abbott plaintiff class. Hence, the plaintiff class of Abbott schoolchildren has every right to relief in aid of litigants' rights based on the State's failure to fully fund SFRA in Abbott districts.

In so holding we add that the record created in this matter provides necessary support for our conclusion. The Special Master's finding that the impact of the reductions is being felt most significantly in high concentration districts is the most telling. It reveals that the cuts to Abbott districts, which are all high concentration districts, were not of a de minimus or inconsequential nature that could, or should, be greeted by this Court with indulgence. Nor, based on the State's equivocal representations about future levels of funding made to us at argument, can we view this as an aberrational or temporary alteration in the State's responsibilities.

Thus, these reductions have had a significant impact on the beneficiaries of our prior remedial orders, namely the plaintiff pupils of the Abbott districts. It was to remedy their decades-long constitutional deprivation that this Court issued remedial orders. And, it was from those past remedial orders that the State asked to be excused in exchange for providing funding under SFRA's formula. Notwithstanding its promises that SFRA fund-

ing would replace the parity remedy funding, the State did not deliver the quid pro quo.

## V.

We turn to address the arguments that the State advances in opposition to plaintiffs' motion in aid of litigants' rights.

### A.

The State claims that because the appropriation power is vested in the Legislature, *see N.J. Const.* art. VIII, § II, ¶ 2, this Court should defer to the appropriations choices made by the Legislature in the current fiscal year, when financial distress plagued the State's ability to satisfactorily address all the demands on state government. In support of its claim that the Appropriations Clause power vested in the Legislature trumps all other considerations, the State cites to two past decisions, wherein this Court stated that "the power and authority to appropriate funds lie solely and exclusively with the legislative branch of government." *City of Camden v. Byrne,* 82 *N.J.* 133, 148, 411 *A.*2d 462 (1980); *see also Karcher v. Kean,* 97 *N.J.* 483, 490, 479 *A.*2d 403 (1984) (noting that "the constitutional budgetary and appropriations authority [ ] is both centered in and shared by the legislative and executive branches"). According to the State, any relief ordered by the judiciary would constitute an impermissible intervention into the budgetary process.

The case law cited by the State addressed situations in which the suspension of other statutory enactments was at issue. No one would quarrel with the now well-understood principle that "the Legislature has the inherent power to disregard prior fiscal enactments," even where statutes " 'dedicate' state revenues for a particular purpose." *Camden, supra,* 82 *N.J.* at 147, 411 *A.*2d 462 (deferring to Legislature's appropriation power and executive's line-item veto power where plaintiffs challenged non-payment of certain statutory disbursements and revenue sharing provisions);

*Karcher, supra,* 97 *N.J.* at 490, 479 *A.*2d 403 (affirming executive's line-item veto power over statutory expenditures, including those for distribution and apportionment of state aid to municipalities); *see also Cnty. of Camden v. Waldman,* 292 *N.J.Super.* 268, 291–92, 678 *A.*2d 1101 (App.Div.1996) (explaining how it is beyond cavil that Legislature can temporarily suspend other statutory enactments through annual appropriation acts), *certif. denied,* 149 *N.J.* 140, 693 *A.*2d 109, 110 (1997). In *Camden, supra,* we rejected municipal and county challenges to the political branches' failure to appropriate state revenues in conformity with statutes that required disbursements to municipalities. 82 *N.J.* at 142–45, 411 *A.*2d 462.[16] Similarly, in *Karcher, supra,* the Court upheld the Governor's exercise of his line-item veto power in respect of provisions relating to state aid to municipalities [17] and highway appropriations. 97 *N.J.* at 493–501, 479 *A.*2d 403. The Gover-

---

[16] The *Camden* plaintiffs brought challenges in connection with several statutory schemes: the Sales and Use Tax Act, by which "ten percent (10%) of the revenues that the State derived from these taxes was to be allotted 'as State aid to municipalities for general municipal purposes[,]' *N.J.S.A.* 54:32B–31 (repealed)"; the bus franchise replacement tax, "which provides that the State make annual payments to municipalities of certain monies to replace the revenues those municipalities had previously received through collection of the since-repealed bus franchise taxes[,] *N.J.S.A.* 48:4–14.2"; certain statutes disbursing funds for highway purposes, including "*N.J.S.A.* 52:27B–20 [by which] certain monetary sums, labeled 'mandatory dedications,' [must] ... be allotted to each county for highway expenses," and "*N.J.S.A.* 27:14–1 [which] also provides for a stated amount of monies [is] to be apportioned to each county for highway costs"; the Transfer Inheritance Tax Act, which "provides for five percent (5%) of the transfer inheritance taxes collected by the State on 'property of resident decedents in the county' to be paid over to the county[,] *N.J.S.A.* 54:33–10"; and the apportionment of certain monies that "should have been apportioned to the counties." *Camden, supra,* 82 *N.J.* at 142–44, 411 *A.*2d 462 (footnotes omitted).

[17] "Appellants challenge[d] the Governor's line-item veto of an appropriation of the proceeds from the franchise and gross receipts taxes of public utilities as state aid to particular municipalities[,] ... authorized by *N.J.S.A.* 54:30A–16 *et seq.* and 54:30A–49 *et seq.*[, and providing] for the distribution and the apportionment of these revenues as state aid for eligible municipalities." *Karcher, supra,* 97 *N.J.* at 493, 479 *A.*2d 403.

nor's use of the line-item veto power was also upheld in respect of general provisions "relating to salaries, compensation, and the status of various state employee positions[,]" and restrictions on "funds appropriated for capital construction by the Department of Corrections." *Id.* at 493, 501–12, 479 *A.2d* 403. However, those cases do not support the State's position in this case.

It does not follow that the Appropriations Clause authority to modify or suspend statutes that raise some expectation of funding, *see, e.g., Waldman, supra,* 292 *N.J.Super.* at 291–92, 678 *A.2d* 1101, empowers the political branches to ignore judicial orders and decrees that specify a remedy to ameliorate a historical finding of constitutional violation. It simply cannot be said that the authority to "disregard prior fiscal enactments," *Camden, supra,* 82 *N.J.* at 147, 411 *A.2d* 462, carries a corresponding authority to suspend judicial decrees issued to remedy substantiated constitutional deprivations. *Cf. Robinson v. Cahill,* 69 *N.J.* 133, 154, 351 *A.2d* 713 (1975) (*Robinson IV*) (stating clearly, although in dicta, that "[i]f there remains a theoretical conflict between the strictures of the Appropriations Clause and the mandate of the Education Clause, we hold the latter to be controlling in these circumstances").

To state the question is to present its answer: how is it that children of the plaintiff class of Abbott schoolchildren, who have been designated victims of constitutional deprivation and who have secured judicial orders granting them specific, definite, and certain relief, must now come begging to the Governor and Legislature for the full measure of their education funding? And, how can it be acceptable that we come to that state of affairs because the State abandoned its promise? The State's position is simply untenable.

We hold that the Appropriations Clause creates no bar to judicial enforcement when, as here,

1) the shortfall in appropriations purports to operate to suspend not a statutory right, but rather a constitutional obligation,

2) which has been the subject of more than twenty court decisions, or orders, defining its reach, and setting out judicial remedies for these plaintiff pupils for its breach, and

3) where the harm being visited is not some minor infringement of the constitutional right but a real, substantial, and consequential blow to the achievement of a thorough and efficient system of education to the pupils of the Abbott districts, and

4) where the formula the State has underfunded was one created by the State itself, and made applicable to the plaintiff pupils of Abbott districts, in lieu of prior judicial remedies, by the Court on application by the State based on specific representations that the statutory scheme, SFRA, would be fully funded at least as to the Abbott pupils, and fully implemented as to those districts.

In such circumstances, the State, having procured judicial relief based on specific representations, will not be heard to argue that the Appropriations Clause power leaves the plaintiff children of the Abbott districts without an effective remedy.

### B.

The State also advocates that the availability of alternative funding streams and systemic reforms could have enabled the delivery of a constitutional education despite the diminished levels of state aid.

First, and most fundamentally, we reject the collateral argument that the availability of certain non-SFRA funds can be used to deflect the State's responsibility for the provision of a constitutionally mandated, adequately funded thorough and efficient system of education. Specifically, the State cites the availability of federal funds [18] and excess surpluses [19] to offset and ameliorate

---

[18] Federal funds are available annually to supplement state revenues in support of programs for at-risk and disabled students. The State maintains that recurring federal funds flow from Title I grant programs "under No Child Left Behind, 20 *U.S.C.A.* 6301 *et seq.*," and "Part B grants under the Individuals with Disabilities Education Act (IDEA), 20 *U.S.C.A.* 1400 *et seq.*" In addition to recurrent funds, one-time federal awards were available in FY 2011 to assist the states in their response to the national fiscal crisis. The American Recovery and Reinvestment Act of 2009 (ARRA), *Pub.L. No.* 111–5, *123 Stat.* 115 (2009), channeled stimulus money through IDEA Basic and Preschool, Title I/School Improvement Allocations (SIA), and State Fiscal Stabilization Fund (SFSF), "to save and create jobs and to reform education." The Education Jobs Fund (Ed

the impact of school aid reductions on district budgets. However, the record reveals that in many cases the alternative funding available was insufficient to fill the gaps left by the reductions in state aid in the individual Abbott districts.

The State asserts that the Abbott districts were able to mitigate the impact of aid reductions with stimulus-based federal funds. For example, the State argues that "$158 million of . . . [American Recovery and Reinvestment Act of 2009 (ARRA) ] funds remained available in the Abbott districts as of June 30, 2010." [20] In total, the State calculates that Abbott districts had $297 million in federal funding available before the start of the current school year. According to the State, the federal funds available to the Abbott districts exceeded the $256 million reduced from those districts. That representation is accurate only to a point; it provides an incomplete picture of the economic experiences of the Abbott districts.

The calculations proffered by the State compare available federal funding to the sum of state aid reduced between FY 2010 and FY 2011 ($256 million); the State does not address the more relevant figure that represents the sum of state aid that the Abbott districts would have received had SFRA been fully funded in FY 2011 ($402 million). A comparison of available federal funds with the amount of funding reduced from SFRA's statutory formula reveals that federal funds actually fell short in the aggregate

---

Jobs) is another federal program designed to retain, recall, or rehire former employees or to hire new employees in public education.

[19] The parties agree that districts are permitted to "maintain unreserved, undesignated general fund balance[s] of up to 2% of the budgeted general fund appropriations for the pre[-]budget year or $250,000, whichever is greater." Any funds the district maintained above that limit were deemed "excess surplus."

[20] Notably an undisclosed amount of that aid was Preschool ARRA aid. The school aid reductions presented to this Court elsewhere in the record reflect the underfunding of K–12 programs, thus the comparison to funds available to support preschool programs is not helpful to the analysis.

of replacing the aid lost from the Abbott districts. And the State makes no attempt to show that the federal funds replaced actual aid lost under SFRA on a district-by-district basis. Instead, the State bases its representations to this Court on aggregate funding data. True, the Abbott districts received $297 million in federal funds; however, on an individual basis, the majority of Abbott districts lost more aid from FY 2010 to FY 2011 than they received in federal funds.

Further, in an exercise of faulty logic, the State also reasons that the availability of surplus funds in individual districts after the State withheld monies mid-year,[21] demonstrates that SFRA provided funding beyond the levels strictly required to deliver a constitutional education. However, it does not follow that, because districts were surprised by the mid-year withholding and were unable to efficiently and effectively regroup and redirect their expenditures mid-school-year, the districts were overfunded. The argument proffered by the State—that the districts should have expended their surplus funds to ensure delivery of the CCCS—would require school administrators to deplete their resources without any assurance that state funding streams would flow more predictably in the coming years. To rely on the fortuitous circumstance that some districts locally possess sufficient excess surplus to ameliorate the State's funding shortfall is impracticable and penalizes those districts whose fiscal responsibility yielded a reserve of emergency funds.

Finally, in an effort to defend the aid reductions imposed in the current school year, the State proffers that districts could have mitigated the impact of the diminished funding by implementing specific educational reforms. Principally, the State challenges the

---

[21] The parties stipulated that in FY 2010, Executive Order No. 14 withheld approximately $450 million in state aid payments, "an amount that did not exceed available surplus revenues in each of the districts." Of the $450 million that was withheld mid-year, the districts collectively requested the restoration of only $27 million of their excess surplus "to support the 2009–10 budgets, leaving over $400 million in excess surplus available for 2010–11."

efficacy of existing tenure laws, teacher evaluation methods, and collective bargaining agreements. For example, the State argues that marginal increases in class size would not have impacted delivery of the CCCS if districts could select teachers for reductions in force based on merit, and be exempt from a "last in, first out" policy.

While there may or may not be virtue in future educational policy reforms, the debate regarding how best to transform the educational system must be reserved for a different forum. The State's presentation of such arguments in connection with the instant matter is simultaneously premature and laggard. In one respect, the State cannot transform its defense to this motion in aid of litigants' rights into a vehicle to obtain an indication of some judicial approval for collateral labor law and education policy reforms that are, as-yet, unadopted by the Legislature. Nor can the State assert that districts should have mitigated the impact of budget reductions somehow before those initiatives were legislatively obtained. Unless and until the State achieves the legislative reforms it prefers, and puts those tools in the hands of the districts, arguments attacking collective bargaining agreements or targeting interest groups in the education community, do not advance the State's position in this matter.

Moreover, to the extent that the State asserts that there is room for greater efficiencies and cost-savings available from the tools presently in the hands of districts, this broad brush attempt at disparagement is unpersuasive. Moreover, we cannot help but note that a significant portion of the Abbott SFRA funds go to districts that remain under State supervision. The State should tend its own house.

In dispensing with the constitutional and collateral arguments advanced by the State, we close by emphasizing that if and when the reforms presented by the State are adopted and prove efficacious, the fully funded SFRA formula would adjust to reflect those cost savings. If education reforms are adopted in the future, the root costs will be reduced as cost-saving policies are incorporated

and resources are economized. Thus, underfunding SFRA through modifications to its statutory formula is not required to effectuate cost-savings, but instead undermines the operability of the statute's own self-adjusting mechanisms. Indeed, it returns this state to the structureless situations of the past where school districts had no way to plan because they could not anticipate in advance what the State would choose to fund for education from year to year. Predictability in funding is key, we emphasized in *Abbott II, supra,* 119 *N.J.* at 385, 575 *A.*2d 359 ("Funding must be certain . . . ."), and a significant part of SFRA's promise was its consistency. *See Abbott XX, supra,* 199 *N.J.* at 173, 971 *A.*2d 989 (noting "formula's insistence on predictability and transparency in budgeting, and accountability").

## VI.

### A.

■ Finally, having dispensed with the constitutional and collateral defenses raised by the State, we turn back to consider the breadth of remedy that is appropriate in plaintiffs' motion in aid of litigants' rights.

As noted earlier, the determinative finding that gives rise to our ability to grant relief lies in the fact that the Abbott plaintiff class of schoolchildren were the beneficiaries of prior remedial orders, issued to remedy the constitutional deprivation that they litigated and this Court ultimately found had been visited on them. It was those specific remedial orders that had bound the State to a precise form of educational funding in the Abbott districts. And, it was from those past remedial orders that the State asked to be excused in exchange for providing funding under SFRA's formula.

We have now found that the State has breached its part in the exchange of obligations that occurred two years ago, when the State was relieved of its duty to adhere to the remedial orders imposed to alleviate decades-old findings of constitutional deprivation. Our mandate to act in the face of the present finding lies in

the background of litigation that had resulted in specific relief of a constitutional dimension for the instant plaintiffs, namely the parity remedy imposed in the Abbott districts. That remedy was exchanged for a specific alternative form of relief: SFRA's level of funding. That presently is the level of funding that the State constitutionally must provide to the children of the Abbott districts. Although it has failed to do so in the current fiscal year, the present request for a remedy focuses only on the future.

Ordinarily, we could provide a choice to the State in the form of remedy: either fund the Abbott districts at the level authorized by our previous decision in *Abbott XX,* that is, provide the Abbott districts with the full funding promised by SFRA, or return to the parity remedy that the previous remedial orders required. However, there is no choice to be provided here. Neither of the parties wants a return to the parity remedy, nor do we have any independent interest in perpetuating it.

SFRA is the preferable and predictable way to provide funding to the children of the Abbott districts so that sufficient resources are provided and can be planned for in the preparation of cohesive educational programming. The children of the Abbott districts constituted the plaintiff class in *Abbott XX* and were the subject of its holding. Only they have the historic finding of constitutional deprivation and only they were the beneficiaries of the remedial orders that the State asked us to switch for the SFRA funding. Their right to full funding is a constitutional mandate, supported by judicial findings and past orders. Those past rulings are not subject to suspension under the legislative appropriation power.

We hold that the plaintiff class of schoolchildren from the Abbott districts cannot be deprived of the full SFRA funding that the State offered, and received approval to exchange for the decisions and remedial orders that had previously established the funding required for such school districts.

### B.

Our finding as to the pupils in the Abbott districts notwithstanding, plaintiffs seek a broader form of relief. Plaintiffs claim

the right to demand full funding of SFRA for all districts in the state. Their argument is based on a broad interpretation of our holding in *Abbott XX*. However, plaintiffs can look in vain for support in *Abbott XX* for a finding that the failure to provide full funding of SFRA to any district is the equivalent of the constitutional violation previously litigated and found to exist for children in Abbott districts. Indeed, in the prior application that led to the *Abbott XX* holding, we specifically declined to recognize that pupils from any district other than the Abbott districts were before us when taking up the question of SFRA's facial constitutionality. *See Abbott XIX, supra,* 196 *N.J.* at 551–52, 960 *A.*2d 360. Without that finding of constitutional deprivation, pupils of other districts stand in the same relation to SFRA as claimants seeking funding under any other statutory program that the Legislature may suspend or modify through the appropriations process, and thus appear to run directly into the holdings of *Camden* and *Karcher* earlier discussed.

We are well aware of the importance of a predictable stream of education funding for any school district. And, the record developed provides a sense of the unpredictability and disruption to instructional planning, services, and programming, that has resulted in districts of all socioeconomic types due to the Legislature's failure to abide by SFRA's formulaic terms. However, our authority to act in this matter is limited. The extent of this Court's jurisdiction in this matter starts and ends with the series of litigated proceedings that preceded this action. Those actions delineated the responsibility of the State to the representative plaintiff schoolchildren from the Abbott districts.

The *Abbott* litigation has proceeded with two distinct adversarial parties: on the one side, New Jersey schoolchildren who attend schools in certain constitutionally deficient districts; and on the other side, the State, who has defended its funding schemes as consistent with the thorough and efficient clause. In *Abbott XX,* this Court found that SFRA was a constitutionally adequate means for the State to provide a thorough and efficient education

for students in Abbott districts. *Abbott XX, supra,* 199 *N.J.* at 175, 971 *A.*2d 989. That said, the ELC now argues that our holding in *Abbott XX* entitles all children, or if not all, then all at-risk children, across the state to relief under this application for litigants' rights. We do not see our authority as being so extensive. This Court's jurisdiction is limited to rectification of the constitutional violation suffered by the Abbott litigants.

The scope of relief in a motion in aid of litigants' rights is limited to remediation of the violation of a court order. *See Asbury Park Bd. of Educ. v. N.J. Dep't of Educ.,* 369 *N.J.Super.* 481, 486, 849 *A.*2d 1074 (App.Div.) (explaining that motion in aid of litigants' rights is intended to allow court that issued an order to rectify violation of that order), *aff'd in part,* 180 *N.J.* 109, 849 *A.*2d 158 (2004); *see also Abbott VI, supra,* 163 *N.J.* at 100–01, 748 *A.*2d 82 (explaining that motion in aid of litigants' rights allows court to order relief where party fails to comply with mandate set out by that court). Throughout the *Abbott* litigation, this Court's orders have done no more than require that Abbott districts receive funding commensurate with a level that allows the provision of a thorough and efficient education. This motion in aid of litigants' rights can do no more than ensure compliance with that mandate.

Further, a litigant typically does not have standing to assert the rights of third parties. *Jersey Shore Med. Ctr.–Fitkin Hosp. v. Estate of Sidney Baum,* 84 *N.J.* 137, 144, 417 *A.*2d 1003 (1980); *State v. Norflett,* 67 *N.J.* 268, 277 n. 7, 337 *A.*2d 609 (1975). While substandard educational conditions—perhaps of constitutional dimension—may exist in districts other than those that have been designated as Abbott districts, this Court has never stipulated any remedy, nor even found a constitutional violation, for children in non-Abbott districts. Simply stated, the present Abbott plaintiffs do not have standing in this litigation to seek vindication of the rights of children outside of the plaintiff class.

In sum, in respect of the undisputed failure on the part of the State to fully fund SFRA in FY 2011, the present disposition can

extend no further than the parties involved in the earlier proceedings in these school funding cases, namely the plaintiff class of schoolchildren of the Abbott districts.

## VII.

One final point requires attention. Our dissenting colleagues, without any historical or precedential support, attempt to place at issue the time-honored doctrine that majority rules. When this Court is constituted as a five-person Court, whether deciding a case or a motion, a vote of three persons has always been sufficient to determine the outcome of the matter.

The dissenters are unable to identify any exception because there is none. Indeed, the dissenters cannot point to a single motion that was denied by a three-to-two vote when the Court was constituted as a five-person Court. In fact, *all* three-two vote examples referred to by the dissent were grants of motions. The historical practice of this Court shows that when constituted with only five persons, three affirmative votes are sufficient to decide a motion. Thus, the dissenters' transparent attempt at nullification of a decision with which they disagree fails on every factual and legal basis.

### A.

It is well recognized that a public body, such as this Court, is presumed to have power to take a given action when a quorum is present and a majority of the members voting favor the action.

New Jersey adheres to the rule that where a quorum exists, a majority of those present are authorized to take action. *See, e.g., Borough of Oakland v. Bd. of Conservation & Dev.*, 98 *N.J.L.* 806, 816, 122 *A.* 311 (E. & A.1923) (explaining that where no exception is present, "the common law rule prevails that a majority of the board constituting a quorum may lawfully act"); *Barnert v. Mayor of Paterson*, 48 *N.J.L.* 395, 400, 6 *A.* 15

(Sup.Ct.1886) ("When the charter of a municipal corporation or a general law of the state does not provide to the contrary, a majority of the board of aldermen constitute a quorum, and the vote of a majority of those present, there being a quorum, is all that is required for the adoption or passage of a motion or the doing of any other act the board has power to do."); *Mountain Hill, LLC v. Middletown Twp.*, 353 *N.J.Super.* 57, 64, 801 *A.*2d 412 (App.Div.) (discussing whether "the Legislature intended to modify the common law rule that once a quorum was established, only a majority of the quorum was needed to take any action"), *certif. denied*, 175 *N.J.* 78, 812 *A.*2d 1110 (2002); *Matawan Reg'l Teachers Ass'n v. Matawan–Aberdeen Reg'l Sch. Dist. Bd. of Educ.*, 223 *N.J.Super.* 504, 507, 538 *A.*2d 1331 (App.Div.1988) ("It must be assumed that by its silence the Legislature intended the common-law rule to apply, *i.e.*, a majority vote of the members of the board constituting a quorum shall be sufficient."). The common-law default that a majority of a quorum may act on behalf of a body is further supported by *Robert's Rules of Order. See Robert's Rules of Order* § 44, p. 387 (10th ed. 2000) ("[T]he basic requirement for approval of an action or choice by a deliberative assembly, except where a rule provides otherwise, is a *majority vote*.").

The common-law presumption is not altered in the context of judicial bodies, and the dissent does not cite to any precedent for its contrary proposition. Indeed, in 1967, the United States Supreme Court spoke on the issue. It heard argument as to whether the Federal Trade Commission, which has five members, required the votes of two members or three members to enter a binding order when only three members participated in a given action. Justice Brennan, writing for a unanimous court, explained: "The almost universally accepted common-law rule is ... in the absence of a contrary statutory provision, a majority of a quorum constituted of a simple majority of a collective body is empowered to act for the body." *FTC v. Flotill Prods., Inc.*, 389 *U.S.* 179, 183–84, 88 *S.Ct.* 401, 404, 19 *L.Ed.*2d

398, 402 (1967). In the presence of statutory silence, a "body is justified in adhering to that common-law rule." *Id.* at 184, 88 *S.Ct.* at 404, 19 *L.Ed.*2d at 402–03. Justice Brennan dismissed the argument that a different common-law rule might apply to judicial actions. *Ibid.*

Our courts have affirmed the principle that a specified threshold needed to take action is understood in reference to those who are present and voting, assuming that a quorum exists. For example, where a statute did not specify that a unanimous vote of a board of health required the unanimous vote of all the members of the board, the court explained that the unanimous vote of those present was sufficient to adopt a resolution. *Coxon v. Inhabitants of Trenton,* 78 *N.J.L.* 26, 29, 73 *A.* 253 (Sup.Ct.1909).

### B.

There are a number of instances where the rules governing this Court derogate from common-law norms. Notably, *Rule* 2:13–2(a) provides that a quorum requires the presence of five members of the Court, rather than four (which would constitute a majority, and therefore a quorum under common-law principles). However, nothing in the rules abrogates the ability of this Court to take action to grant a motion for enforcement of litigants' rights by majority of a quorum. The common-law presumption thus governs.

That conclusion is reinforced by the compelling fact that, for certain types of motions, the rules do alter the default presumption that a majority of a quorum can take action. A motion for reconsideration requires, in addition to "a majority of the court," that a justice or judge who concurred in the original decision be part of the majority deciding to rehear the case. *R.* 2:11–6(b). The requirements to take action on a motion are *loosened* in a number of circumstances: motions in the Appellate Division may be decided by a single judge (*R.* 2:8–1(c)); motions for adjournment, extension, or acceleration may be granted by the Chief Justice, the Clerk of the Court, a presiding judge of the Appellate

Division, or the Clerk of the Appellate Division (*R.* 2:9–2); and temporary relief in emergent matters can be granted by a single Supreme Court Justice or a single judge of the Appellate Division (*R.* 2:9–8). Those alterations illustrate that decisions on certain motions can be rendered in the absence of a quorum and with fewer votes than a majority of the court.[22] In the absence of any special rule applicable here, it is utterly incongruous to suggest that, although three members of a five-person Court can decide a case on the merits, a supermajority of four—potentially eighty percent of a duly-constituted quorum—is required to grant affirmative relief on a motion in aid of litigants' rights.

## C.

In sum, in the absence of a statute, rule, or constitutional provision on point, the default common-law principle governs in this case, as it has done in all other motion votes when the Court was acting on the basis of a mere quorum of five members. Here, the Court, acting with a five-member quorum, is taking its consistent approach with respect to the vote required for affirmative action on the pending motion in aid of litigants' rights under *Rule* 1:10–3 by acting on the basis of the affirmative votes of three members. This is a straightforward application of a universal common-law norm.

To hold otherwise, without any basis, would yield the illogical and indefensible result that this Court, acting with a quorum of its membership, will allow three votes to decide a case in a party's favor, yet require four votes to ensure continuing relief to that party whose rights had already been vindicated. It should not be

---

[22] Petitions for certification to this Court also are governed by special rules. *Rule* 2:12–10 specifically requires "the affirmative vote of 3 or more justices" for the granting of a petition for certification. That rule, in specifying a particular number, does not vary depending on how many members of the Court are participating. It illustrates a special instance where the rules specifically loosen quorum and majority requirements, allowing a potential minority on a seven or six person Court to take a particular preliminary action.

lost on anyone contemplating the dissenters' argument that the same two members of this Court, just two weeks ago, asserted the right to speak for the Court when their vote in favor of the outcome reached was based only on three votes—theirs plus one vote by a temporarily assigned judge of the Appellate Division—to two against. *See He v. Miller,* —— *N.J.* ——, —— *A.*3d ——, 2011 *WL* 1795832 (2011).

## VIII.

We order that funding to the Abbott districts in FY 2012 must be calculated and provided in accordance with the SFRA formula. In making the calculation for FY 2012, the formula must adjust to correct the State's failure to provide SFRA's statutory level of formula funding to those districts during FY 2011.[23] We further order that, whether or not the formula is fully funded on a statewide basis, the State nevertheless must undertake a look-back analysis that is meaningful and relevant for the Abbott districts so that SFRA continues to operate optimally and as intended in future years for pupils in those districts.

## APPENDIX

## NOT TO BE PUBLISHED WITHOUT THE APPROVAL OF THE COMMITTEE ON OPINIONS

SUPERIOR COURT OF NEW JERSEY

BERGEN COUNTY

DOCKET No. M–1293

OPINION/RECOMMENDATIONS TO THE SUPREME COURT

---

[23] Information publicly available through the Office of Legislative Services estimates the full cost of the remedy ordered herein to be approximately $500 million. *See* Office of Legislative Servs., N.J. Legislature, *Analysis of the New Jersey Budget, Fiscal Year 2011–2012: Department of Education* 23 (Apr.2011) (comparing school aid allocated under proposed FY 2011–2012 budget with sum required to fully fund SFRA in respect of Abbott districts).

RAYMOND ARTHUR ABBOTT, a minor, by his Guardian Ad Litem, FRANCES ABBOTT; ARLENE FIGUEROA, FRANCES FIGUEROA, HECTOR FIGUEROA, ORLANDO FIGUEROA and VIVIAN FIGUEROA, minors, by their Guardian Ad Litem, BLANCA FIGUEROA; MICHAEL HADLEY, a minor, by his Guardian Ad Litem, LOLA MOORE; HENRY STEVENS, JR., a minor, by his Guardian Ad Litem, HENRY STEVENS, SR.; CAROLINE JAMES and JERMAINE JAMES, minors, by their Guardian Ad Litem, MATTIE JAMES; DORIAN WAITERS and KHUDAYJA WAITERS, minors, by their Guardian Ad Litem, LYNN WAITERS; CHRISTINA KNOWLES, DANIEL KNOWLES and GUY KNOWLES, JR., minors, by their Guardian Ad Litem, GUY KNOWLES, SR.; LIANA DIAZ, a minor, by her Guardian Ad Litem, LUCILA DIAZ; AISHA HARGROVE and ZAKIA HARGROVE, minors, by their Guardian Ad Litem, PATRICIA WATSON; and LAMAR STEPHENS and LESLIE STEPHENS, minors, by their Guardian Ad Litem, EDDIE STEPHENS, *Plaintiffs,*

v.

FRED G. BURKE, Commissioner of Education; EDWARD G. HOFGESANG, NEW JERSEY DIRECTOR OF BUDGET and ACCOUNTING; CLIFFORD A. GOLDMAN, NEW JERSEY STATE TREASURER; and NEW JERSEY STATE BOARD OF EDUCATION, *Defendants.*

### Hearings: February 14, 2011 to February 25, 2011; Closing Arguments March 2, 2011; Post– Trial Submissions March 14, 2011

### Decided: March 22, 2011

### Honorable Peter E. Doyne, A.J.S.C.

Jon Martin, Deputy Attorney General; Nancy Kaplen, Robert Lougy and Michelle Lyn Miller, Assistant Attorneys General; Shannon M. Ryan, Lisa Kutlin and Michael C. Walters, Deputy Attorneys General, argued the cause for defendants (Ms. Kaplen,

of counsel and on the brief; Mr. Lougy, Ms. Miller, Ms. Kutlin, Ms. Ryan, and Mr. Walters, on the briefs).

David G. Sciarra, Executive Director, Education Law Center, Gregory G. Little (White & Case, LLP) of the New York bar, admitted pro hac vice, and Eileen M. Connor, argued the cause for plaintiffs (Mr. Sciarra, Gibbons P.C., and White & Case, LLP, attorneys; Mr. Sciarra, Lawrence S. Lustberg, Theresa S. Luhm, Ms. Connor, Mr. Little Elizabeth A. Athos, John D. Rue, Brandon C. Freeman (White & Case, LLP) of the New York bar, admitted pro hac vice, and Derrick F. Moore (White & Case, LLP) of the New York bar, admitted pro hac vice, on the briefs).

Stephen Fogarty argued on behalf on behalf of *amici curiae* Boards of Education of Montgomery Township and Piscataway Township (Fogarty & Hara, Esqs., attorneys; Mr. Fogarty, Jane Gallina Mecca and Cameron R. Morgan, on the briefs).

Richard E. Shapiro argued on behalf of *amici curiae* Boards of Education of City of Bridgeton, Jersey City Public Schools and City of Perth Amboy (Richard E. Shapiro, LLC, attorney).

Frederick A. Jacob argued on behalf of *amicus curiae* Buena Regional School District (Jacob & Chiarello, LLC, attorneys).

John D. Rue joined in the action on behalf of *amicus curiae* Disability Rights New Jersey (White & Case, LLP, attorneys).

Avidan Cover joined in the action on behalf of *amici curiae* New Jersey State Conference of the NAACP, New Jersey Black Issues Convention and Paterson Education Fund (Seton Hall Law School Law Center for Social Justice, attorneys).

Arsen Zartarian joined in the action on behalf of *amicus curiae* State Operated School District of City of Newark (Newark Public Schools Office, attorneys).

Richard A. Friedman joined in the action on behalf of *amicus curiae* New Jersey Education Association (Zazzali, Fagella, Nowak, Kleinbaum & Friedman P.C., attorneys).

## Table of Contents

I. Introduction................................379
II. Procedural History........................383
III. The Remand .............................395
IV. The Burden of Proof .....................398
V. Motion in Limine .........................402
VI. Definition of High, Medium, and Low
 Concentrations of "At–Risk" Pupils ..............405
VII. New Jersey Education and Funding Data ...........406
VIII. The State Aid Reductions .....................407
IX. Availability of Federal Funding ...................411
X. The Hearings ............................414
 a) The Budget Process .........................415
 b) The Core Curriculum Content Standards and
 the Testing Process ........................420
 c) The State's Case ..............................428
 i. Testimony of Educators/Superintendents .....430
 ii. The State's Two "Experts"...................444
 iii. The State's Fact Witness ...................452
 d) The Plaintiffs' Case ..........................455
XI. Conclusion ..............................462

### I. *Introduction*

And so, once again, unto the breach.[1]

Faced with daunting economic realities, and in recognition of the long history of the perils and complications of educational funding, the School Funding Reform Act of 2008 (SFRA), *L.* 2007, *c.* 260 (*N.J.S.A.* 18A:7F–43 to –63) was signed into law. In *Abbott v. Burke,* 196 *N.J.* 544 [960 *A.*2d 360] (2008) (*Abbott XIX*) the Supreme Court remanded to this court, as its Special Master, the obligation to develop a full record and to render its recommendation whether SFRA meets constitutional mandates.[2] That is,

---

[1] WILLIAM SHAKESPEARE, HENRY THE FIFTH, act 3, sc.1.

[2] It should be noted, reference to the "Court" means the Supreme Court, reference to the "court" or the "Master" means this court sitting as Special Master.

"does SFRA represent an equitable and constitutional funding approach 'that can ensure Abbott districts have sufficient resources to enable them to provide a thorough and efficient education,' as defined by the [Core Curriculum Contents Standards]." *Abbott XIX, supra,* 196 *N.J.* at 564 [960 *A.*2d 360].

The New Jersey Constitution requires:

[t]he Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all children in the State between the ages of five and eighteen years.

*N.J. Const.,* art. VIII, § 4, ¶ 1.

Pursuant to the initial remand order this court conducted hearings from February 9th to March 3rd, 2009 and rendered its report to the Court dated March 24, 2009. *Abbott v. Burke,* 199 *N.J.* 140, 175–250 [971 *A.*2d 989] (2009) (*Abbott XX* ) (cited as an appendix to *Abbott XX* ).

Our Court, in *Abbott XX,* determined SFRA met constitutional muster.

The State has constructed a fair and equitable means designed to fund the costs of a thorough and efficient education, measured against delivery of the CCCS [Comprehensive Core Curriculum Standards].

*Id.* at 172 [971 *A.*2d 989].

The Court went on, though, to make clear the finding that SFRA is constitutional ". . . is tethered to the State's commitment diligently to review the formula after its initial years of implementation and to adjust the formula as necessary based on the results of that review. This Court remains committed to our role in enforcing the constitutional rights of the children of this State should the formula prove ineffective or the required funding not be forthcoming." *Id.* at 169 [971 *A.*2d 989].

The Court, by way of its opinion authored by Associate Justice Jaynee LaVecchia, went on to provide as follows:

SFRA will remain constitutional only if the State is firmly committed to ensuring the formula provides those resources necessary for the delivery of State education standards across the State.

*Id.* at 170 [971 *A*.2d 989].

In light of the extraordinary budget crisis facing our State, on June 29, 2010 the Legislature passed the Fiscal Year (FY) 2011 Appropriations Act.[3] Governor Chris Christie signed the Act into law on that same day. *L.* 2010, *c.* 35. The FY 2011 Appropriations Act reduced total State expenditures from FY 2010 by $2.7 billion, an 8.3% reduction. *L.* 2010, *c.* 35; Stip. ¶ 41, Mar. 2, 2011. In light of the overall reductions in State spending, the Legislature and the Governor reduced the funding for the SFRA formula aid by $1.601 billion for the 2010–2011 school year. D–124. Despite the same, the FY 11 Appropriations Act still dedicates more than one-third of the total FY 2011 line item appropriations to school aid. *L.* 2010, *c.* 35.

As a result of the reductions in funding, counsel on behalf of the plaintiffs filed a notice of motion in aid of litigants' rights on June 8, 2010.[4] By way of the application, plaintiffs sought to enjoin the State from providing less State school funding aid than the aid levels required by SFRA as referenced in *Abbott XX* to New Jersey school districts for 2010–2011, requested a review of the SFRA formula and its "operative parts," and requested the Court make recommendations to the Legislature under *N.J.S.A.* 18A:7F–

---

[3] The State operates on a fiscal year beginning on July 1 and ending on June 30. Stip. ¶ 1, Mar. 2, 2011. As such, FY 2011 would start on July 1, 2010 and end on June 30, 2011.

[4] At the initial hearing before this court conducted on January 18, 2011, plaintiffs' longstanding counsel, David G. Sciarra, Esq., acknowledged he only represented the interests of the plaintiff class; that is, students in the former Abbott districts. Accordingly, of the 1,366,271 students in the State—282,417, or 20.67 percent, are students in former Abbott districts, leaving the remainder 79.33% of students residing in non-Abbott districts unrepresented. This is as troubling now as it was in the prior remand. *Abbott XX, supra,* 199 *N.J.* at 240 [971 *A*.2d 989] ("It is noted the interests of students in all districts other than the Abbott districts are not concretely before the court."). For simplicity, this report will continue to reference these districts as the "Abbott districts," or the "former Abbott districts."

46(a) and (b) until the State can demonstrate the formula has been fully implemented as enacted.

After the matter was briefed and oral argument conducted the Court, by way of an order dated January 13, 2011 executed by the Honorable Virginia A. Long, Presiding Justice, this court was appointed as Special Master to preside over the creation of a record and to make proposed findings of fact and conclusions of law. Remand Order, Jan. 13, 2011 (Remand Order I). Remand Order I made clear the hearing was to solely address "whether school funding through SFRA, at current levels, can provide for the constitutionally mandated thorough and efficient education for New Jersey school children." [5] The remand order made clear the hearing was to address the level of funding in the school year 2010–2011 (FY 11) and reposed with the State the burden of demonstrating that that level of school funding, distributed according to the SFRA formula, "can provide for a thorough and efficient education as measured by the comprehensive core curriculum standards in districts with high, medium, and low concentrations of disadvantaged pupils." Remand Order I ¶ 4. The Court established a narrow window for the submission of the Special Master's report and also established a briefing schedule thereafter for submissions to the Court.

Given the limited and specific nature of the remand, it is as important to note what is not under review by this court, as it is to note what is to be studied and considered.[6] This court has *not* been asked:

1. to address the impact of the economic difficulties facing the Legislature and the Governor and all citizens of our State when considering the level of school aid for FY 11;

---

[5] It is worth noting this remand addresses the constitutional rights of all New Jersey school children, rather than only the school children who resided in the "Abbott districts," as was the case in the prior remand. It does, though, appear the plaintiffs' application focused primarily upon the children in the Abbott districts.

[6] Although the court was initially reminded of Brendan Sullivan's witty aphorism, "I'm not a potted plant," it is certainly within the Court's prerogative to

2. how the judiciary should best address the current, and possibly future, economic realities;

3. to review what deference, if any, need be accorded the Legislative and Executive branches as they try to grapple with the economic uncertainties that abound, particularly as it relates to the essential obligation to educate our youth;

4. to determine whether the disadvantaged students of New Jersey have been unfairly discriminated against by current levels of funding;

5. to consider whether the other 79% of school children need or should be represented;

6. what is the appropriate judicial response in times of fiscal crisis, and particularly, whether the requirements for CCCS should be made more stringent in such a period as is the case here;

7. to determine whether there is sufficient current support for finding the CCCS should satisfy constitutional mandates;

8. whether the underpinnings of SFRA need be re-examined as it relates to the correlation between funding and student performance; nor

9. the wisdom or prudence of "last in, first out" in the reduction of teaching positions.

Rather, the specific remand is only to determine whether current funding levels of SFRA can provide the constitutionally mandated thorough and efficient education for all New Jersey school children. As such, it is that question that was the focus of the hearing and shall be the focus of this report.

## II. *Procedural History*

Educational reform in the State of New Jersey has been a crusade waged in the courts for nearly four decades producing twenty Supreme Court opinions in an effort to provide the schoolchildren of New Jersey with their constitutional right to a thorough and efficient education.[7] No other issue has, even remotely,

---

limit the Special Master's review. *See* Brendan V. Sullivan Jr., Esq., representing Lt. Col. Oliver North during the Iran-contra hearings.

[7] *Robinson v. Cahill*, 62 *N.J.* 473 [303 A.2d 273] (1973) (*Robinson I* ), *Robinson v. Cahill*, 63 *N.J.* 196 [306 A.2d 65] (*Robinson II* ), *cert. denied*, 414 *U.S.* 976 [94 *S.Ct.* 292, 38 *L.Ed.2d* 219] (1973), *Robinson v. Cahill*, 67 *N.J.* 35 [335 A.2d 6]

been the focus of such scrutiny and controversy. As such, a short summary of the *Abbott* proceedings leading to the present remand is necessary for context.

The New Jersey Constitution directs "[t]he Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all children in this State between the ages of five and eighteen years." *N.J. Const.*, art. VIII, § 4, para. 1. The Supreme Court first addressed violations of the right to a thorough and efficient education in 1973, *Robinson v. Cahill*, 62 *N.J.* 473 [303 *A.*2d 273] (1973) (*Robinson I*), finding the then-implemented education funding plan unconstitutional as applied to the State's poor "special needs" school districts. *Abbott v. Burke*, 196 *N.J.* 544, 548 [960 *A.*2d 360] (2008) (*Abbott XIX*). In response to the finding of unconstitutionality, the Legislature enacted the Public School Education Act of 1975 (the "1975 Act"), *N.J.S.A.* 18A:7A-1 to 52 (repealed), which was held to be facially constitutional. *Robinson*

---

(1975) (*Robinson III*), *Robinson v. Cahill*, 69 *N.J.* 133 [351 *A.*2d 713] (1975) (*Robinson IV*), *cert. denied*, 423 *U.S.* 913 [96 *S.Ct.* 217, 46 *L.Ed.*2d 141] (1975), *Robinson v. Cahill*, 69 *N.J.* 449 [355 *A.*2d 129] (1976) (*Robinson V*), *Abbott v. Burke*, 100 *N.J.* 269 [495 *A.*2d 376] (1985) (*Abbott I*), *Abbott v. Burke*, 119 *N.J.* 287, 304 [575 *A.*2d 359] (1990) (*Abbott II*), *Abbott v. Burke*, 136 *N.J.* 444 [643 *A.*2d 575] (1994) (*Abbott III*), *Abbott v. Burke*, 149 *N.J.* 145 [693 *A.*2d 417] (1997) (*Abbott IV*), *Abbott v. Burke*, 153 *N.J.* 480 [710 *A.*2d 450] (1998) (*Abbott V*), *Abbott v. Burke*, 163 *N.J.* 95 [748 *A.*2d 82] (2000) (*Abbott VI*), *Abbott v. Burke*, 164 *N.J.* 84 [751 *A.*2d 1032] (2001[2000]) (*Abbott VII*), *Abbott v. Burke*, 170 *N.J.* 537 [790 *A.*2d 842] (2002) (*Abbott VIII*), *Abbott v. Burke*, 172 *N.J.* 294 [798 *A.*2d 602] (2002) (*Abbott IX*), *Abbott v. Burke*, 177 *N.J.* 578 [832 *A.*2d 891] (2003) (*Abbott X*), *Abbott v. Burke*, 177 *N.J.* 596 [832 *A.*2d 906] (2003) (*Abbott XI*), *Abbott v. Burke*, 180 *N.J.* 444 [852 *A.*2d 185] (2004) (*Abbott XII*), *Abbott v. Burke*, 182 *N.J.* 153 [862 *A.*2d 538] (2004) (*Abbott XIII*), *Abbott v. Burke*, 185 *N.J.* 612 [889 *A.*2d 1063] (2005) (*Abbott XIV*), *Abbott v. Burke*, 187 *N.J.* 191 [901 *A.*2d 299] (2006) (*Abbott XV*), *Abbott v. Burke*, 196 *N.J.* 348 (2006) (*Abbott XVI*), *Abbott v. Burke*, 193 *N.J.* 34 [935 *A.*2d 1152] (2007) (*Abbott XVII*), *Abbott v. Burke,* 196 *N.J.* 451 [956 *A.*2d 923] (2008) (*Abbott XVIII*), *Abbott v. Burke*, 196 *N.J.* 544 [960 *A.*2d 360] (2008) (*Abbott XIX*), *Abbott v. Burke*, 199 *N.J.* 140 [971 *A.*2d 989] (2009) (*Abbott XX*).

*v. Cahill,* 69 *N.J.* 449, 467 [355 *A.*2d 129] (1976) (*Robinson V* ). The 1975 Act was then challenged by plaintiffs, school children attending public schools in poor urban districts, who asserted the 1975 Act was unconstitutional as applied to them, thereby beginning the *Abbott v. Burke* litigation saga. *Abbott v. Burke,* 100 *N.J.* 269, 280 [495 *A.*2d 376] (1985) (*Abbott I* ).

In *Abbott I,* the Supreme Court held plaintiffs should first exhaust their administrative remedies before adjudicating the matter in the courts. Nonetheless, the Court concluded the constitutional issue, whether the funding scheme of the 1975 Act, as applied, violated the plaintiffs' rights to a thorough and efficient education, required establishing a comprehensive factual record before the complex issues could be addressed and, as such, ordered a remand for fact-finding and hearings. 100 *N.J.* at 301 [495 *A.*2d 376]. On remand, the then Administrative Law Judge (ALJ), Steven L. Lefelt (J. Lefelt),[8] after holding exhaustive hearings over eight months, set forth his lengthy decision on August 24, 1988 finding

> that evidence of substantial disparities in educational input (such as course offerings, teacher staffing, and per pupil expenditures [sic] ) were related to disparities in school district wealth; that the plaintiffs' districts, and others, were not providing the constitutionally mandated thorough and efficient education; that the inequality of educational opportunity statewide itself constituted a denial of a thorough and efficient education; that the failure was systemic; and that the statute and its funding were unconstitutional.

*Abbott v. Burke,* 119 *N.J.* 287, 297 [575 *A.*2d 359] (1990) (*Abbott II* ).

The ALJ's findings of disparity in educational input, such as course offerings and per pupil expenditures, were related to disparities in school district wealth were rejected by the Commissioner, who then concluded the 1975 Act was constitutional as

---

[8] The matter was originally remanded to the Commissioner of the Department of Education ("Commissioner"), but as the Commissioner was a defendant in *Abbott I,* the Court noted the initial hearing and fact-finding should be before an ALJ. *Abbott II, supra,* 119 *N.J.* at 297 [575 *A.*2d 359].

applied to the entire State, and the State Board of Education ("Board") affirmed his determination. *Id.* at 297 [575 *A.*2d 359].

In *Abbott II,* the Court reversed the Board's determination and held the 1975 Act unconstitutional as applied to twenty-eight poor urban districts classified within the District Factor Group (DFG) as A and B districts. 119 *N.J.* at 394 [575 *A.*2d 359]. The DFG designation of districts was a method to group school districts by their socioeconomic status from A through J, with A being the lowest socioeconomic status and J being the highest. *Id.* at 338 [575 *A.*2d 359]. The districts are measured by seven factors: 1) per capita income level, 2) occupation level, 3) education level, 4) percent of residents below the poverty level, 5) density (the average number of persons per household), 6) urbanization (percent of district considered urban), and 7) unemployment (percent of those in the work force who received some unemployment compensation). *Ibid.* The factors were weighted according to their level of importance in indicating status, and were then combined in a formula which produced a numerical result. *Ibid.*

The Court further held the 1975 Act must be amended to provide for funding of poor urban districts at the same level as affluent districts and such funding cannot depend on the districts' ability to tax; the level of funding must be guaranteed and mandated by the State; and the level of funding must adequately provide for the special needs of the poor urban districts. *Id.* at 295 [575 *A.*2d 359]. The judicial remedy devised to redress the constitutional deficiency was limited only to the poor urban districts. The Court, while acknowledging disparity may exist in other districts, recognized it could only direct "constitutional compliance" by the State not "optimum educational policy." *Id.* at 296 [575 *A.*2d 359]. Specifically, it noted its function was "limited strictly to constitutional review" and as such "[t]he definition of the constitutional provisions by this Court, therefore must allow the fullest scope to the exercise of the Legislature's legitimate power." *Id.* at 304 [575 *A.*2d 359].

The *Abbott II* Court found a thorough and efficient education required, at the minimum, an educational opportunity to "equip the student to become 'a citizen and ... a competitor in the labor market'," *id.* at 306 [575 *A.*2d 359] (quoting *Robinson I, supra*, 62 *N.J.* at 515 [303 *A.*2d 273]), but more specifically it meant "the ability to participate fully in society, in the life of one's community, the ability to appreciate music, art, and literature, and the ability to share all of that with friends." *Id.* at 363–64 [575 *A.*2d 359].

The Court, substantially adopting the ALJ's factual-findings regarding the quality of education delivered in poor urban and special needs districts (SNDs), and the lack of adequate facilities, *id.* at 359–63 [575 *A.*2d 359], determined "in order to achieve the constitutional standard for the students from these poorer urban districts—the ability to function in that society entered by their relatively advantaged peers—the totality of the districts' educational offering must contain elements over and above those found in the affluent suburban district," notably in the DFG I and J districts. *Id.* at 374 [575 *A.*2d 359].

In response to the findings of disparity, the Court fashioned a two-part remedial approach to the deprivation of a constitutional education by ordering: (i) appropriate legislation must be passed to equalize the level of per-pupil funding of the poorer urban districts with the level of funding of affluent school districts in DFGs I and J, *id.* at 384 [575 *A.*2d 359], and (ii) "[t]he level of funding must also be adequate to provide for the special educational needs of these poorer urban districts in order to redress their extreme disadvantage." *Id.* at 295 [575 *A.*2d 359]. Implementation of the remedial actions was left to the Legislature as the Court's role was simply to determine whether the legislation passed constitutional muster. *Id.* at 304 [575 *A.*2d 359]. Furthermore, the Court noted the new legislation could equalize per-pupil spending for all districts at a level that provided a thorough and efficient education, which was not necessarily the average level of the affluent districts. *Id.* at 387 [575 *A.*2d 359].

In 1994, the Court addressed the constitutionality of the Quality of Education Act of 1990 (QEA), *N.J.S.A.* 18A:7D–1 to –37 (repealed), enacted by the Legislature in response to the Court's instructions in *Abbott II*. *Abbott v. Burke*, 136 *N.J.* 444 [643 *A.*2d 575] (1994) (*Abbott III* ). The QEA was declared unconstitutional as applied to the special needs districts because it failed "to assure parity of regular education expenditures between the special needs districts and the more affluent districts," *id.* at 446–47 [643 *A.*2d 575], and it failed to address the needs of the SNDs by way of supplemental programs. *Id.* at 452–54 [643 *A.*2d 575]. While the QEA could theoretically permit parity funding, it failed to guarantee adequate funding to accomplish the same. *Id.* at 451 [643 *A.*2d 575]. The Court also found infirmity in the Commissioner's failure to study and identify which supplemental programs were necessary for disadvantaged children as required in *Abbott II*. *Id.* at 453 [643 *A.*2d 575].

In response to *Abbott III*, the Legislature passed the Comprehensive Educational Improvement and Financing Act of 1996 (CEIFA), *N.J.S.A.* 18A:7F–1 to –34 (repealed). The Act embodied substantive standards to define the content of a constitutionally sufficient education referred to as the Core Curriculum Content Standards (CCCS) [9], *Abbott v. Burke*, 149 *N.J.* 145, 161 [693 *A.*2d 417] (1997) (*Abbott IV*), as well as the funding provisions prescrib-

---

[9] The CCCS provided achievement objectives for all students in seven subject areas: (1) visual and performing arts, (2) comprehensive health and physical education, (3) language-arts literacy, (4) mathematics, (5) science, (6) social studies, and (7) world languages. *Abbott IV, supra*, 149 *N.J.* at 161 [693 *A.*2d 417]. In addition, the seven subject areas are permeated with " 'cross-content workplace readiness standards,' which are designed to incorporate career-planning skills, technology skills, critical-thinking skills, decision-making and problem-solving skills, self-management, and safety principles." *Id.* at 161–2 [161–62, 693 *A.*2d 417]. At the time, the standards also envisioned incorporating performance indicators from statewide assessment exams based on the standards for grades three, four, eight and eleven. *Id.* at 162 [693 *A.*2d 417].

ing the costs necessary to implement these standards. *Id.* at 163 [693 *A.*2d 417].

The Court concluded the CCCS in CEIFA were "facially adequate as a reasonable legislative definition of a constitutional thorough and efficient education," *id.* at 168 [693 *A.*2d 417], but held CEIFA's funding provision, which was derived from a hypothetical model school district, was unconstitutional as applied to the special needs districts. *Id.* at 177 [693 *A.*2d 417]. Specifically, the Court determined CEIFA did not link the content standards to the actual level of funding required to implement these standards. *Id.* at 169 [693 *A.*2d 417]. Moreover, the model district did not account for the characteristics of the special needs districts nor did the funding provision prescribe the amount necessary for the special needs districts to conform to the model district. *Id.* at 172 [693 *A.*2d 417]. Additionally, the base per-pupil amounts for supplemental programs were not based on actual studies of the educational needs of the students or the costs necessary to implement these programs in the special needs districts. *Id.* at 185 [693 *A.*2d 417]. Finally, CEIFA failed to address the need for adequate facilities in these districts. *Id.* at 186 [693 *A.*2d 417]. Concluding CEIFA could not provide students in poor urban districts with a thorough and efficient education, and left with no viable alternative, the Court was forced to devise a remedy to redress the continued deprivation of this constitutional right. *Id.* at 188 [693 *A.*2d 417].

The Court noted the limits of its ability to fully address the educational needs of the school children and advised "[t]he judicial remedy is necessarily incomplete; at best it serves only as a practical and incremental measure that can ameliorate but not solve such an enormous problem .... [and] [i]t cannot substitute for the comprehensive remedy that can be effectuated only through legislative and executive efforts." *Id.* at 189 [693 *A.*2d 417]. As such, the "interim" remedial relief devised by the Court mandated increased funding to assure "parity in per-pupil expenditures between each SND and the budgeted (as opposed to

predicted) average expenditures of the DFG I & J districts." *Id.* at 189 [693 *A.*2d 417]. The parity remedy was envisioned by the Court to become "obsolete," particularly if it could be demonstrated that "a substantive thorough and efficient education can be achieved in the SNDs by expenditures that are lower than parity with the most successful districts, that would effectively moot parity as a remedy." *Id.* at 196 [693 *A.*2d 417]. The remedy further included "implementation of administrative measures that will assure that all regular education expenditures are correctly and efficiently used and applied to maximize educational benefits." *Ibid.* Finally, the Court insisted the State should determine and implement the necessary supplemental programs for special needs students as had been ordered by the Court since *Abbott II. Id.* at 190 [693 *A.*2d 417].

Concluding the task of making critical educational findings and determinations concerning the special needs of children should not be left to the Court, the matter was then remanded to the Superior Court to direct the Commissioner and to conduct studies as a basis for specific findings identifying the needs of students in special needs districts, the programs necessary to address those needs, and the expenditures necessary to implement such programs. *Id.* at 199–200 [693 *A.*2d 417]. The Superior Court could appoint a Special Master to assist in the court's review of the parties' recommendations. *Id.* at 200 [693 *A.*2d 417]. The Honorable Michael Patrick King, P.J.A.D., was temporarily assigned to the Chancery Division to conduct the remand proceedings. He appointed Dr. Allan Odden, a professor at the University of Wisconsin–Madison, as Special Master. *Abbott v. Burke,* 153 *N.J.* 480, 493 [710 *A.*2d 450] (1998) (*Abbott V* ).

In 1998, the *Abbott V* Court set forth "the remedial measures that must be implemented in order to ensure that public school children from the poorest urban communities receive the educational entitlements that the Constitution guarantees them." 153 *N.J.* at 489 [710 *A.*2d 450]. The Court directed the Commissioner to implement broad-based educational reform, including a high-

quality pre-school program, in the special needs districts, now referred to as the Abbott districts. *Id.* at 527 [710 *A.*2d 450].

Two years later, in 2000, plaintiffs returned to the Court on a motion in aid of litigants' rights asserting the State failed to implement a high-quality pre-school program for all Abbott children. *Abbott v. Burke,* 163 *N.J.* 95, 104 [748 *A.*2d 82] (2000) (*Abbott VI* ). The Court granted the motion in part, concluding the implemented pre-school program did not meet the necessary standards imposed by *Abbott V. Id.* at 101 [748 *A.*2d 82].

The same year, Jack Collins, Speaker of the General Assembly, brought a motion before the Court for intervention in and for clarification of the Court's previous *Abbott V* decision asking whether the Legislature could require contribution of a fair share of local aid from a district. *Abbott v. Burke,* 164 *N.J.* 84, 86 [751 *A.*2d 1032] (2000) (*Abbott VII* ). The Court unequivocally confirmed "the State is required to fund all the costs of necessary facilities remediation and construction in Abbott districts." *Id.* at 88 [751 *A.*2d 1032]. Furthermore, it noted districts may apply to be designated as Abbott districts and, alternatively, if a district no longer possesses the requisite characteristics of an Abbott district, then the State may take appropriate actions with respect to that district. *Id.* at 89–90 [751 *A.*2d 1032].

In 2002, plaintiffs brought their second motion in aid of litigants' rights since *Abbott V,* alleging the Commissioner failed to comply with the Court's instructions in *Abbott V* and *Abbott VI,* and requested relief regarding pre-school programs in the Abbott districts, including appointing a Judge of the Superior Court to adjudicate any anticipated disputes. *Abbott v. Burke,* 170 *N.J.* 537, 540 [790 *A.*2d 842] (2002) (*Abbott VIII* ). To ensure the pre-school program in the Abbott districts and the budget proposals were reviewed, and final dispositions issued in time for the upcoming school year, the Court set forth a schedule for decision-making by the Appellate Division and by the Executive Branch. *Id.* at 540–41 [790 *A.*2d 842]. Furthermore, having previously found the

administrative process adequate for addressing Abbott matters, the Court declined to appoint a Standing Master. *Id.* at 541 [790 A.2d 842]. Finally, the Court emphasized they were

> acutely aware of the constitutional imperative that undergirds the *Abbott* decisions, and of the vulnerability of our children in the face of Legislative and Executive Branch inaction. But we do not run school systems. Under our form of government, that task is left to those with the training and authority to do what needs to be done. Only when no other remedy remains should the courts consider the exercise of day-to-day control over the Abbott reform effort.

*Id.* at 562 [790 A.2d 842].

In the same year, the Court considered a motion filed by the Attorney General on behalf of the Department of Education (DOE), with the consent of Education Law Center (ELC), for a one-year relaxation of remedies for K–12 programs for the upcoming school year due to the State's budget crisis. *Abbott v. Burke,* 172 *N.J.* 294 [798 *A.*2d 602] (2002) (*Abbott IX* ).

Thereafter, in 2003, the Court ordered mediation between the parties before the Honorable Philip S. Carchman, J.A.D., in response to the State's motion and the plaintiffs' cross-motion to modify the decision in *Abbott V. Abbott v. Burke,* 177 *N.J.* 578 [832 A.2d 891] (2003) (*Abbott X* ). Following mediation, the Court entered an order approving the parties' mediation agreement pursuant to which the State would continue to implement whole-school reform in Abbott elementary schools with certain limited exceptions. *Id.* at 584 [832 *A.*2d 891]. It was further ordered the remaining issue, whether to extend the one-year cessation of funding previously granted in *Abbott IX* for an additional year, would be addressed and oral argument conducted. *Id.* at 589 [832 *A.*2d 891].

Following oral argument, the Court granted the relief requested by the State by giving authority to the DOE to treat the upcoming 2003–2004 fiscal year as a maintenance year for purposes of calculating the additional aid for the Abbott districts and by providing the K–12 programs for that year are to continue, subject to the conditions set forth by the Court. *Abbott v. Burke,* 177 *N.J.* 596, 598 [832 *A.*2d 906] (*Abbott XI* ).

In 2004, the Court granted the DOE's application for a limited relaxation of the deadline for the pre-school teacher certification requirement mandated by *Abbott VI, supra,* 163 *N.J.* 95 [748 *A.*2d 82]. *Abbott v. Burke,* 180 *N.J.* 444 [852 *A.*2d 185] (2004) (*Abbott XII* ).

On November 1, 2004, upon the DOE's application to modify certain provisions of the *Abbott X* order, *supra,* 177 *N.J.* 578 [832 *A.*2d 891], the Supreme Court entered an order directing the parties to mediate the issue and appointed the Honorable Richard J. Williams, J.A.D., as Special Master to preside over the mediation. *Abbott v. Burke,* 182 *N.J.* 153 [862 *A.*2d 538] (2004) (*Abbott XIII* ).

On December 19, 2005, the Supreme Court granted, in part, the plaintiffs' motion for relief in aid of litigants' rights alleging violations of the mandate in *Abbott V, supra,* 153 *N.J.* 480 [710 *A.*2d 450], and *Abbott VII, supra,* 164 *N.J.* 84 [751 *A.*2d 1032], concerning funding for school construction in Abbott districts. *Abbott v. Burke,* 185 *N.J.* 612 [889 *A.*2d 1063] (2005) (*Abbott XIV* ).

In 2006, the Attorney General, on behalf of the DOE, filed an application with the Court requesting authorization to require the Abbott Districts to submit budget requests consonant with the funding provided for in the upcoming 2007 budget and for funding to the Abbott districts to remain "flat" at 2006 level due to the fiscal crisis facing the State of New Jersey. *Abbott v. Burke,* 187 *N.J.* 191, 194 [901 *A.*2d 299] (2006) (*Abbott XV* ). The Court granted the request for a funding freeze in Abbott Districts for the 2007 fiscal year. *Id.* at 195 [901 *A.*2d 299]. Subsequently, on May 22, 2006, sixteen intervenor districts sought clarification of *Abbott XV. Abbott v. Burke,* 196 *N.J.* 348 (2006) (*Abbott XVI* ). In response, the Supreme Court set budget timelines and required funding for new and renovated facilities for the 2007 fiscal year. *Ibid.*

In 2007, the Supreme Court considered plaintiffs' motion in aid of litigants' rights which sought an order directing defendants to

comply with the Court's mandates in *Abbott V, supra,* 153 *N.J.* 480 [710 *A.*2d 450], *Abbott VII, supra,* 164 *N.J.* 84 [751 *A.*2d 1032], and *Abbott XIV, supra,* 185 *N.J.* 612 [889 *A.*2d 1063], for the then upcoming 2008 fiscal budget. The Court denied the same on the grounds the relief sought was premature as the State's budget had not yet been enacted and defendants had not yet failed to comply. *Abbott v. Burke,* 193 *N.J.* 34, 35 [935 *A.*2d 1152] (2007) (*Abbott XVII* ).

Following the matter chronologically, in January 2008, the Legislature passed, and the Governor signed into law, a new school funding formula entitled the School Funding Reform Act of 2008 (SFRA), *L.* 2007, *c.* 260. Plaintiffs then again moved for an order in aid of litigants' rights seeking compliance with the Court's previous decisions in *Abbott V, supra,* 153 *N.J.* 480 [710 *A.*2d 450], *Abbott VII, supra,* 164 *N.J.* 84 [751 *A.*2d 1032], and *Abbott XIV, supra,* 185 *N.J.* 612 [889 *A.*2d 1063], mandating necessary funding for construction and repair of educational facilities in the Abbott districts. *Abbott v. Burke,* 196 *N.J.* 451, 451–52 [956 *A.*2d 923] (2008) (*Abbott XVIII* ). In February 2008, the Court denied plaintiffs' motion as premature given the State's representation legislation was pending to finance school construction in the Abbott districts. *Id.* at 452 [956 *A.*2d 923].

In January 2008, the State filed a motion seeking to declare SFRA constitutionally sound and declaring the Court's prior remedial orders concerning the Abbott districts unnecessary. *Abbott v. Burke,* 196 *N.J.* 544, 549 [960 *A.*2d 360] (2008) (*Abbott XIX* ). Plaintiffs, through the ELC, opposed the motion, filed a cross-motion which sought to preserve the "status quo" and to declare the remedial orders continued to apply. *Ibid.* The Court, after having heard oral argument, concluded it was unable to resolve the issue of SFRA's constitutionality solely based upon opposing affidavits. *Id.* at 565 [960 *A.*2d 360]. Accordingly, by way of a decision and order, both dated November 18, 2008, the Court remanded the matter to this court sitting as Special Master to conduct a plenary hearing to develop an evidential record which

would address whether SFRA represented an equitable and constitutional funding approach "that can ensure Abbott districts have sufficient resources to enable them to provide a thorough and efficient education as defined by the [Core Curriculum Content Standards]." *Id.* at 568–69 [960 *A.2d* 360].

On remand, this court, after weeks of examination and cross-examination of expert testimony and numerous witnesses concluded SFRA passed constitutional muster. This court further recommended supplemental funding should continue to the Abbott districts during the three-year "look-back" period as SFRA's immediate and practical effects could not be known at the time. *Abbott v. Burke,* 199 *N.J.* 140, 172–73 [971 *A.2d* 989] (2009) (*Abbott XX*). Following submission of the Special Master's Report, *see* App. to *Abbott XX* at 175–250 [971 *A.2d* 989], the Supreme Court accepted the Special Master's findings, while rejecting the recommendation for supplemental funding during the "look-back" period, *id.* at 170 [971 *A.2d* 989], and issued its decision which found SFRA constitutional "premised on the expectation that the State will continue to provide school funding aid during this and the next two years at the levels required by SFRA's formula each year." *Id.* at 146 [971 *A.2d* 989].

Specifically, the Court found the SFRA formula would remain constitutional provided the required funding was forthcoming. *Id.* at 169 [971 *A.2d* 989]. Furthermore, it noted while there is "no absolute guarantee that SFRA will achieve the results desired by all .... [t]he political branches of the government are entitled to take reasonable steps, even if the outcome cannot be assured, to address the pressing social, economic, and educational challenges confronting our State." *Id.* at 175 [971 *A.2d* 989]. The State of New Jersey "should not be locked into a constitutional straightjacket." *Ibid.*

### III. *Remand*

Shortly after its finding of constitutionality, SFRA was back on the Court's calendar following passage of the FY 2011 Appropria-

tions Act, which reduced SFRA funding. In response to the underfunding, the ELC, on behalf of plaintiffs, moved for an order in aid of litigants' rights challenging the defendants' execution of its duties under SFRA as defined in *Abbott XX, supra,* 199 *N.J.* 140 [971 *A.*2d 989]. Remand Order I at 2. The Court, noting "SFRA's funding formula was constitutional, on its face, having been predicated on the express assumption that SFRA would be fully funded and adjusted as its terms prescribed," *id.* at 4 (citing *Abbott XX, supra,* 196 [199] *N.J.* at 170 [971 *A.*2d 989] ), found the record before it was insufficient to determine "whether school funding through SFRA, at the current underfunded levels, can provide a constitutional and thorough education for New Jersey school children." *Id.* at 4–5.

By way of Remand Order I, dated January 13, 2011, the Supreme Court remanded the matter to this court to sit as its Special Master (the fifth in the long history of this litigation), and to create the appropriate record. *Id.* at ¶ 1. Remand Order I limited the Special Master's findings to considering "whether school funding through SFRA, at current levels, can provide for the constitutionally mandated thorough and efficient education" for the State's school children, and the basis for the record was to be the level of funding provided in the current school year. *Id.* at ¶¶ 2–3. The Court further ordered the defendants must bear the burden of showing SFRA's current levels of funding can provide for a constitutionally mandated education as defined by the CCCS "in districts with high, medium, and low concentrations of disadvantaged students." [10] *Id.* at ¶ 4. The Court also held that the State could not make the showing solely by demonstrating the relative comparison of funding among the districts. *Id.* at ¶ 5. Finally, unlike the previous remand which specified no deadlines,

[10] Disadvantaged or "at-risk" students will be referenced herein as those eligible for free or reduced-price lunch. *Abbott XX, supra,* 199 *N.J.* at 152 [971 *A.*2d 989]; *see also* D–125 at 12.

the order directed the Special Master to issue his report no later than March 31, 2011. *Id.* at ¶ 6.

Following the remand, this court held case management conferences on January 18 and January 21, 2011, during which the parties were advised the language of the order appeared to preclude consideration of the State's fiscal situation during the remand proceedings. Subsequently, on January 25, 2011, the Office of the Attorney General of New Jersey, on behalf of the State, filed a motion with the Supreme Court seeking clarification of the Court's January 13, 2011 order, to permit the Special Master to consider the State's fiscal situation and to expand the dates established in the Court's order to allow for additional discovery. *See generally,* Dfs.' Br. to Clarify, Jan. 25, 2011.

In support of its motion to clarify, the State argued

[i]n enacting the Fiscal Year 2011 Appropriations Act, the Legislature confronted the perfect storm of declining revenues in each of the State's major taxes and a persistent and substantial structural deficit. To forestall consideration of that reality by the Special Master in the fulfillment of its charge is to divorce constitutional analysis under Article VIII, § 4, ¶ 1 from both the pertinent facts, as well as other, co-equal constitutional provisions.

Dfs.' Br. to Clarify 6.

The State further asserted the fiscal crisis was relevant to the Special Master's consideration as the State's financial situation was "casually related to the current level of educational funding." *Id.* at 7. If the order was left unclarified, then the Special Master's considerations would be reduced to dollar figures in a formula without due weight to context. *Ibid.* Finally, the State submitted there are dual constitutional considerations relevant to this matter. *Id.* at 8. The Constitution directs the Legislature to provide for a thorough and efficient education, *N.J. Const.,* art. III, § IV, ¶ 1, and it also provides the Legislature with the sole and exclusive authority to appropriate funds (i.e., "balance the budget"), *N.J. Const.,* art. VIII, § II, ¶ 2. *Ibid.*

In response to the State's motion to clarify, the ELC, on behalf of the plaintiffs, asserted the State's argument was essentially the

same as that presented before the Supreme Court in opposition to the plaintiffs' motion in aid of litigants' right. Plfs.' Br. in Opp. to Clarify 1–2. Specifically, plaintiffs argued the issue requiring development of a factual record does not require the Special Master to consider the impact of the State's fiscal situation as the same was already reviewed by the Court in considering the plaintiffs' motion in aid of litigant's rights. *Id.* at 2. The plaintiffs similarly opposed the State's request to extend the dates established in the remand order arguing the State provided no information concerning the presentation of its case before the Special Master which would necessitate extra time. *Id.* at 3.

On February 1, 2011, the Supreme Court executed an order denying the State's motion for clarification and extension of time on the remand proceedings. Remand Order 3, Feb. 1, 2011 (Remand Order II). By way of the same order, the Court "retained for its future consideration the question of what effect, if any, the State's fiscal condition may have on plaintiffs' entitlement to relief." *Id.* at 2–3. The Court noted "the Special Master is authorized to entertain any and all evidence as he sees fit in the proper completion of his assigned task." *Id.* at 3.

### IV. *The Burden on the State*

Remand Order I directed the State must bear the burden of demonstrating the current level of school funding through SFRA can provide for an efficient and thorough education as measured by the CCCS in districts with "high, medium, and low" concentrations of disadvantaged students. Remand Order I ¶ 4. It did not, however, specify the standard of proof by which the State must carry its burden, thereby implying the applicable standard is to be determined by this court, at least in the first instance.

In the previous remand, this court, similarly faced with a lack of an express standard from the Supreme Court, looked to prior *Abbott* decisions as a starting point for its analysis. *Abbott XX, supra,* 199 *N.J.* at 237 [971 *A.*2d 989] (citing *Abbott XIX, supra,* 196 *N.J.* at 551 [960 *A.*2d 360] ). Finding the *Abbott XIX* decision

specifically noted the "convincing" standard employed in *Abbott IV,* the court found reference to that standard, by a Court well versed in evidentiary standards, was significant. *Id.* at 237–38 [971 *A.*2d 989] (citing *Abbott XIX, supra,* 196 *N.J.* at 562 [960 *A.*2d 360] ).

The issue concerning the proper standard of proof arises again. The New Jersey Rules of Evidence set forth three potential standards for the burden of persuasion: (1) by a preponderance of the evidence, (2) by clear and convincing evidence, (3) or beyond a reasonable doubt. *See N.J.R.E.* 101(b)(1). The first two standards are applied in civil cases, and "beyond a reasonable doubt" is usually reserved for criminal cases. *See Liberty Mut. Ins. Co. v. Land,* 186 *N.J.* 163, 169–70 [892 *A.*2d 1240] (2006).

Generally, in civil actions, the preponderance standard applies. *Ibid.* This standard requires a litigant to establish a desired inference is more probable than not. *Ibid.* The preponderance standard is considered adequate when the claim being advanced is "not one, which is either unusually subject to deception or disfavored by the law." *State v. Sheppard,* 197 *N.J.Super.* 411, 440–41 [484 *A.*2d 1330] (Law Div.1984). "Application of the preponderance standard reflects a societal judgment that both parties should 'share the risk of error in roughly equal fashion.'" *Liberty Mut. Ins. Co., supra,* 186 *N.J.* at 169 [892 *A.*2d 1240] (quoting *Addington v. Texas,* 441 *U.S.* 418, 423 [99 *S.Ct.* 1804, 60 *L.Ed.*2d 323] (1979)). To apply any other standard, "expresses a preference for one side's interests." *Ibid.* (quoting *Herman & MacLean v. Huddleston,* 459 *U.S.* 375, 390 [103 *S.Ct.* 683, 74 *L.Ed.*2d 548] (1983)).

The clear and convincing standard, also applied in civil cases, requires a showing greater than preponderance but less than beyond a reasonable doubt. *Liberty Mut. Ins. Co., supra,* 186 *N.J.* at 169 [892 *A.*2d 1240]. For this standard, the trier of fact should have "a firm belief or conviction as to the truth of the allegations sought to be established." *Ibid.* (quoting *In re Pur-*

*razzella,* 134 *N.J.* 228, 240 [633 *A.*2d 507] (1993)). The clear and convincing standard is required "when the threatened loss resulting from civil proceedings is comparable to the consequences of a criminal proceeding in the sense that it takes away liberty or permanently deprives individuals of interests that are clearly fundamental or significant to personal welfare." *In re Polk License Revocation,* 90 *N.J.* at 560, 563 [449 *A.*2d 7] (1982). In addition, the clear and convincing standard is compelled where "proof by a lower standard will not generate confidence in the ultimate factual determination," *id.* at 568 [449 *A.*2d 7], or where "the evidentiary matters are intrinsically complex or prone to abuse." *Liberty Mut. Ins. Co., supra,* 186 *N.J.* at 170 [892 *A.*2d 1240].

The State asserts, in the absence of any express directive, a preponderance of the evidence standard is generally applicable to civil proceedings. Dfs.' Burden Br. 1, Jan. 28, 2011. While acknowledging the "convincing" standard used by this court in the previous remand, the State posits the present remand order contains nothing to allow a departure from the preponderance standard. *Id.* at 2. Absent any directive from the Supreme Court that a standard higher than preponderance should be employed, the well-established burden of proof for these types of cases should apply. *Id.* at 3–4.

Conversely, the plaintiffs argue the standard of proof should be clear and convincing, or in the alternative, the standard should be higher than preponderance of the evidence. Plfs.' Burden Br. 2, Jan. 28, 2011. Plaintiffs submit the clear and convincing standard is compelled in civil litigation involving the deprivation of an interest that is either "clearly fundamental or significant to personal welfare." *Id.* at 3 (citing *In re Polk License Revocation,* 90 *N.J.* 550, 563 [449 *A.*2d 7] (1982)). The plaintiffs understandably assert the right to a thorough and efficient education is a fundamental right under the New Jersey Constitution, and, as such, the proceeding goes beyond a standard civil litigation involving, for example, a pecuniary loss. Plfs.' Burden Br. at 4. Alternatively,

plaintiffs argue a standard higher than preponderance should be utilized, even if the clear and convincing standard is deemed inapplicable, based on the standard employed previously by the Supreme Court in the *Abbott* proceedings. *Id.* at 6. Specifically, the plaintiffs assert pursuant to the law of the case doctrine, this court should follow the standard previously employed in *Abbott II, supra,* 119 *N.J.* 287, 377 [575 *A.*2d 359] (stating Court "would not strip all notions of equal and adequate funding from constitutional obligation unless we were convinced that the State was clearly right"), *Abbott IV, supra,* 149 *N.J.* at 196 [693 *A.*2d 417] (finding replacement of parity remedy required State to "convincingly demonstrate" adequate funding), and *Abbott XIX, supra,* 196 *N.J.* at 562 [960 *A.*2d 360] (referencing standard employed by *Abbott IV* Court). Plfs.' Burden Br. at 7 & 9. Finally, plaintiffs submit the burden on the State to demonstrate SFRA's constitutionality was higher than a preponderance, and as such, the burden to prove SFRA's constitutionality when underfunded should be no less. *Id.* at 8. Accordingly, plaintiffs contend, the burden on the State should be the "convincing" standard previously utilized by this court. *Id.* at 8–9.

Canvassing all prior *Abbott* decisions does not reflect utilization by the Court of a preponderance standard. *See Abbott II, supra,* 119 *N.J.* at 377 [575 *A.*2d 359] ("[W]hile we are unable to conclude from this record that the State is clearly wrong, we would not strip all notions of equal and adequate funding from the constitutional obligation unless we were *convinced* that the State was clearly right." (emphasis added)); *id.* at 386–87 [575 *A.*2d 359] ("The record *convinces* us of a failure of a thorough and efficient education only in the poorer urban districts." (emphasis added)); *Abbott IV, supra,* 149 *N.J.* at 196 [693 *A.*2d 417] (concluding parity remedy may be "obsolete" if State "convincingly demonstrated" it could provide thorough and efficient education at less than parity); *Abbott V, supra,* 153 *N.J.* at 507 [710 *A.*2d 450] (noting Court "convinced" pre-school would significantly benefit school children in Abbott districts); *Abbott VI, supra,* 163 *N.J.* at 101 [748 *A.*2d

82] (finding Court "convinced" DOE failed to implement pre-school program in accordance with *Abbott V* mandate); *Abbott XIX, supra,* 196 *N.J.* at 562 [960 *A.*2d 360] (reiterating alternate funding remedy could be implemented if State showed "convincingly" constitutional education can be met with funding lower than parity); *Abbott XX, supra,* 199 *N.J.* [at] 147 [971 *A.*2d 989] ("[R]ecord before us *convincingly* demonstrates that SFRA is designed to provide school districts in this State, including the Abbott school districts, with adequate resources to provide the necessary educational programs consistent with state standards." (emphasis added)); *id.* at 163–64 [971 *A.*2d 989] ("We have been explicit in our insistence that if the State could *convincingly* demonstrate that a substantive thorough and efficient education can be achieved, Court-imposed remedies would no longer be necessary." (emphasis added)). Using the foregoing as a guide, the prior standard utilized and the compelling interests to be addressed, this court will adopt the "convincing" standard for these proceedings.[11]

### V. *Motion in Limine*

On February 7, 2011, plaintiffs' counsel submitted a motion in limine seeking to bar the State's introduction of testimonial evidence in the remand proceedings of the State Treasurer, Andrew P. Sidamon–Eristoff, of the Budget Manager, Mary Byrne, and of the Assistant Commissioner of the Division of Student Services, Barbara Gantwerk, on the grounds such evidence was beyond the scope of the remand orders. Plfs.' N.O.M. in Limine, Feb. 7, 2011. Specifically, counsel asserted evidence of the State's fiscal condition and evidence concerning allocation of federal funding to the school districts is outside the scope of the remand for several reasons. Plfs.' Br. in Supp., Feb. 7, 2011.

---

11 As will be detailed hereinafter, the result would have been no different had the burden been by a preponderance.

First, plaintiffs' counsel argued the Court, by denying the State's motion to expand Remand Order I, "expressly limited" the Special Master's evidentiary considerations to "his assigned task" and, as a result, Remand Order II could not be interpreted as authorizing consideration of the State's economic conditions. *Id.* at 6. Counsel asserted the "assigned task" was to determine whether current funding levels under SFRA can provide New Jersey school children with an education meeting the CCCS. *Ibid.* Second, counsel submitted the Court retained the issue of economic effects for itself instead of remanding this question for development of a factual record. *Id.* at 7. Third, plaintiffs' counsel urged evidence of federal funding allocations was inapposite to the remand orders, which were limited to considering the sufficiency of funding solely through the SFRA formula and not additional "outside" funding. *Id.* at 8–9. Finally, counsel argued the "testimony" of the three witnesses was already before the Supreme Court for consideration on the retained issue of fiscal conditions, and as such, further testimony would be duplicative and beyond the scope of the remand issue. *Id.* at 7 & 9.

The State's counsel, in turn, argued consideration of the State's fiscal situation and the allocation of federal funds for educational spending was critical to the Special Master's, and, ultimately, the Supreme Court's determinations concerning the constitutionality of SFRA funding. Dfs.' Br. in Opp. at 1–2, Feb. 9, 2011. Counsel asserted the economic recession compelled the State to make adjustments to SFRA funding by way of the Appropriations Act and the manner in which funds were allocated, by way of these adjustments, was significant in determining whether the same was constitutional. *Id.* at 8. Counsel submitted the proposition the Special Master was, in essence, being asked "to determine whether a statute (in this case the Appropriations Act) providing State school aid is unconstitutional because it violates the thorough and efficient clause of the New Jersey Constitution." *Ibid.* Counsel further urged a finding of unconstitutionality could be made only if the modified formula "create[ed] or support[ed] gross disparities

between poor urban districts and wealthy suburban districts" as gross disparity was the only factual situation whereby the Supreme Court had previously rendered its determination of unconstitutionality. *Id.* at 9 (citing *Abbott IV, supra,* 149 *N.J.* at 191 [693 *A.*2d 417]; *Abbott III, supra,* 136 *N.J.* at 447 [643 *A.*2d 575]; and *Abbott II, supra,* 119 *N.J.* at 334 [575 *A.*2d 359]). Exclusion of this information would leave the Supreme Court without a complete factual record upon which to make its ultimate determination. *Id.* at 10.

The State's counsel objected to the plaintiffs' reading of the Remand Order II order as precluding the Special Master from considering evidence of fiscal conditions, arguing the additional language, authorizing the entertainment of "any and all" evidence, should be read as providing the Special Master with discretion concerning what evidence to consider in creating a complete record for the Court. *Ibid.* Counsel further urged this court to exercise its discretion in permitting the introduction of fiscal evidence for its full consideration, and, thereby, avoid drawing conclusions on facts taken out of their relevant context. *Id.* at 11. Moreover, the State asserted the exclusion of fiscal conditions from testimony would prejudice the State by depriving it of a reasonable opportunity to present an explanation underlying the school funding scheme for 2011, especially given the State's inability to develop additional empirical evidence as a result of the remand's time frames. *Id.* at 11–12. Specifically, the State's counsel argued the current remand, requiring a determination of the constitutionality of an act as applied to all districts and not just Abbott districts, was akin to the remand which took place in the 1980's in *Abbott II,* when the ALJ issued his report three years after his appointment as Special Master. *Id.* at 12. In turn, inclusion of the evidence would not prejudice the plaintiffs given the court's inherent discretion to afford varying weight to the evidence presented. *Id.* at 15.

Finally, the State's counsel urged the court to reject the plaintiffs' contention the remand order's language precludes evidence

of federal funding, which is a significant aspect of school districts' budgets. *Id.* at 16. Furthermore, testimonial evidence from Assistant Commissioner Gantwerk concerning the effects of federal funding would concern the amounts of federal funds available to all school districts, unlike the certification submitted to the Supreme Court regarding distribution of federal funds to Abbott districts, and, as a result, such testimony would not be repetitive. *Id.* at 17–18.

Finding the Supreme Court reposed solely to itself the issue of economic realities and whether these realities should impact upon the required levels of SFRA funding, and further finding such issues were not before this court, the evidence was permitted solely to avoid further delays as the Court was obviously concerned about the FY 12 budget in establishing its remand time limit, and subsequent briefing schedule. Rather than have motions for a further remand or augmentation of the record, this court decided to permit the evidence subject to the Court's limitations, only for purposes of completeness of record and not for the Master's consideration.

## VI. *Definition of High, Medium and Low Concentrations of "At–Risk" Pupils*

The remand directed this court to determine whether the current level of funding can provide for a thorough and efficient education in districts with high, medium, and low concentrations of disadvantaged or at-risk students. However, the Court had not specified the definition of high, medium and low concentration. Plaintiffs and defendants' agreed to define the concentrations as follows: a high concentration district has greater than forty percent of at-risk students, a medium concentration district has twenty to forty percent, and a low concentration district has less than twenty percent. Plfs.' Pre–Trial Br. 11–12, Feb. 10, 2011; Dfs.' Pre–Trial Br. 22, Feb. 10, 2011. This court accepted counsels' definition.

## VII. *New Jersey Education and Funding Data*

Currently, New Jersey has 581 school districts, of which 31 are former Abbott districts. Stip. ¶ 97. Of the total districts, 114 have a greater than forty percent concentration of at-risk pupils, 142 have twenty to forty percent concentrations, and 352 have less than twenty percent. *See* D–106.

The State has 1,366,271 students; 282,417 of them reside in the former Abbott districts. Stip. ¶ 98. In other words, 79.33% of the student population resides outside of former Abbott districts in comparison to 20.67% residing within. *Ibid.* On average, the length of a school day in New Jersey across all grade levels is 6 hours and 30 minutes. Stip. ¶ 164. Of this time, generally, less than 6 hours are dedicated to instruction. *Ibid.* Teachers' salaries and benefits are 55% of total comparative expenditures, and administrative salaries and benefits are 8% of the total comparative expenditures. *Ibid.* In New Jersey, the student to administrator ratio, the number of students per administrator, is 275:1. *Ibid.*

The total amount of K–12 State aid allocated to all districts in FY 10 was $7,930,342,303, and the total amount of K–12 State aid allocated in FY 11 was $6,848,783,991.[12] Stip. ¶¶ 101–02. The resulting difference was $1,081,558,312, or a 13.6% reduction from FY 10 funding levels. D–109 at 12.

The composition of the State's school districts is wildly disparate. Districts vary in geographic size; age, size, and location of its school buildings; number of students enrolled and percentage of at risk, Limited English Proficiency (LEP), and special needs students; wealth as delineated by DFGs; security concerns and transportation needs; involvement and nature of the families and

---

[12] Both FY 10 and FY 11 State aid included Equalization Aid, Education Adequacy Aid, Special Education Categorical Aid, Transportation Aid, Choice Aid, Security Aid, and Adjustment Aid, and excluded Preschool Education Aid and Adult Education Aid. Stip. ¶¶ 99–100.

extended families of the students, etc. This significant diversity among districts has only added to the complexity of understanding and attempting to create a fair funding formula.

## VIII. *The State Aid Reductions*

The substantive intricacies of the SFRA formula were examined in full, first in the Master's report to the Court and thereafter in *Abbott XX.* 199 *N.J.* 140 [971 *A.*2d 989]. The basic principle underlying the formula, though, is there is an acceptable method for determining the level of spending required to provide a student, accounting for his or her educational needs, a thorough and efficient education as mandated by the State Constitution. The FY 2011 Appropriations Act modified the established funding formula for the current fiscal year and set forth a method of determining and allocating the reductions to State aid funding.[13] Stip. ¶ 51. The modifications to the funding of the SFRA formula were effectuated by way of the Appropriations Act, were to apply only to FY 11, and were not permanent amendments to the original SFRA statute. Wyns, 13 T 23:20–25:23.[14] Significantly, there was a difference of $1.601 billion between full SFRA funding, pursuant to the parameters for K–12 State formula aid in *N.J.S.A.* 18A:7F–43 et seq., and the modified K–12 State formula aid provided through the FY 11 Appropriations Act. Stip. ¶ 65. If the formula had been funded according to the original SFRA parameters, the districts would receive $8.451 billion in State aid, however, the modifications pursuant to the FY 11 Appropriations

---

[13] For clarity, the modifications to the SFRA formula pursuant to the Appropriations Act will be referred to as the "modified SFRA formula" and the initially enacted formula will be referred to as the "original SFRA formula."

[14] The trial transcript is cited by indicating the witness or colloquy, followed by the transcript volume number and the page and line cites. Each reporting session has a volume number starting with the morning on day one (1 T), then the afternoon on day one (2 T), the morning on day two (3 T), and so on for the remainder of the hearing.

Act resulted in an allocation of $6.849 billion in State aid, which was a 19% reduction from the fully funded original SFRA formula. D–124 at 19. Of the total allocated State formula aid in FY 11, the former Abbott districts received $3.933 billion or 57.4%. Stip. ¶ 118.

The reduction to State formula aid for FY 11 was the product of several steps. First, the FY 11 Appropriations Act modified three factors in the SFRA formula: the Consumer Price Index (CPI), the State aid growth limits, and the allocation of Educational Adequacy Aid. Stip. ¶ 51. Specifically, the CPI was set to zero, the State aid growth limits were set to zero for all districts, and each district's allocation of Educational Adequacy Aid funding was held at the 2009–2010 level. Stip. ¶¶ 53–56. Under the original SFRA formula parameters, the CPI would be 1.6, the State aid growth limits would cap the aid increases for districts spending under adequacy at 20% and for districts spending over adequacy at 10%, Dehmer, 7 T 105:4–106:3; *see also N.J.S.A.* 18A:7F–47(d), and Educational Adequacy Aid was designed to bring the former Abbott districts meeting certain criteria, which were spending below adequacy, up to adequacy within three years of SFRA's implementation through a combination of increased local levy and additional State aid. *Abbott XX, supra,* 199 *N.J.* at 229 [971 *A.*2d 989]; Dfs.' Post–Trial Br. ¶ 21, Mar. 14, 2011 (citing *N.J.S.A.* 18A:7F–58(b)). As a result, the modified version reduced the total State aid by way of the modified formula by $520,276,732. Wyns, 13 T 63:18–64:12; D–120 at 11. In other words, it reduced the sum of Equalization Aid, Educational Adequacy Aid, Security Aid, Adjustment Aid, School Choice Aid, Special Education Categorical Aid and Transportation Aid, which would have otherwise been provided pursuant to the original formula. Stip. ¶ 57. The modified SFRA formula was then "run" for each district, or calculated with the above modifications, and a dollar allocation figure was determined for each of the districts. Wyns, 13 T 37:8–11.

Second, for each district, a reduction amount was calculated equal to the lesser of either (a) the amount equal to 4.994% of the

district's adopted 2009–2010 general fund budget, or (b) the sum of the district's initial 2010–2011 allocation of State aid pursuant to the modified formula. Stip. ¶ 57. Third, the reduction amount calculated from (a) or (b) in step two, whichever was less, was then subtracted from the figure derived from the modified SFRA formula in step one. *Ibid.* The resulting dollar figure is the actual dollar allocation to the district for the 2010–2011 school year. Wyns, 13 T 37:12–18.

By limiting the reductions of State aid to no greater than 4.994% of each district's 2009–2010 general fund budget, which included both State and local resources but excluded federal aid, the State attempted to treat districts equitably and not disadvantage those most reliant on State aid. *See* Summations, 15 T 37:2–5; Plfs.' Post–Trial Br. ¶¶ 50–51, Mar. 14, 2011. In other words, in an effort to impose the reductions equitably, districts which relied more heavily on State aid and districts which supported their school budgets primarily through local resources experienced aid reductions of less than 5% from their 2009–2010 general fund budget. Stip. ¶ 57. By allocating reductions in this manner, the districts with the highest concentrations of at-risk students had the smallest percent reductions of State aid in comparison to other districts which received significantly less State aid and thus had substantially higher percent reductions in State aid. Dfs.' Post–Trial Br. ¶ 396; *see also* D–94.

The total reduction of 4.994% from all of the districts' 2009–2010 general fund budgets was equal to $1.081 billion. Wyns, 13 T 45:5–10; Dehmer, 8 T 39:10–18. The reduction of $1.081 billion is also the difference between the K–12 State aid received in FY 10 and FY 11, a 13.6% reduction. D–109 at 11. The sum of the reductions resulting from the modification to the SFRA formula, $520 million, and the sum of the reductions of 4.994% from each district's general fund, $1.081 billion, resulted in the $1.601 billion underfunding of the original SFRA formula in FY 11. Wyns, 13 T 64:16–21.

The fourth step required determining the methodology for allocating the reduction amount, from the lesser of (a) or (b) from step two above, among the various statutory categories of SFRA aid. Wyns, 13 T 38:7–16. Specifically, "[t]o determine the level of appropriation for each line item of formula aid in the FY 2011 Appropriations Act, the Commissioner was authorized to establish a hierarchy of the formula aid categories" in the SFRA formula among which the reduction amount from step two would then be allocated. Stip. ¶ 60. The funds allocated to districts through the formula aid line items included in the hierarchy were unrestricted general fund revenue, and reductions in these formula aid categories did not affect the manner in which the districts could then budget or expend the allocated funds. Stip. ¶¶ 63–64.

The established hierarchy reduced each district's State aid in the following order: (1) Adjustment Aid, (2) Transportation Aid, (3) Security Aid, (4) Equalization Aid, and (5) Special Education Categorical Aid. Stip. ¶ 61. This "pecking order" required reducing the first category to zero before carrying over any reduction amount left to the subsequent category, and so on, until the reduction amount was fully exhausted. If the reduction amount was exhausted by applying it to the first category only, then the remaining aid categories were left intact. As a result, each line item for formula aid in the State budget was reduced by the sum of the aid reductions in each category of all districts. Stip.¶ 62. Accordingly, the total reductions in each category from the original fully funded SFRA formula for FY 11 were as follows: Adjustment Aid was reduced 38.63%, Transportation Aid was reduced 76.78%, Security Aid was reduced 61.89%, Equalization Aid was reduced 11.05%, and, additionally, Educational Adequacy Aid was reduced by 70.09% and Choice Aid was reduced 0.39%.[15] P–129. Essentially, the hierarchical method was implemented to

---

[15] It should be noted, the stipulations provided the effect on each category of State aid in comparison to FY 10 funding levels, and not to the original SFRA parameters for FY 11. *See* Stip. ¶ 123.

ensure the cuts were spread equitably among all the districts. Wyns, 13 T 42:21–25. If the State had instead chosen to implement overall cuts for only one aid category, such as Equalization Aid, the less affluent districts relying more heavily on that type of aid would have been disproportionately affected as compared to wealthier districts, which may not even receive Equalization Aid under the formula. *Ibid.* While the method employed by the State ensured the poorer districts had lesser State aid reductions, the wealthier districts, whose allocation of State formula aid was less than 4.994% of their 2009–2010 general fund budgets, lost all of their State aid for FY 11. *Id.* at 42:1–12; D–124 at 17–19. Consequently, 59 districts, 43 of which were DFG I or J districts, received no formula aid for FY 2011. Stip. ¶¶ 58–59; D–124 at 17–19.

### IX. *Availability of Federal Funding*

The Master was directed to consider whether the current level of funding, "distributed through the SFRA formula," is adequate to provide a thorough and efficient education to New Jersey students. Remand Order I at ¶ 4. The Court in *Abbott XX* found available federal funds should not be "used as a crutch against some structural failing in the funding scheme itself." 199 *N.J.* at 174 [971 *A.*2d 989]. Access to federal funding was considered by the Court in lieu of providing supplemental aid to districts while contemplating fully funded formula aid during the three year lookback period, and was not envisioned as a funding substitute for State aid.[16] *Ibid.* Presently, though, the State urged the very

---

[16] The State, apparently, had used federal funds to subsidize State aid in FY 10. In FY 10, the State subsidized its State school aid with $1.057 billion of one-time non-recurring State Fiscal Stabilization Funding (SFSF). Stip. ¶ 24. The federal funds, in the amount of $1.3 billion, were allocated to New Jersey as a part of its award under the American Recovery and Reinvestment Act of 2009 (ARRA), and were intended to assist local governments in avoiding reductions in education, as well as other necessary public services. Stip. ¶¶ 21–22. The entire amount allocated to the State was utilized to support education, particularly funding the SFRA formula, and other public services in FY 10. Stip. ¶ 23.

position explicitly rejected by the Court: federal funding must be considered as a supplement to the State's inability to fully fund the SFRA formula. While consideration of federal funding cannot advance the State's burden in this limited remand, for purposes of completeness of record, the various federal funding schemes are briefly summarized. The federal funding streams available can be separated into what has been recurring funding available year to year to supplement State revenues and support programs for at-risk and disabled students, and one-time funding provided for a set period to save and create jobs, and to reform education. Dfs.' Post–Trial Br. ¶¶ 74 & 85.

Title I federal funding is provided annually to districts through the Title I grant programs pursuant to the No Child Left Behind Act of 2001, 20 *U.S.C.* § 6301 et seq. Dfs.' Post–Trial Br. ¶ 74; Stip. ¶ 126. It also includes funding for School Improvement Allocation (SIA). Stip. ¶ 126. Funds through the Title I program are allocated to districts based on poverty levels, and are then allocated among the schools within the districts depending on the "school-level poverty rates" to ensure all children meet State academic standards. Stip. ¶ 127; Dfs.' Post–Trial Br. ¶ 78 (citing 20 *U.S.C.* §§ 6301, 6314, 6315). For FY 11, a total of $290,866,380 in combined Title I and SIA funding was available to New Jersey's school districts, of which $153,379,693, or 52.73%, was available to the former Abbott districts. Stip. ¶¶ 128–29. The Individuals with Disabilities Education Act (IDEA) Part B grants were also provided annually to support special education programs and services to students with disabilities. Stip. ¶ 135; Dfs.' Post–Trial Br. ¶ 83 (citing 20 *U.S.C.* §§ 1400(d) & 1411(a)). In FY 11, $330,936,501 in IDEA funds was available to New Jersey school districts. Stip. ¶ 136. Of this amount, the former Abbott districts received 22.3%, or $76,248,108. Stip. ¶ 137.

One-time stimulus funding was provided to districts pursuant to ARRA, which was enacted to provide additional support to districts with at-risk and special education students. Specifically, ARRA·Title I and SIA monies were available to school districts on

a "reimbursement basis," and were awarded only to eligible districts with at least 5% of their students qualifying for free or reduced-price lunch. Stip. ¶ 130. The purpose of this ARRA federal program was to "save and create jobs and to advance reforms, support programs that are sustainable and support early childhood programs and activities." Stip. ¶ 132. The funds were awarded in 2009 for use in FY 2010 and FY 2011. Stip. ¶ 130. Funds not utilized by the end of the two-year period would be forfeited. Funding available under this program provided $173 million in ARRA Title I and $7 million in ARRA SIA, or a total of $180 million. *Ibid.* Of this amount, $113 million, or 62.77%, was awarded to the former Abbott districts. *Ibid.* As of June 30, 2010, former Abbott districts had a total of $83,231,761 in unused ARRA Title I and SIA funds remaining, or 48.1% of the total. Stip. ¶ 134. In other words, the former Abbott districts have roughly half of the original allocation to use for the remainder of the two-year period.

The former Abbott districts were also provided with ARRA IDEA Basic and Preschool funding in 2009 for use in the subsequent FY 2010 and FY 2011. Stip. ¶ 138. The ARRA IDEA funds were intended to provide districts with monies for improving teaching and learning, as well as achievement results for children with disabilities, ages 3 to 21. Stip. ¶ 139. The total statewide allocation for the two year period was $372 million, of which $86,593,024, or 23.27%, was allocated to the former Abbott districts. Stip. ¶ 138. As of June 30, 2010, the former Abbott districts had a total of $74,762,541 remaining in unused aid. Stip. ¶ 142. Of those districts, 15 had less than a million dollars remaining. *See* D–110.

The last available stream of one-time federal funding programs was the Education Jobs Fund (Ed Jobs), which provides funding to retain, recall and rehire former employees or hire new employees for education related services. Stip. ¶ 143. The purpose of the Ed Jobs funding was to "offset" layoffs in local school districts. Dehmer, 7 T 91:21–92:2. The Ed Jobs funding is available for FY

11 and FY 12, and districts may either use the funding in FY 11 or reserve all or part of it for use in FY 12, however, any unused portion will be forfeited by the end of FY 12. Stip. ¶ 148. The State received a total of $262,742,648 in Ed Jobs fund, of which $138,812,478, or 52.83%, was allocated to former Abbott districts. Stip. ¶ 145; *see also* D–108. While the Ed Jobs funding may be used in FY 11, several superintendent witnesses received instructions from the Commissioner with strong suggestions to reserve the entirety the Ed Jobs funds for use in FY 12. Whitaker, 10 T 21:18–24; Tardalo, 12 T 26:6–14. Specifically, under cover of September 20, 2010, the Commissioner advised district superintendents and boards of education even though significant funding at federal, state and local levels had been made available, "the next budget cycle promises to be challenging" and therefore districts should consider reserving their one-time funding for the subsequent 2011–2012 school year. P–59. Moreover, the Ed Jobs funds were made available to districts sometime in October or November 2010, after the districts had already reduced staff and commenced their school year with previously established schedules. Whitaker, 10 T 22:3–8; Tardalo, 11 T 84:19–85:12.

## X. *The Hearings*

The hearings were held over eight days, during which the plaintiffs and the defendants each presented witnesses comprised of superintendents of various school districts, and factual and expert witnesses who testified concerning the effects the reductions of aid had on the ability to provide students with a thorough and efficient education. Thereafter, post-trial briefs were submitted to the court on March 14, 2011. Preliminarily, though, to fully understand the context in which the reductions were made, it is necessary to briefly summarize both the budget process undertaken by the school districts, the requirements imposed by the CCCS, and the standardized testing process implemented by the State.

### a. *The Budget Process*

Each year the DOE publishes a School Election and Budget Procedures Calendar which sets forth both the statutory budget deadlines pursuant to Title 18A of the New Jersey Statutes, and the statutory election deadlines for the presentation of the school budget to the voters pursuant to Title 19 of the New Jersey Statutes.[17] Stip. ¶ 171. In the ordinary course of a school budget cycle, all school district boards of education must adopt and submit an itemized budget, which provides for a thorough and efficient education, to the Executive County Superintendent (ECS) on or before March 4. *N.J.A.C.* 6A:23A–8.1; *see also N.J.S.A.* 18A:7F–5 & –6.

Prior to the submission of the budget to the ECS, the school district's superintendent will receive several budgets outlining the various needs of the district's schools, transportation needs, facili-

---

[17] The calendar setting the dates for the FY 12 budget process is provided on the DOE's website, available at http://www.state.nj.us/education/finance/fp/dwb/calendar.pdf. Stip. ¶ 171. It should be noted, school districts in New Jersey are classified as either Type I or Type II districts, unless the State by administrative order creates a State-operated district. *N.J.S.A.* 18A:9–1. The same affects the budget process depending on the district's classification and the statutorily imposed deadlines for various budget submissions. Briefly, a Type I school district is "a local school district established in a city, pursuant to *N.J.S.A.* 18A:9–2, where board members are appointed by the municipality, and where the governing body of the municipality issues school bonds for school district capital projects pursuant to *N.J.S.A.* 18A:22–20 and 18A:24–11." *N.J.A.C.* 6A:26–1.2. In each type I district, there is a board of school estimate consisting of two members of the board of education, two members of the governing body of the municipality, and either the mayor or the chief executive officer of the municipality. *N.J.S.A.* 18A:22–1. Type II districts are defined as:

> local school districts established in a municipality other than a city, every consolidated local school district, and every regional school district, pursuant to *N.J.S.A.* 18A:9–3, where board member are elected or appointed by the municipality, as applicable, and where in a school district without a board of school estimate the district board of education issues school bonds for school district capital projects, pursuant to *N.J.S.A.* 18A:24–12.

*N.J.A.C.* 6A:26–1.2.

ties needs, and the like. Kim, 6 T 27:19–25. Generally, the superintendent will review the submitted budgets with the district's business administrator, and other administrative staff, by examining each line item and incorporating staffing projections based on anticipated enrollment. *Id.* at 29:2–15. Thereafter, each school district's board of education will receive the district's proposed budget for review for the upcoming year for review in late January. *Id.* at 52:9–16. According to the testimony of the one superintendent, typically, the Association of Business Administrators will informally receive the preliminary numbers from the DOE, with the understanding those figures are usually the approximate State aid amounts the district will be allocated, which allows for preliminary budget preparation. *Id.* at 55:1–7.

The actual State aid figures are received by the districts on or about the fourth Tuesday in February, at the time the Governor presents the annual budget message to the Legislature for the upcoming fiscal year.[18] Stip. ¶ 172 (citing *N.J.S.A.* 52:27B–20). Within two days of the budget message, the Commissioner of Education ("Commissioner") "must notify each district of the maximum amount of aid payable to the district for the upcoming school year and of the adequacy budget payable to each district for the upcoming year." Stip. ¶ 174 (citing *N.J.S.A.* 18A:7F–5). In the normal course, the district's tentative budget is approved by its board of education in late February, in time for its submis-

---

[18] For further clarity, State aid awards for districts are determined through the Application for State School Aid (ASSA), which is a data collection system used in obtaining the resident and non-resident pupil counts required to calculate the school district's state aid award. Stip. ¶ 185. The ASSA data is uploaded electronically by the school districts to the DOE. Stip. ¶ 186. Districts must report to the DOE the enrollment numbers for their full-time and part-time students in each grade, as well as limited English proficiency, and at-risk students. Stip. ¶ 185. To generate state aid for FY 11, a student needed to be enrolled in a program, meeting for at least 180 days during the school year, by October 15, 2010. *Ibid.* Thereafter, in February, the actual enrollment data is finalized and made available for determining the enrollment projections for the State aid notices provided to districts in late February. Stip. ¶ 186.

sion to the ECS, in the beginning of March. Kim, 6 T, 52:9–25; *see also N.J.S.A.* 18A:7F–5 & –6.

Upon receipt of the itemized budget in early March, the ECS determines whether the proposed budget meets the requirements of a thorough and efficient education, as well as a "checklist" of efficiency standards set by the State. If the requirements are met, then the ECS approves the budget. Kim, 6 T 53:10–16. The tentative budget is then returned to the district board of education by the ECS about one week later. *Ibid.* If the ECS approves the budget, the board of education may continue to discuss it until final submission. *Id.* at 53:21–24. If it is not approved, the district then has to make adjustments, with the board of education's input, and the budget will need to be again forwarded to the ECS for approval. This approval and discussion process takes place throughout March. *Id.* at 54:3–5. At the end of the month, the district is required to submit its final itemized budget to the ECS, who has to approve it before it can be placed on the ballot for public consideration. *Ibid.* Using a specific software program developed by the Commissioner, the proposed budgets are transmitted to the ECS in the format required by the DOE, along with supporting documents. *See* Plfs.' Letter Memo. 1–2, Feb. 17, 2011 (citing *N.J.S.A.* 18A:7F–5(c); *N.J.A.C.* 6A:23–8.1(b)). Apparently, a district cannot file a proposed budget without a signed transmittal letter on the specific form designated by the DOE.[19] *Id.* at 2. The letter of transmittal, or school district budget statement signed by a district superintendent and the board of education's secretary, is required, as an administrative practice, to be submitted with the budget for review to the ECS. *See* Dfs.' Letter Memo.

---

[19] It should be noted, earlier in the hearings counsel ambiguously referred to the letter of transmittal as a "certification," thereby leading to confusion as to whether the document was a sworn statement as opposed to a "certification" in the non-legal sense of the word. Kim, 6 T 71:1–72:13. Clearly, the transmittal letter and form is not a "certification" as the legal term is understood; that is swearing to its contents.

1, Feb. 16, 2011; *see also* D–26. Without the signed letter of transmittal, the ECS cannot accept the proposed budget from the district, and as a result the budget cannot be placed on the ballot for voter's consideration.

For the FY 11 budget cycle, the Governor's budget message was delivered on March 16, 2010. Stip. ¶ 173 (citing *P.L.* 2009, *c.* 269). Consequently, the Commissioner had to adjust the dates in the school budget calendar to conform to the State aid notification date which follows the budget message. Stip. ¶ 175 (citing *N.J.S.A.* 18A:7F–5c). Districts seeking a waiver to increase the adjusted tax levy by more than the allowable amount, *N.J.S.A.* 18A:7F–39, had been required to submit a preliminary budget to the ECS no later than February 25, 2010 for the upcoming school year. Stip. ¶ 176. As revised, but by no later than March 22, 2010, all districts, except those under "state intervention," [20] were to submit their final itemized budgets to the ECS. Stip. ¶ 177. Once the ECS approved the final budget, the district could no longer make adjustments to it. Kim, 6 T 54:14–16. Consequentially, as the final budget had to be submitted by the end of March, in preparing the FY 11 budget, the districts were under significant time constraints to restructure their budgets, which took several months to create,[21] and to do so in less than a week. *Id.* at 64:2–21.

---

[20] A school district may be found to require state intervention pursuant to the factors listed in *N.J.A.C.* 6A:30–6.2. Two of the three factors which could lead to state intervention are failure to develop or failure to implement an "NJQSAC district improvement plan," as will be discussed hereinafter. *Ibid.* School districts under "state intervention" had to submit their itemized budgets by March 22, 2010 to the Commissioner, instead of the ECS. Stip. ¶ 177.

[21] The Montgomery superintendent testified the budget took about seven months to put together and the district had approximately three working days to restructure it to accommodate the state aid cuts. Kim, 6 T 97:15–98:1. The testimony of several superintendents suggested the reductions were considerably deeper than had been anticipated.

Following approval of the budget by the ECS, advertisements of the budget statement are made and public notice for hearings on the school district's budget is provided, which are then held between the end of March and beginning of April.[22] Stip. ¶ 178. Within 48 hours of the public hearings, the school districts are required to post on their websites a "user-friendly" plain language budget summary. Stip. ¶ 179 (citing *N.J.A.C.* 6A:23A–8.1(c)). The school elections, held on the third Tuesday of April each year, took place on April 20, 2010 to vote on the FY 11 budget. Stip. ¶ 181 (citing *N.J.S.A.* 19:60–1). Conversely, for those districts whose budgets are not submitted to voters,[23] as well as those districts under "state intervention," the last date for the adoption of a tax certificate establishing the local levy to be collected in support of the proposed budget was April 8, 2010 for the FY 11 budget cycle. Stip. ¶ 180 (citing *N.J.S.A.* 18A:22–14, –26, & 18A:7A–52).

Within two days of certifying the school election results, the boards of education for all school districts with voter-approved budgets are required to certify to the County Board of Taxation the tax levy amount to be raised for the upcoming school year. Stip. ¶ 182 (citing *N.J.S.A.* 18A:22–33). Alternatively, within the same two days of certifying the school election results, if the budget is defeated by the voters, the district's board of education has to deliver the defeated budget to the governing body. Stip. ¶ 182 (citing *N.J.S.A.* 18A:22–37; *N.J.S.A.* 18A:12–17). The governing body then has until a statutory deadline, for the FY 11 cycle it was May 19, 2010, to consult with the board of education to

[22] For FY 11, the public hearings were held between March 26 and April 3, 2010. Stip. ¶ 178.

[23] In school districts where the budget is not submitted to voters, the district's board of education instead delivers the final itemized budget to each member of the "board of school estimate," *N.J.S.A.* 18A:22–7, which then, by official action at a public meeting, adopts the budget and certifies to the BOE and the governing body the amount of local funds to be appropriated for use of the public schools. *N.J.S.A.* 18A:22–14, –26, & 18A:7A–52.

determine and certify to the County Board of Taxation the tax levy amount to be raised. Stip. ¶ 183 (citing *N.J.S.A.* 18A:22–37 & *N.J.S.A.* 18A:12–17).

Within ten business days after the certification of the general fund tax levy by the governing body, for districts where budgets were defeated either by vote or by the board of school estimate, the district's board of education may submit an application to the Commissioner to restore any budget reductions made. Stip. ¶ 184. Accordingly, the Commissioner has the authority to restore any reductions which would either negatively affect the ability of the district to provide a thorough and efficient education or affect "the stability of the district given the need for long term planning and budgeting." *Ibid.* Several superintendents testified such requests would be looked upon with disfavor.

If the governing bodies fail to certify a levy amount, the budget is then submitted to the Commissioner for review and determination of the tax levy. *See* D–25 at ¶ 31. Prior to review, the Commissioner may solicit assistance from the ECS to make recommendations for reductions to the budget. *Ibid.* The Commissioner then adopts a budget and certifies a tax levy amount for the district. *Ibid.* Based upon the Commissioner's adopted budget, the district is directed to make appropriations and reductions in its budget accordingly. *Id.* at ¶ 32.

### b. *The Core Curriculum Content Standards and the Testing Process*

The remand requires a determination whether school funding through SFRA, at the current FY 11 levels, can provide for a thorough and efficient education for New Jersey school children. The Court had found previously the CCCS provide the necessary content to deliver the level of education mandated by the New Jersey Constitution. *Abbott IV, supra,* 149 *N.J.* at 168 [693 *A.*2d 417].

The CCCS accepted by the Supreme Court in *Abbott IV* initially contained seven academic content areas, which have since expand-

ed to nine: (1) visual and performing arts, (2) comprehensive health and physical education, (3) language-arts literacy, (4) mathematics, (5) science, (6) social studies, and (7) world languages, and, additionally, (8) technology, and (9) 21st century life and careers. *See* P–4–12; *N.J.A.C.* 6A:8–1.1. Generally, each of the nine content standards contain both a broad vision statement of the skills and knowledge to be obtained and a more specific break down of the standards students should achieve by each grade level. For example, according to the CCCS in mathematics, by the end of second grade, students should develop a proficiency in basic addition and subtraction.[24] P–7. The CCCS must be revised every five years. *See N.J.A.C.* 6A:8–2.1. The CCCS were revised in 2004, in 2008 the CCCS were revised for language arts and math, and were revised again in 2009. *Ibid.* The 2009 revisions are scheduled to be implemented beginning in the 2011–2012 school year and in the 2012–2013 school year. *See* P–64. For purposes of the remand, this court was directed to review whether the current levels of funding allow all districts to provide a constitutional education as measured by the 2004 and 2008 standards, not the 2009 standards which have not yet been implemented in the schools. Counsel so agreed. Tardalo, 11 T 97:1–98:20. While the 2009 standards are of little moment to this remand, it should be noted, the preparation for implementation of the new CCCS is ongoing in the districts this year. As such, allotted funds have been and are being utilized to meet this obligation.

In addition to providing instruction in the nine content areas, school districts are required to provide an appropriate education to all students with disabilities pursuant to IDEA, 20 *U.S.C.*

---

[24] It should be noted, plaintiffs' exhibit, P–7, provides the first six pages of the CCCS for mathematics, which is forty-seven pages long. The description of the content standards found on the pages not specifically provided by counsel was referenced herein for purposes of completeness, and the remaining pages are available on the DOE website at https://www13.state.nj.us/NJCCCS/Worldclass standards.aspx.

§ 1400 et seq.; *N.J.A.C.* 6A:14, to provide all English language learners with instructional services pursuant to *N.J.A.C.* 6A:15, and to provide all gifted and talented students with appropriate instructional service pursuant to *N.J.A.C.* 6A:3.1. *N.J.A.C.* 6A:13–2.1. Furthermore, school districts are required to provide "library-media services" in each school building under the direction of a "certified school library media specialist," and with access to appropriate books, computers, and district approved instructional software. *Ibid.*

The CCCS apply to all students enrolled in the public elementary and secondary school programs in New Jersey. *See N.J.A.C.* 6A:8–1.2(a). Furthermore, all district boards of education are responsible for aligning their district's curriculum and instructional methodologies to assist all students in achieving the CCCS, as well as to prepare all students for employment or postsecondary study upon their graduation. *See N.J.A.C.* 6A:8–1.2(c).

To ensure all students[25] receive the education guaranteed to them by the New Jersey Constitution, the rules promulgated pursuant to SFRA direct all districts to provide students with a curriculum based on the CCCS, which "relies on the use of State assessments to improve instruction." P-2; *see also N.J.A.C.* 6A:13–1.1. To measure student progress in meeting the CCCS, statewide assessments, or standardized tests, are administered at grade 3–8 and 11–12. *See N.J.A.C.* 6A:8–1.2(d). Each school and school district is required "to analyze student assessments of student progress in relation to curricular benchmarks and the results of State and non-State year end tests." P-2; *see also N.J.A.C.* 6A:13–2.1(d)(4).

---

[25] "All students" is defined as "every student enrolled in public elementary, secondary, and adult high school education programs within the State of New Jersey, including general education students, students with disabilities, and English language learners (ELLs)." *N.J.A.C.* 6A:8–1.3. English language learners are the same students who are sometimes referred to as limited English proficient (LEP). *Ibid.*

The State administers the New Jersey Assessment of Skills and Knowledge (NJ ASK) in mathematics and language arts literacy to students in grades 3 through 8, and, additionally, in science to students in grades 4 and 8. Stip. ¶¶ 153–55; *see also N.J.A.C.* 6A:8–4.1. The High School Proficiency Assessment (HSPA) is administered to all first-time eleventh graders, retained eleventh-graders, twelfth graders and retained twelfth graders in language arts literacy and mathematics. Stip. ¶ 159; *see also N.J.A.C.* 6A:8–4.1. The Alternative High School Assessment (AHSA) is administered to those twelfth graders who repeatedly failed the HSPA in one or both content areas. Lastly, students are required to take "end of course" exams in Biology and Algebra I, upon completion of those courses.[26] Stip. ¶ 152. The other content areas of the CCCS are not tested by way of statewide assessments. P–13.

The schedule for all upcoming State assessments for the current school year is set forth annually by the Commissioner.[27] Stip. ¶ 152. Generally, all the NJ ASK tests are administered in May. Stip. ¶ 161. Testing for HSPA occurs in March for all first-time eleventh graders, retained eleventh-graders, twelfth graders and retained twelfth graders, and, additionally, make-up testing is scheduled for October for all retained eleventh graders, twelfth graders, and retained twelfth graders. Stip. ¶¶ 157 & 159. The AHSA is administered during several testing windows in January,

---

[26] The "end of course" exam in biology is required to be taken by all New Jersey public high school students regardless of high school grade level, who were enrolled in a first-year biology course at any time during the 2010–2011 school year. The "end of course" exam in Algebra I must be taken by all New Jersey public school students, regardless of grade level, who were enrolled in such a course within the 2010–2011 school year. Stip. ¶ 152 (citing Statewide Assessment Schedule for 2010–2011 School Year, N.J. DEPARTMENT OF EDUCATION (2010), http://www.state.nj.us/education/assessment/schedule1011.pdf).

[27] The assessment schedule for the 2010–2011 school year was provided by the Commissioner on April 12, 2010, and is available at http://www.state.nj.us/education/assessment/schedule1011.pdf. Stip. ¶ 152.

April, and July. The results of all spring assessments are available publicly in the following month of January, and thereafter reported in the New Jersey School Report Card publication in February. Stip. ¶ 161.[28] Accordingly, the tests measuring student progress for the 2010–2011 school year are scheduled to be administered in May 2011, and the results will not be available publicly until January 2012. *Ibid.* As such, these test results are not available for this report when addressing the question presented.

The standardized tests are intended to measure whether or not a student is meeting the CCCS. Erlichson, 3 T 42:20–25. A student is considered to have met the CCCS in the tested subject if he or she demonstrates "proficiency" on the exam. *Ibid.* To demonstrate proficiency, or to "pass" the exam, a student must attain a scaled score of at least 200. *Ibid.* Scaled scores are derived from a student's raw score, which is the number of items answered correctly on the exam. Erlichson, 4 T 31:2–8. Accordingly, a student who attains a scaled score of 199 or less is deemed not to have demonstrated proficiency, and is considered not to have met the CCCS. *Id.* at 33:16–17.

The rules, based on the CCCS, provide specific requirements for districts with high concentrations of poverty which fall below a certain level on proficiency tests, or "high need" school districts. A "high need" school district is defined as one having a forty percent or greater concentration of "at-risk" students, and the district is at one or more of the enumerated proficiency levels for State assessments. P–2 at 9; *see also N.J.A.C.* 6A:13–3.3(a). The applicable statutory proficiency levels are as follows:

1. Less than 85% of total students have achieved proficiency in language arts literacy on the NJ ASK 3;

---

[28] The New Jersey Report Card, available on the DOE website, presents school data for each public school in the State concerning the school environment, student information, student performance indicators, staff information and district financial data, and compares such data to the State average. Stip. ¶ 162. The Report Card also includes the average class size for grades K–12 in the State. Stip. ¶ 165.

2. Less than 80% of total students have achieved proficiency in language arts literacy on the NJ ASK 8;

3. Less than 80% of total students have achieved proficiency in language arts literacy on the HSPA;

4. Less than 85% of total students have achieved proficiency in mathematics on the NJ ASK 4;

5. Less than 80% of total students have achieved proficiency in mathematics on the NJ ASK 8; and/or

6. Less than 80% of total students have achieved proficiency in mathematics on the high school State assessment.

School districts deemed "high need" are required to implement statutorily designated programs for language arts literacy, mathematics, or both, for a minimum of three years. P–2 at 10; *see also N.J.A.C.* 6A:13–3.3(b). By way of example, districts where less than 85% of the students achieved proficiency on NJ ASK 3 in language arts are required to provide an "intensive literacy program for preschool to grade three to ensure that all students achieve proficiency on the State standards." P–2 at 10; *see also N.J.A.C.* 6A:13–3.4(a). The requirements of the intensive literacy program include an emphasis on small group instruction, at least a ninety-minute uninterrupted language arts literacy block which may then include direct instruction or guided reading, and professional development for teachers in elements of intensive early literacy, to name a few. *Ibid.* Similarly, those districts achieving less than 85% proficiency in NJ ASK 4 in mathematics, are required to implement a comprehensive program for grades three and four, including "[e]xplicit mathematics instruction for struggling students," differentiated instruction, and methods to involve parent and family members in student learning. P–2 at 13–14; *see also N.J.A.C.* 6A:13–3.5(b).

One area of concern identified by the State's witness is the lack of a uniform standard within the State to determine whether a district is meeting or exceeding the CCCS. Erlichson, 3 T 50:13–19. In other words, there is no standard similar to the 200 point "pass" score, which would require a district to have a certain percentage of its students pass in order to be considered meeting the CCCS. The assessments currently used by the State are either

the statewide benchmarks under No Child Left Behind or the yearly progress towards those benchmarks. *Ibid.* The lack of a uniform method to determine whether a district is meeting the CCCS is problematic, as this remand requires determining whether a thorough and efficient education can be delivered as measured by the CCCS, not by No Child Left Behind or any other standards.

The DOE is required to review, at each grade level in which statewide assessments are administered, the performance of schools and school districts, using a percent of students performing at the proficiency levels as one measure of yearly progress, and using the "Adequate Yearly Progress Targets." [29] *See* P–13; *see also N.J.A.C.* 6A:8–4.4. Individual school performance is reviewed annually by the DOE, in accordance with the New Jersey Single Accountability Continuum (QSAC) Act, by evaluating the school's performance on standardized tests as it relates to achieving the CCCS according to the criteria specified in the Adequate Yearly Progress Targets. *Ibid.* In other words, the school is evaluated on its proximity to meeting the yearly progress benchmarks.

The school district's progress is evaluated and monitored according to the QSAC Act. Specifically, the QSAC Act was established:

> For the purpose of evaluating the thoroughness and efficiency of all the public schools of the State, the commissioner, with the approval of the State board and after review by the Joint Committee on the Public Schools, shall develop and administer the New Jersey Quality Single Accountability Continuum for evaluating the performance of each school district. The goal of the New Jersey Quality Single Accountability Continuum shall be to ensure that all districts are operating at a high level of performance. The system shall be based on an assessment of the

---

[29] Adequate Yearly Progress Targets are benchmark goals for proficiency levels for the statewide assessments within a grade level, which should be achieved by a certain year. *See* P–13; *see also N.J.A.C.* 6A:8–Appendix. For example, for the math statewide test administered to grades 3, 4 & 5, between the years 2011–2013, 86% should be proficient. *Ibid.* The target for 2014 for all tested grade levels for both subjects is to reach 100% proficiency. *Ibid.*

degree to which the thoroughness and efficiency standards established pursuant to section 4 of *P.L.* 2007, *c.* 260 (C.18A:7F47) are being achieved and an evaluation of school district capacity in the following five key components of school district effectiveness: instruction and program; personnel; fiscal management; operations; and governance. A school district's capacity and effectiveness shall be determined using quality performance indicators comprised of standards for each of the five key components of school district effectiveness. The quality performance indicators shall take into consideration a school district's performance over time, to the extent feasible. Based on a district's compliance with the indicators, the commissioner shall assess district capacity and effectiveness and place the district on a performance continuum that will determine the type and level of oversight and technical assistance and support the district receives.

*N.J.S.A.* 18A:7A–10.

The QSAC Act requires the DOE to "evaluate and monitor public school districts' performance and capacity in five key components of school district effectiveness" as follows: (1) instruction and program; (2) personnel; (3) fiscal management; (4) operations; and (5) governance. *N.J.A.C.* 6A:30–2.1. Every three years, the Commissioner conducts a comprehensive review of each school district. *See N.J.A.C.* 6A:30–3.1. Within the intervening years between the review periods for each district, the Commissioner may determine there are conditions significantly and negatively impacting the district's educational programs or operations, and as a result, the Commissioner may direct an immediate comprehensive review of the district. *Ibid.* Furthermore, an immediate comprehensive review may be ordered for districts designated as "District in Need of Improvement" pursuant to the No Child Left Behind Act, 20 *U.S.C.* §§ 6301 et seq., and, as a result, these districts are subject to corrective action pursuant to Federal law.[30] *See N.J.A.C.* 6A:30–3.4.

The comprehensive review, occurring every three years, requires each district to complete a self-assessed District Performance Review. *See N.J.A.C.* 6A:30–3.2. Subsequently, the District

---

[30] While this court was directed to determine whether a thorough and efficient education is being provided as measured by the CCCS, for completeness of record and to explain the State's process in making progress assessments, the federal standards are referenced.

Performance Review is submitted to the ECS for evaluation and issuance of a recommendation to the Commissioner for the district's placement on the "performance continuum." *N.J.A.C.* 6A:30–3.3. The Commissioner makes the final determination for the district's placement on the continuum. *Ibid.* Placement on the continuum depends on the district's reported percentage of "weighted quality performance indicators satisfied by the public school district in each of the five key components of school district effectiveness." *N.J.A.C.* 6A:30–4.1. A district which satisfies between 80–100% of the weighted quality performance indicators in each of the five key components of district effectiveness is deemed a "high performing school district." *Ibid.* A school district accumulating less than 80% in any one of the key components will be required to initiate improvement activities including the implementation of a QSAC improvement plan. *See N.J.A.C.* 6A:30–5.2. Failure to submit an improvement plan may result in withholding of State aid pursuant to *N.J.S.A.* 18A:55–2, or, if necessary, State intervention within the district. *See N.J.A.C.* 6A:30–5.5; *N.J.A.C.* 6A:30–6.1.

### c. *State's Case*

Essentially, and more importantly, paradoxically, the State's case in its distilled form apparently sought to prove and/or urge the following:

1. There was insufficient time to marshal the necessary proofs;
2. There is an insufficient relationship between funding and student performance;
3. There are various efficiencies which could be accomplished in each district;
4. The State's fiscal distress and the concomitant decrease in funding must be considered, especially as the decrease in funding was done in a manner to least affect the most disadvantaged;
5. Federal funds need necessarily be considered; and
6. The existence of surplus and the districts' failure to utilize the same.[31]

---

[31] During summations and in their post-trial submissions, the State apparently wished to he heard for the proposition the surplus monies could be used and should have been used by the districts in FY 11, as will be described hereinafter. *See* Summations, 15 T 31:4–12; Dfs.' Post–Trial Br. ¶¶ 70–73.

On February 24, 2011, the court, having heard testimony from all of the State's witnesses, advised the State's counsel of what it understood to be the State's primary arguments, and provided counsel the opportunity to respond to the same if the court overlooked a constituent element. *See* Colloquy, 11 T 4:19–6:2. Nothing was forthcoming thereafter. Having received no objection or further clarification from the State, it is concluded the court properly understood the main tenets of State's position. Of these positions, only the position regarding efficiencies (# 3, above), and use of surplus funds (# 6, above) were relevant to the limited remand before the court. Accordingly, the State's position, whether by necessity or choice, mandates the result referenced hereinafter. Of even greater import, the argument premised upon insufficient relationships between funding and performance runs in direct contravention of the accepted principles of the SFRA formula.[32] To suggest, even if correctly, there is an insufficient correlation between expenditures and performance defies the underlying pillar of SFRA, and is beyond the purview of this Master.

In an attempt to meet its burden, the State offered seven witnesses. Of these seven, four were superintendents of school districts, each from districts with varying socioeconomic characteristics. Apparently, they were offered to demonstrate the possible efficiencies available to districts, as well as avoidable inefficiencies.

---

[32] The remand did not direct or permit this court to consider the infirmities, if any, of the SFRA formula, nor to comment on whether modification may be warranted. Counsel were advised, repeatedly, the limited remand directed the court to find and make recommendations solely concerning whether a thorough and efficient education, as measured by the CCCS, can be delivered under current funding levels in light of the State's contention there was a less than five percent funding reduction. This court, while mindful of the State's position before the Supreme Court, both initially and in its petition to augment the remand, urged the parties to nonetheless direct their efforts to presenting the proofs necessary to address the limited issue presented. Furthermore, the court's comments regarding the possible inappropriateness of the arguments given the scope of this remand in no way suggested the same arguments would not be proper before the Supreme Court or, even possibly, in another forum. *See* Colloquy, 5 T 4:15–12:9.

One expert and one witness were offered to opine on the insufficiency of a correlation between increased spending and improved student performance, and, lastly, a fact witness from the DOE, Division of Finance, was offered to quantify and clarify the aid reductions.

### i. Testimony of Educators/Superintendents

To further the position various efficiencies could be achieved within each district, the State called four district superintendents to demonstrate possible savings and/or revenue generating possibilities. The superintendents appeared to be capable, hardworking and dedicated educators committed to the goal all of their students should meet or exceed the CCCS. The educators seemed to be genuinely motivated to provide the highest level educational experience to the students in their respective districts, given existing funding levels, while recognizing there need necessarily be some limit on educational funding. Their collective commitment to attempt to ensure all students meet the CCCS was clear. Their district's ability to do so with current level of funding was far less certain.

Specifically, the State called Robert L. Copeland ("Copeland"), superintendent of Piscataway Township school district, Dr. John A. Crowe ("Crowe"), superintendent of the Woodbridge school district, Dr. Harry Victor Gilson ("Gilson"), superintendent of the Bridgeton school district, and lastly, and Earl Kim ("Kim"), superintendent of the Montgomery Township (now consolidated with Rocky Hills) school district. The presented districts had significantly different characteristics, including their DFG designations, the percentages of "at-risk" students within each district, and differences in the reductions of State formula aid allocated to the districts. All of the districts presented were funded "under adequacy levels."

The Piscataway Township school district, located in Middlesex County, is designated as a DFG "GH" district. Copeland, 1 T 22:12–17. There are 7,163 students attending school in the dis-

trict, with 27.35% of those students classified as "at-risk," D–106 at 7, and one hundred in-district "special needs" students.[33] Copeland, 1 T 27:22–25. The district has four elementary schools grades K–5 and two intermediate schools for grades 4–5 with approximately 3,400 students in total, three middle schools with approximately 1,500 students, and one high school with approximately 2,300 students. The graduation rate is approximately 95%. *Id.* at 58:1–2. The district was supposed to receive $20,163,169 in FY 11 State aid pursuant to the original SFRA formula, and received $11,974,697 under the modified formula, an $8,188,472 difference or a 40.6% reduction. *See* D–124 at 12. Woodbridge school district, also located in Middlesex County, is designated a DFG "DE" district. Crowe, 2 T 32:9. There are 13,205 students in the district, with 30.2% of the students classified as "at-risk," D–106 at 6, five percent limited English proficiency, and eleven percent receiving special education services. Crowe, 2 T 98:19–99:6. Within the district, there are sixteen elementary schools, five middle schools and three high schools. *Id.* at 31:25–32:1. Pursuant to the original SFRA formula, the district would have received $31,730,539 of State aid in FY 11, and received $17,655,042 under the modified funding formula, which is a difference of $14,075,497 or a 44.4% reduction. *See* D–124 at 13. Both Piscataway and Woodbridge represent districts with medium, or 20% to 40% concentrations of at-risk student populations.

---

[33] In-district means special needs students who live in the district and are educated within the district. Copeland, 1 T 28:4–8. Copeland testified a "special needs" student was one who has an Individualized Educational Program (IEP), and any child who is classified by a child study team would be deemed "special needs" or "special education." Copeland, 1 T 27:15–19. The statutory definition of IEP is a plan written for "students with disabilities developed at a meeting according to *N.J.A.C.* 6A:14–2.3 that sets forth present levels of performance, measurable annual goals, and short-term objectives or benchmarks, and describes an integrated, sequential program of individually designed instructional activities and related services necessary to achieve the stated goals and objectives." *N.J.A.C.* 6A:8–1.3.

Conversely, the City of Bridgeton school district, located in Cumberland County, is a former Abbott district, is designated a DFG "A" district, and even within the other A districts, recent census data demonstrated it is the "first or second poorest community" in the State. Gilson, 4 T 119:16–20. There are 4,764 students in the district, of which 89.3% are "at-risk." *See* D–106 at 1. Bridgeton has six elementary schools for grades K–8 and one high school. *Id.* at 54:22–55:4. The district relies on State aid for ninety percent of its funds. *Id.* at 56:20–22. Pursuant to the original SFRA formula, Bridgeton was supposed to receive $74,143,755 in State aid, and received $60,823,033 under the modified funding formula, a difference of $13,320,722 or an 18% reduction. *See* D–124 at 5. On the other hand, the Montgomery school district, located in Somerset County, is designated a DFG "J" district.[34] Kim, 6 T 9:18–19. The district has 5,122 students, of which 2.52% are classified as "at-risk," D–106 at 16, sixty students are classified as limited English proficiency, and 10–12% are classified as special education students. *Id.* at 10:1–11:2. Montgomery has five schools: one elementary pre–K–2 school with about 900 students, one school for grades 3 and 4 with about 750–800 students, one school for grades 5 and 6 with 800–900 students, one school for grades 7 and 8 with about 900 students and one high school with about 1,700 students. *Id.* at 11:3–25. For FY 11, Montgomery/Rocky Hill was supposed to receive $6,479,374 pursuant to the original SFRA formula, and received $1,871,805 under the modified funding formula, which was $4,607,568 less, or a 71.1% reduction. *See* D–124 at 14. Bridgeton represents a former Abbott district with a high concentration of at-risk students, more than forty percent, while Montgomery represents a district with a low a concentration or less than twenty percent at-risk students.

---

[34] It should be noted, the Montgomery district was consolidated with the Rocky Hills district by order of the executive county administrator in FY 10. Kim, 6 T 39:18–22.

Interestingly, despite the aforementioned districts having such varying characteristics, each was under adequacy for FY 11.[35] *See* Summations, 15 T 43:16–19. Piscataway, Woodbridge, Bridgeton and Montgomery were under adequacy by $13,716,574, $16,135,701, $12,609,520 and $4,882,959, respectively. *See* P–126 at 1–2. The district witnesses called by the plaintiffs from Clifton and Buena regional school districts, discussed hereinafter, were also under adequacy by $29,441,368 and $2,991,727, respectively. *Ibid.* The State sought to urge, even for those districts under adequacy, the current level of funding would be sufficient to provide a thorough and efficient education given careful fiscal planning which would maximize efficiency.[36] Summations, 15 T 47:4–12. Essentially, the State asserted despite the diligent efforts of the superintendents to effectuate various efficiencies, as will be discussed hereinafter, and their attempts to minimize the effects on instruction, there could, nonetheless, have been other areas where further cuts could have been made. *Id.* at 46:17–19; *see also* Dfs.' Post–Trial Br. ¶ 298 (urging instead of reinstating sports teams district should have hired academic support instructors, but failed to quantify cost of team reinstatement). Presumably, the State's position is, the Court, having approved a formula that provided each district a certain amount of monies, did not mandate following the formula in spending the allocated fund monies. *Abbott XX, supra,* 199 *N.J.* at 147 [971 *A.2d* 989]; *see also* Stip. ¶¶ 63–64. As a result, each district has the discretion to determine how to best utilize the funds allotted to it by the formula. *Ibid.* Furthermore, the State asserted it consistently maintained the position "SFRA exceeds the requirements necessary to provide the CCCS to the students in each districts" and had implemented a formula which was more generous with State

[35] To determine whether a district is over or under adequacy, the DOE compares the sum of a district's adequacy budget plus Special Education Categorical Aid and Security Aid to the district's spending in the current year. *See* Dfs.' Post–Trial Br. ¶ 18; *see also* Wyns, 13 T 79:8–81:8.

[36] Ms. Kaplen, in her closing statement offered on behalf of the State urged there is "plenty of money in the system." Summations, 15 T 29:16–17.

aid than necessary to obtain the requisite education. Dfs.' Post–Trial Br. ¶¶ 13–15 (citing *Abbott XX, supra,* 199 *N.J.* at 164 [971 *A.*2d 989] ).

To that effect, the State sought to elicit testimony from the district witnesses regarding cost-saving or revenue generating measures implemented by the districts. Without delineating the testimony of each district witness as to the specific efficiencies each district employed, all of the districts sought to reduce costs by reducing staff deemed nonessential that had no direct effects on instruction, restructured their transportation services, shared services with neighboring districts to reduce costs, implemented special education programs to increase out of district enrollment to increase tuition revenue, and outsourced substitute staff or instructional support staff, as well as other services, such as cafeteria cleaning. The savings achieved from these ventures varied from district to district.

Specifically, and by way of example, Copeland testified concerning the various efficiency initiatives the Piscataway school district implemented in an effort to reduce costs or generate revenue for use in FY 11. The primary cost saving mechanism was by way of "sharing services" with the surrounding school districts. Copeland, 1 T 32:16–22; *see also* D–2 at 3. Piscataway created over $300,000 in revenue for each of two previous years by providing transportation services to the smaller districts surrounding Piscataway, *id.* at 33:20–34:5; D–2 at 3, increased tuition revenue earned from fees paid by the sending districts by fifty percent by opening up its in-district special education program, *id.* at 35:7–15; D–2 at 3, and created $60,000 in savings by participating in a pooled cash management program whereby the districts came together to pool their resources as one depository and, as a result, were able to obtain better interest rates than other cash management funds.[37]

---

[37] The twelve participants in the cash management pool are the Boards of Education of Highland Park, Middlesex, North Brunswick, Piscataway, South

*Id.* at 38: 9–17. In addition to shared services, the district implemented plans to increase the energy efficiency of its facilities, such as by replacing outmoded windows with energy-efficient ones.[38] *Id.* at 40:5–17. For these projects, the district applied for and obtained grants of $147,000 from the DOE and is awaiting receipt of funds from the New Jersey Board of Public Utilities (NJBPU) in the amount of $46,000. *Id.* at 41:4–9. Furthermore, the district utilized outsourcing services for substitute employees, paraprofessionals and lunchroom cleaning services. Copeland noted the district contracted with a private provider of substitute teachers, aides and secretaries, thereby eliminating the district's need to oversee any aspects of substitute hiring. *Id.* at 60:20–61:8. Further outsourcing by the district included paraprofessionals, or teacher aides and assistants, who primarily worked with kindergarten and special education students. *Id.* at 60:25–62:1. Lastly, the district outsourced its cafeteria cleaning services to a food services company hired by the district. *Id.* at 62:20–63:1. Projected savings in the budget from outsourcing services totaled $707,790. *See* D–2 at 8.

The districts' attempts to implement efficiency are praiseworthy and commendable, and possibly could amount to significant savings. However, without quantification of the savings achieved or to be achieved by all districts for the FY 11 year, it is impossible to find, based on anecdotal evidence alone, these efficiencies would significantly impact the effectuated reductions. One factor which makes educational funding problematic, and elusive, is the wide disparity between districts, whether by population, demographics, wealth, geography, and/or the like. While it may be possible for

---

Plainfield, Spotswood, Woodbridge, Edison, Watchung Hills, Somerset, Milltown, and North Plainfield. *See* D–2 at 3.

[38] The facilities plan was not shared with other districts at the time, although Copeland testified an attempt to do the same will be made. Copeland, 1T 41:20–42:9.

one district to achieve $1 million in savings, for another a $100,000 may not be possible. Without sufficient proofs, any finding concerning the overall amount of savings for "efficiencies" would be mere speculation, and as such, does not advance the State's position in meeting its burden.

In addition to the various efficiencies, the State urged districts had access to excess surplus funds to support their budgets and the districts could have also increased their local tax levies to generate additional revenue. *See* Plfs.' Post–Trial Br. ¶¶ 70–75, 184, 221, 254, 286, 322. Excess surplus is generated when a district's end of fiscal year general fund balance is greater than the two percent of its initial general fund balance, or its "rainy day" funds. Specifically, as a part of their budget process, districts could, and were encouraged to, maintain up to two percent of their undesignated general fund budget as surplus to be used two years in the future, usually, as emergency funds. Wyns, 14 T 64:13–19; *see also N.J.S.A.* 18A:7F–7(a). In other words, districts put away a two percent surplus in 2008–2009 for use in 2010–2011. *Ibid.* Excess surplus is general fund balance in excess of the two percent or $250,000, whichever is greater. Stip. ¶ 150 (citing *N.J.S.A.* 18A:7F–7(a)). District budgets are audited annually at the conclusion of each fiscal year on June 30, and an audit report is thereafter released sometime in November of the same year. Plfs.' Post–Trial Br. ¶ 61 (citing Gilson, 4 T 105:13–24); *see also N.J.S.A.* 18A:7F–7(c). The audit identifies whether a district has excess surplus for the year which just ended, and, if so, the excess surplus is required to be appropriated into the district's budget in the fiscal year following the release of the audit in November, generally, to provide a reduction in the general fund tax levy for the budget year. *See N.J.S.A.* 18A:7F–7(a); *see also* Plfs.' Post–Trial Br. ¶ 63. The State asserted the 2008–2009 year audit determined $430.6 million in excess surplus was available, and in the subsequent 2009–2010 year, the districts had $190.2

million in excess surplus.[39] Dfs.' Post–Trial Br. ¶¶ 70–71; *see also* D–162. The State further urged during the midyear State aid withholding in FY 10, discussed hereinafter, pursuant to which districts had to then seek approval to use their surplus, only $27 million was used towards the FY 10 budget. Dfs.' Post–Trial Br. ¶ 72; D–162. The remaining $400 million was available to support the FY 11 budget. *Ibid.* In addition, districts had $250 million projected as general fund balance at the end of the 2009–2010 school year, or in other words monies not expended during the year, which was appropriated for the 2010–2011 school year. Dfs.' Post–Trial Br. ¶ 72. From these available amounts, the districts used $650 million to support their FY 11 budgets, and, consequently, the State argued, should be taken into account in determining the effects of reductions in State aid on the districts. *See* Summations, 15 T 31:4–12; Dfs.' Post–Trial Br. ¶ 73. The State's argument the excess surplus was available for use, and could have been used in totality to support budgets school districts believed were not enough to provide the CCCS appears unfair and short-sighted. As noted, not all districts had excess surplus funding available to them for use in FY 11. Furthermore, several of the district witnesses testified not all funds were used for the FY 11 budget in order to save all or part of the monies for future years in an effort to plan ahead for the possibilities of greater aid reductions. Understandably the districts are uncertain concerning their future budgetary planning given that the FY 10 formula aid was withheld mid-year, and then FY 11 formula funding was again subject to modifications. To assert the districts were inefficient by not utilizing the totality of all funds available to them, and not planning for future contingencies, especially in such an uncertain time period, is simply inequitable as the districts were attempting to be fiscally responsible concerning future budgeting.

_____

[39] It should be noted, about 211 districts did not have excess surplus following the 2008–2009 audit, and about 285 districts did not have excess surplus following the 2009–2010 audit. *See* D–162.

Utilizing the totality of excess funds available would require the districts to plan only for the current year and ignore the possibility additional funding may be necessary in the future in the event similar reductions to State aid occur.

The State further suggested the districts were not utilizing the permissible tax levy increase of up to four percent to generate additional tax revenue for their budgets. *See* Dfs.' PostTrial Br. ¶ 184 (Montgomery's tax levy increased by 2.3%, not four percent), ¶ 221 (Piscataway increased tax levy two percent for FY 11 instead of four percent, which would generate $1.6 million in additional revenue), ¶ 254 (Woodbridge increased tax levy 3.3% for FY 11 not full four percent which would generate $1 million additional revenue), ¶ 286 (Clifton increased tax levy just over one percent, not full four percent which would generate $3.1 million in revenue), ¶ 322 (Buena increased tax levy less than one percent, but four percent increase would generate $324,000 additional revenue). Districts contribute to their Adequacy Budgets by way of their Local Fair Share (LFS), which is, essentially, the amount a district can raise by way of its local tax levy. *Abbott XX, supra,* 199 *N.J.* at 221 [971 *A.*2d 989]; *see also N.J.S.A.* 18A:7F–52. While a district could raise its tax levy more than its LFS, tax levies are subject to limitations on increases. *See N.J.S.A.* 18A:7F–38. The SFRA does not require any district below adequacy to increase its local levy to bring it up to adequacy. Dfs.' Post–Trial Br. ¶ 25 (citing *N.J.S.A.* 18A:7F–5(d)). Furthermore, a district with a local levy below its LFS may not be at adequacy even with full funding of State aid. Dfs.' Post–Trial Br. ¶ 26. The six districts which participated in the remand hearings were under adequacy and had local tax levies which were either equivalent to or exceeded the minimum tax levy required by SFRA. Plfs.' Post–Trial Br. ¶ 66. Specifically, Piscataway, Woodbridge, Montgomery, Buena Regional and Clifton exceeded their local levies by $13.4 million, $29.8 million, $1.5 million, $979,331, $16.7 million, respectively, and Bridgeton was equivalent to its minimum requirement. *See* P–33 at 2; P–52 at 2; D–33 at 1; P–37 at 2; P–46

at 2; P–16 at 1. Some of the districts proposed higher tax levies in their budgets, however, the proposed levies were defeated by voters and the districts chose to abide by the voter decisions instead of seeking to request restoration of the budget from the Commissioner. Kim, 6 T 40:4–42:2 (testifying Commissioner certified tax levy 3.2% less than proposed following voter defeat of budget); Whitaker, 10 T 40:8–17 (noting district board of education chose to restore confidence of overtaxed population); Tardalo, 11 T 37:3–22 (explaining Clifton board of education and voters rejected budget proposing increase of 1.34% in tax levy); Gilson, 4 T 159:10–160:3 (testifying did not seek waiver of four percent cap as district was impoverished). The districts were not acting inefficiently by not utilizing the allowable tax levy increase in full over the objections of the voters who voiced their decisions by rejecting a proposed levy. The districts, in an effort to maintain the confidence of their residents, understandably, chose to avoid overriding the voters' decision.

Despite the monies the State urged were available to the districts, the superintendents' consistent lament concerning reductions to instructional, support and administrative staff in response to and its effect upon meeting the CCCS was clear. The most significant effects were on the various supplemental support programs, such as reading, summer programs, and "push-in" or "pull-out"[40] services offered by the districts to students identified as struggling, and in need of additional help. These support staff and ancillary programs were offered to help our students in need in an effort to avoid having the student fall further from proficiency. Further reductions in teachers and aides resulted in increased class sizes and even the elimination of certain classes

---

[40] Specifically, based upon some type of assessment, such as the results from a standardized test, academic support staff offered "push-in" services, where the staff would go into the classroom and help the student at his or her desk, and also "pull-out" services, where the staff would take the student to another location for additional help.

required by the CCCS, such as world languages and technology in elementary schools. As a result of the eliminations of the various support programs, teachers, support personnel, and courses, three of the four superintendents opined their districts would not be able to deliver the CCCS to the students for the 2010–2011 school year, and one superintendent believed, although difficult, the district would be able to deliver CCCS to its students this year, although he was gravely concerned for FY 12.

Specifically, Copeland, although admittedly struggling to manage the reductions in a manner least affecting direct instruction to students, testified the current level of funding provided to his district would allow for the delivery of the CCCS to its students "in the most basic way." Copeland, 1 T 85:19–86:5. If the ability to deliver the CCCS under present funding levels was limited to the overwhelming majority of students in the Piscataway district, he opined the district would be able to deliver the standards "this year." *Id.* at 116:16.

Copeland, and Piscataway Township, are used as the first example as he was the only superintendent who testified his district was able to deliver the CCCS with decreased funding for FY 11. Further, this court was impressed with his forthright testimony, and his concerned and knowledgeable posture, particularly as an experienced educator. It should also be noted, however, his district is designated as a DFG "GH" district.

Copeland testified a total of 14 teacher positions were eliminated in grades K–12. The eliminations resulted in some third grade classes increasing from 24–25 students up to 27 students and high school classes increased from mid-twenties up to 31–32 students. Certain reductions affected subject areas required by the CCCS, as discussed above, as a result of the loss of instructors in those areas. Specifically, the district terminated four certified world language teachers who provided direct Spanish language instruction to English speaking students for elementary grades K–3, and, consequently, eliminating the program in those grades. *Id.* at

48:20–24, 49:20–25. In lieu of the language teachers, the district directed regular classroom teachers, who did not necessarily speak Spanish, instruct the students by playing language-teaching DVDs in the classroom. *Id.* at 50:10–19. Currently, direct certified world language instruction is provided in elementary grades four and five, and continues to middle school grades 6–8. *Id.* at 101:15–18. As a result of terminating four practical arts instructors, industrial arts, consumer science and the home economics programs for middle school grades 6–8 were eliminated. *Id.* at 53:4–12. Furthermore, of the two technology instructors responsible for teaching the technology curriculum to intermediate school grades 4–5, one was eliminated, making it difficult for the remaining instructor to get through the curriculum with all of the students. *Id.* at 54:14–18. Reductions were made to media specialists who acted as librarians, in addition to working part-time in the gifted and talented and reading programs. There were also the eliminations of middle school athletics, a summer program for Kindergarten students and a Saturday program.

Despite the reductions in State aid and the eliminations in staffing, Copeland opined the Piscataway district would be able to deliver education which meets the CCCS to the overwhelming majority of students for the current year. *Id.* at 116: 16–19. Understandably, Copeland, a capable educator determined to attempt to have all his students exceed the standards, was troubled the reductions in aid will affect those students who are not meeting the standards and would cause them to fall even further behind. He opined the availability of support services and extra-curricular activities was a crucial aspect of the effort to deliver the CCCS to those students. *Id.* at 117:16–22, 122:3–6. Poignantly, he offered the following:

> I think that there are going to be teachers and students who are going to succeed no matter the hurdle. I don't know if I can give you the kids ... there are some kids who ... were born on third base. They walk in and they're able to do everything they're supposed to do. I have a bunch of kids having a hard time getting out of the dugout. I'm worried about the kids who it doesn't come easy for

and what we're not able to do for them. And I don't know if I can categorize or codify who they are at this point.

*Id.* at 115: 13–23

Comparatively, Kim testified the current budget was not sufficient to provide a thorough and efficient education, as opposed to the prior year's budget, which was adequate. Kim, 6 T 83:4–6. The Montgomery school district had to eliminate eleven teaching positions. The eliminations implemented by the district included academic support teachers who provided a reading recovery program to about 45 students in grades pre-K through 2, first and second grade teachers were eliminated, as well as the termination of two world language teachers, resulting in the elimination of the world language program for first and second grade. In addition, the district eliminated 26 support staff, which implicated child study team services, social worker services, and technology instruction. The cuts to technology instruction will prevent the district from providing the CCCS in technology to its students for the current school year. *Id.* at 130:1–10.

The resulting terminations increased class sizes in all grades, except for grades 6 and 7, by ten percent. *Id.* at 99:5–11; D–30. Furthermore, Kim asserted the ten percent class size increase was already on top of a previous increase. Specifically, in the 2008–2009 school year, with the exception of Kindergarten, the district had class sizes which were twenty to thirty percent smaller than at the present time. *Id.* at 110:12–20. Kim opined the reason the district will not be able to provide students with a thorough and efficient education with current level of funding, as compared to last year's funding, was the district had academic support, which "compensated for the larger class size." *Id.* at 118:1–9. Accordingly, without the supplemental programs and increased class sizes the district cannot provide the CCCS to its students.

Collectively, the educators appeared capable and utilizing their best efforts to attempt to have their students meet the requirements of the CCCS. They attempted to resolve the difficulties of instituting reductions as fairly as possible while still complying

with their mandate to provide a thorough and efficient education consistent with the CCCS. Although it may be thought numerous districts are more heavily weighted in administration rather than emphasizing the classroom, the proofs did not fully substantiate such a position.[41] Furthermore, given the truncated time afforded these districts in effectuating the requisite reductions after receipt of information as to the quantum of State aid, it nonetheless appeared the budgeting was as thoughtful a collective process as was then possible.[42]

The Master finds that despite the best effort of the superintendents, the CCCS are not being met at existing funding levels. The loss of teachers, support staff and programs is causing less advanced students to fall farther behind and they are becoming demonstrably less proficient. Is there a concern teachers have

---

[41] Several states, other than New Jersey, are seeking to impose limits on administrative salaries. In particular, New York Governor Andrew A. Cuomo introduced legislation to cap school superintendent salaries, singling out administrative compensation as one of the areas where substantial savings could be made in an effort to close New York's $10 billion budget deficit. *See* Kaplan, Thomas, *Cuomo Seeks to Cap Pay for School Superintendents*, N.Y. Times, March 1, 2011, at A22, *available at* http://www.nytimes.com/2011/03/01/nyregion/01 superintendent.html?src=twrhp; *see also* Janssen, Katie, *Are School Administrators Making Too Much?*, Keloland com (Feb. 28, 2011, 9:52 PM), http://www. keloland.com/News/NewsDetail6374.cfm?Id=111486 (noting dissatisfaction over administrative salaries in South Dakota amidst debate over education cuts); Gordon, Maggie, *Finance Board Urges Board of Reps to Reject School Administrators' Contract*, StamfordAdvocate.com (Feb. 27, 2011, 10:50 PM), http://www. stamfordadvocate.com/news/article/Finance-board-urges-Board-of-Reps-to-reject-1033678.php (reviewing proposition to set precedent by rejecting labor contracts for city school administrators in effort to lower employee benefit costs).

[42] As aforementioned, the districts were notified of their State aid allocations on March 19, 2010, while the finalized budget had to be submitted to the executive county superintendent by the end of March. From the superintendents' testimonies, it was clear the extent of State aid reductions was not anticipated, and resulted in significant changes being made to budgets in the span of a week, which had taken months to prepare.

failed to heed the request to freeze their salaries in an effort to assist their students, certainly. Are there concerns the various collective bargaining agreements curtail flexibility and available teaching time, certainly. The directive to this court, though, is clear and the superintendents' testimony, collectively, did not allow this court to find the State had met its burden, at least with regard to these witnesses.

### ii. The State's Two "Experts" [43]

The State elicited the testimony of Dr. Bari Erlichson ("Erlichson"), Director of the Office of Education Data from the DOE and Dr. Eric Allen Hanushek ("Hanushek"), a Senior Fellow at the Hoover Institution of Stanford University. Both witnesses opined there is an insufficient correlation between spending and achievement.

The State's first "expert," Erlichson, presented a series of scatter-graphs from which she drew the conclusion there is little or no correlation between the ratio of a district's spending to adequacy and the performance of its students on standardized tests for the 2009–2010 school year.[44] Interestingly, from these same scatter-graphs, the expert concluded there is a pattern demonstrating affluent districts do better on standardized tests in comparison to less affluent districts. Based on her experience in compiling education assessment data for the DOE, Erlichson prepared a series of scatter-graphs comparing various standardized test assessment data with spending to adequacy ratios for districts in particular socio-economic groupings for the 2009–2010

[43] Dr. Erlichson was not qualified as an expert, but certain latitude was afforded in an effort to create a full record for the Court. Erlichson, 3 T 36:7–18.

[44] The court, upon hearing the State's position there is a lack of correlation between funding and achievement, advised the State it was not permitted to review the wisdom or the efficacy of SFRA. Erlichson, 3 T 68:4–69:1. Counsel were advised such a position, if urged by the State, would only be appropriate in a different forum. *Ibid.*

school year, only. Erlichson, 3 T 18:2–19:11. It should be noted, no data was yet available for FY 11, the year to be examined. Nor was any evidence offered concerning comparisons with prior years or trends. Consequently, the exact effects of the reductions for FY 11 are unknown. However, the remand specifically posed whether the current level of funding "can" provide a thorough and efficient education, and not "did" it in fact provide the same.

To understand the conclusions Erlichson drew from the data presented, preliminarily, it is necessary to first explain the origin of the assessment data and then explain the composition of the scatter-graphs to illustrate this data. *See* D–46. The assessment data was gathered from the results of the standardized exams for NJ ASK 4 and 8, and HSPA, for mathematics and language arts, all administered in 2009–2010. Individual student data was aggregated to determine the percentage of students within each district who achieved proficiency on the exam for that grade in 2009–2010.[45] As aforementioned, there is no established State standard measuring whether a district is delivering or meeting the CCCS, and the available assessments currently used by the State are either the statewide benchmarks under No Child Left Behind or the yearly progress towards those benchmarks. Erlichson, 3 T 50:13–51:5.

Each district was plotted on the scatter-graph's X and Y axis, according to the percentage of students who reached proficiency within the district and the district's spending to adequacy ratio. Erlichson, 3 T 18:2–19:11; *see also* D–46. On each scatter-graph, the horizontal, X-axis represented the percentage of students who reached proficiency within a district as compared to the statewide pass rate. The State pass rate, represented by a zero in the center of the X-axis, was an arbitrary point of focus chosen by the State, merely for purposes of convenience in comparing student

---

[45] The percentage is calculated by dividing the number of students who passed the exam by the number of students who took the exam.

achievement across the State.[46] The statewide pass rate, which "re-sets" each year the test is taken, is the total number of students statewide who demonstrated proficiency or better on a particular test for the particular grade divided by the number of students statewide who took the test. For example, a district which was plotted on the zero point of the X-axis had exactly 60% of its students pass the exam in that year, and thus was on-par with the State pass rate. *See* D–46. Specifically, for the 2009–2010 school year, the statewide pass rate for NJ ASK 4 on language arts was 60%, or, alternatively, 60% of the total students in New Jersey taking that test were able to "pass."[47] The districts plotted to the right of the zero were districts performing better than the State pass rate and districts plotted to the left of zero were those performing worse than the State pass rate.

The vertical, Y-axis on each scatter-graph depicted the ratio between a district's spending budget and its adequacy ratio. D–46. The zero in center of the Y-axis represented the point where spending and adequacy were equivalent. *Ibid.* As such, those districts plotted below the zero point were spending below their adequacy budget, and districts plotted above the zero point were spending above their adequacy budget. *Ibid.* Finally, the last variable segregated the scatter-graph data to show districts either by their DFG rating or by the percentage of at-risk students within those districts.[48] *Ibid.*

---

[46] Erlichson noted the zero point could have been assigned to the fifty percent passage as opposed to the State average. In other words, the zero would be a focal point to separate those districts where fifty percent or more of their students passed from those districts where less than fifty percent passed. Erlichson, 3 T 41:19–24.

[47] The state-wide pass rate for the particular graph can be determined from the scatter-graph by subtracting the "0" point on the X-axis from the 100% point found on the far right. Erlichson, 3 T 48:8–17.

[48] These series of graphs were organized according to the less than twenty percent, between twenty and forty percent and over forty percent of students who are at-risk, as defined by the eligibility to receive free and reduced-price

From these scatter-graphs, the witness discerned two salient conclusions, although curiously contradictory. First, there was no demonstrated pattern between spending to adequacy and performance. Erlichson, 3 T 93:5–13. The State conceded its purpose in eliciting this testimony via the graphs was to illustrate "at some point there is no causative connection between funding and outcome." Id. at 67:9–10. For the reasons heretofore set forth this conclusion has no place in this remand.

Second, the series of graphs demonstrated a sobering pattern reflecting districts with a higher percentage of poverty, or those in the less affluent DFG categories, perform at a lower level of proficiency on the standardized tests than districts with less poverty or in higher DFG categories. Id. at 88:9–17. Even without quantification of the districts which appeared on either side of the State pass rate, a pattern was clearly discernable: more affluent districts performed better and more readily passed State requirements. Given the expert's conclusion spending over and above adequacy may not necessarily correlate with the level of performance, it was impossible for Erlichson not to agree with the broad picture overall student performance was better in the wealthier districts.

Doctor Eric Allan Hanushek ("Hanushek"), offered by the State as its expert, is a nationally recognized, although apparently a controversial figure in educational finance policy. Currently a Senior Fellow at the Hoover Institution of Stanford University, with a glittering curriculum vitae and other various recognitions and appointments in the field of the economics of educational financing, his entire career has been dedicated to determining the factors, including educational spending, which affect student achievement. He has authored numerous books and articles concerning the dynamics affecting student performance. Given his extensive background and recognized achievements in his field,

---

lunch. The same, presumably, was to address the remand concerning low, medium and high levels of disadvantaged students in a district.

Hanushek was qualified as an expert in educational finance policy. His provocative theory, which shall be detailed hereinafter, is worthy of serious review.

Hanushek opined the current level of funding, using the SFRA formula, can provide a thorough and efficient education to the school children of New Jersey. Hanushek, 5 T 20:6–9. To reach this conclusion, he, essentially, utilized two foundational premises. First, there is an insufficient correlation between spending and student performance. *Id.* at 33:9–13. Having reviewed national standardized test and educational expenditure data, Hanushek opined the data demonstrated spending on education increased substantially over the last several decades, D–80, however, student performance had not substantially improved as one would expect with this rise in levels of financial input. Hanushek, 5 T 28:22–29:25; D–82. In other words, on a national level, increases in aid have not resulted in substantially increased student achievement, and the same pattern was also evident in New Jersey. *Id.* at 21:1–5. Hanushek compared per pupil spending in New Jersey to the national per pupil spending average. *See* D–83. From 1990 to 2000 spending was relatively consistent in New Jersey between $12,581 per pupil to $12,927, and it was greater than the national averages of $7,741 per pupil in 1990 and $8,644 in 2000. *Ibid.* From 2000 to 2008, New Jersey experienced an increase of 36%, adjusted for inflation, in student expenditures, as compared to the 25% increase in the national average. Hanushek, 5 T 29:2–9; *see also* D–84–86. Student expenditures per pupil rose to $17,620, as compared to $10,297 nationally. *See* D–83. In 2008, New Jersey was one of, if not the, the highest per pupil spending of all other states.[49] Hanushek, 5 T 29:9–11. Although, student performance

---

[49] While mindful the following is not before this court, for purposes of context it is included. The latest U.S. Census data demonstrates the highest spending per pupil states in 2008 were New York ($17,173), New Jersey ($16,491), Alaska ($14,630), the District of Columbia ($14,594), Vermont ($14,300) and Connecticut ($13,848). *See Public School Systems Spend More than $10,000 Per Pupil in*

for the years when New Jersey increased its spending was better than the national average, the difference in achievement was minimal considering the spending increases New Jersey implemented. Hanushek, 5 T 32:1–10; *see also* D–84–86.

Second, Hanushek opined it is far more important how money is spent than how much is spent. Hanushek, 5 T 28:7–11. Specifically, rather than focusing on how much more money to infuse into the system, significantly better performance results could be achieved by removing the bottom five to eight percent of ineffective teachers and modestly increasing class sizes. He urged the bulk of studies performed on class sizes suggest reductions of one to two students have no noticeable effect on student achievement.[50] As such, he concluded the effectiveness of teachers more significantly impacts performance than any changes in class size. *Id.* at 35:3–12. Accordingly, he opined, each class may be increased by one to two students, and even up to five students, without negatively affecting student performance. *Id.* at 54:1–4.

---

*2008*, U.S. Census Bureau, http://www.census.gov/newsroom/releases/archives/education/cb10–96.html (last visited March 18, 2011). According to the U.S. Census Bureau website, available at http://www.census.gov/govs/school/, the data for 2009 will be released in April 2011, and the data for 2010 is currently being collected.

[50] Hanushek noted one specific study often cited to support a purported correlation between reduced class size and demonstrable effects on achievement was the Tennessee Star Study conducted in the 1980s, which tracked the progress of students from kindergarten to third grade. The experiment reduced class sizes from the average 24 to 25 by approximately one-third, or down to 15 students per class. Hanushek testified the results only demonstrated modest improvement in performance when compared to a significant one-third reduction in class size. Hanushek, 5 T 35:13–36:21. Furthermore, he argued other studies conducted on class size show there was no improvement gained from reductions in class sizes past the third grade. As a result of all the studies, Hanushek concluded the effects of class size reductions, if any, were evident only in kindergarten and first grade, and, even so, the modest effects were not sufficient given the substantially increased costs necessary to achieve these reduced class sizes.

Although the Master was impressed with Hanushek's thoughtful, if thought provoking analysis, it was problematic for this hearing for several reasons. First, the focus of Hanushek's testimony was predominantly national, rather than focusing upon New Jersey. Second, there was a dearth of any meaningful review of the obstacles; e.g. collective bargaining agreements, union contracts, tenure and statutory provisions, may have on removal of the five to eight percent of our least capable teachers. Hanushek acknowledged he had not specifically studied any such agreements in New Jersey or the applicable statutory provisions. Furthermore, his testimony failed to give consideration to the possible costs associated with identifying and removing the five to eight percent of our least capable teachers.[51] In support of Hanushek's proposition for removal of underperforming teachers, the State cited to *N.J.S.A.* 18A:28–5, providing tenured teachers may be removed for inefficiency, and *N.J.S.A.* 18A:6–11, requiring written notice for inefficiency removal and 90 days to correct or overcome the inefficiency. Dfs.' Post–Trial Br. ¶ 300. While the statutes appear to allow removal tenured teachers, the testimony from several superintendents appeared to suggest the removal process is more onerous and costly than a literal reading of the statutes might suggest. *See* Whitaker, 10 T 50:12–51:2 (difficult to remove teachers); Tardalo, 12 T 43:6–12 (noting hundreds of thousands of dollars in legal fees to remove tenured teacher). Finally, Hanushek's testimony did not account for the possibility, if not the reality, there already have been significant increases in class size since the implementation of SFRA. As discussed above, the district witnesses testified to increases in class size having taken place already.

Furthermore, New Jersey, by statute, mandates certain levels for class sizes in high poverty districts, where forty percent or

---

[51] The superintendent of Clifton City, Tardalo, who testified for the plaintiffs, noted it costs hundreds of thousands of dollars in legal fees to remove a tenured teacher.

more of the students are "at-risk." The statute mandates, with some minor exception, grades K–3 cannot exceed 21 students, grades 4–5 cannot exceed 23 students, and grades 6–12 cannot exceed 24 students. *See* P–2; *see also N.J.A.C.* 6A:13–3.1. As such, the proposition urged by Hanushek cannot, by law, be implemented in high poverty districts, of which there are 114 in New Jersey.

Hanushek conceded he had not studied New Jersey class size data over any time period which would permit conclusions specific to New Jersey school children. Moreover, Hanushek conceded the greater the funding reductions, leading to even greater increases in class size, would cause greater hesitancy in concluding there would be no impact on performance. Hanushek, 5 T 79:2–18. If class sizes had already been increased, as they apparently have, then the result of further enlargements in class size to accommodate the budget cuts, as suggested by Hanushek, could lead to a compounded effect which would further deleteriously affect student performance. Lastly, the data reviewed by Hanushek pre-dated, at least in large part, SFRA funding or reductions thereto.

Accordingly, while the Master found Hanushek's testimony compelling, and worthy of further review by educators, legislators, and government officials, its focus was not New Jersey. Certainly general propositions may be made across state lines; however, for this hearing the focus necessarily need be on New Jersey. Without having the opportunity to review prior increases in class sizes, current labor contracts, typical cost of removal of our least capable teachers or the implications of tenure, Hanushek's conclusions are better left examined on another day, possibly in another forum.

The lack of correlation between spending and performance may also be an intriguing theory worthy of legislative review, however, the same has no probative force in assisting the State in meeting its burden before this court. The State's reliance on this position is ironic as it is in direct contravention of the underlying principle of SFRA: the amount of aid necessary to deliver a thorough and

efficient education as measured by the CCCS can be quantified and "costed out." *Abbott XX, supra,* 199 *N.J.* at 195 [971 *A.*2d 989] ("By way of ['costing out'], the level of resources needed for students to perform to specified standards, in New Jersey the CCCS, is identified.").

The remand requires a determination whether with the reductions of State aid, through the SFRA formula, districts can provide a thorough and efficient education to their students. Despite the court's efforts to confine the hearing within the remand's parameters, the State's presentation appeared more oriented to the Supreme Court. Accordingly, one of the central tenets of the State's experts' testimony, lack of correlation between spending and performance, can have little or no bearing on this hearing. The sole purpose of this hearing was to determine whether the reductions in State aid, resulting in less than full funding of SFRA, can pass constitutional muster. The limited nature of the remand was to ascertain whether there was sufficient latitude in the SFRA formula such that the reduced funding would not affect the delivery of a thorough and efficient education. The State was either unwilling or unable to meet its burden, at least as it concerned Erlichson and Hanushek.

### iii. The State's Fact Witness

Kevin Dehmer ("Dehmer"), employed by the DOE in the Division of Finance, testified concerning the figures generated in response to this court's inquiry regarding the amount by which State aid was reduced from the original formula, the quantification of the formula enhancements, and the various federal funding available to districts for the 2010–2011 year. Significantly, Dehmer testified in response to this court's letter dated January 28, 2011, in which the court, in an effort to focus the issues presented by the remand, requested to be provided with proofs concerning:

1. The percentage and dollar reduction of funding in the Abbott and non-Abbott districts in light of the current funding in relation to the SFRA formula;

2. The percentage and dollar amount required under SFRA for the Abbott and non-Abbott districts should there have been no augmentation beyond that

which was strictly required by the experts in creation of the SFRA formula (that is, for example, (i) the formula applies a .47 at-risk weight, which was an enhancement from the .42 to .46 weights suggested by the PJP panel; (ii) for the LEP students weight, the PJP panel suggested a weight of .47 for each LEP student, but SFRA applies a weight of .50; and (iii) for students who are both LEP and at-risk, the non-overlapping resources were calculated to be 22.6% of the LEP weight, however, the DOE used a slightly higher figure of 25% in creating the combination weight) (hereinafter the "enhancements").

D–126.

In response to the first inquiry, the data presented demonstrated the fully funded SFRA formula for FY 11 would yield $8,450,619,035 of State aid, and the actual State aid allocated was $6,848,783,991, resulting in underfunding of the formula by a total $1,601,835,044, or a 19% reduction. Dehmer, 8 T 19:3–14; D–124 at 19. Of this amount, $3,932,593,020 was K–12 State aid allocated to the former Abbott districts, or, in other words, 57.42% of total formula aid for FY 11 being allocated to former Abbott districts. *See* D–98. This data provided clear evidence of the levels of underfunding. The prior assertion the reductions totaled $1.08 billion was, actually, the difference in aid allocation between FY 10 of $7.930 billion and $6.848 billion in FY 11. *See* D–109.

In response to the court's second inquiry regarding the formula's original "enhancements" and whether the same could allow the State to still provide the CCCS despite underfunding, the data demonstrated the enhancements provided only a minimal change. D–115. Specifically, the amount resulting from running the SFRA formula with the reduced weights in comparison to the original formula was $72,267,056. Dehmer, 8 T 44:2–8; D–115. Accordingly, the "enhancements" are self-evidently insufficient to even attempt to counterbalance the $1.6 billion underfunded amount.

The State sought to elicit testimony from the witness to support its position federal funding need be considered, and moreover, should be considered as a source of funding to "make-up" the loss in State aid. Federal funding programs, discussed above, were identified as available to the school districts in addition to the State formula aid. The first was the Education Jobs Fund, the

one-time federal program implemented for the purpose of offsetting layoffs, and which provided a gross monetary allotment of $262,742,648. *See* D–107. The allotment was allocated to districts to be spent within the period from August 2010 to September 2012. *Ibid.* The former Abbott districts received $138.8 million of the $262.7 million of federal aid.[52] *See* D–108. The districts had full discretion in spending their allocations, with the caveat money not spent by the end of the allotment period would be forfeited. Dehmer also testified concerning other one-time federal funding programs, particularly, ARRA Title I and SIA, and ARRA IDEA Basic and Preschool aid, as aforementioned. *See* D–110.

Essentially, the State sought to demonstrate the various federal funding programs made available to States in response to the national fiscal conditions should have been used by the districts to "make-up" for the loss in State formula aid. D–111. Focusing on the former Abbott districts' $256 million reduction in K–12 State aid from FY 10 to FY 11, Dehmer pointed to data demonstrating the remaining federal funds available to these districts totaled $296.8 million. D–111. In other words, the districts could "make-up" or substitute their losses with these funds.

The limited remand orders directed the Master to consider whether the present level of funding distributed through the SFRA formula was sufficient to deliver the CCCS. Federal funding is not within the SFRA formula. In *Abbott XX,* the Court made clear consideration of available federal funds should not be "used as a crutch against some structural failing in the funding scheme itself." 199 *N.J.* at 174 [971 *A.*2d 989]. Now the State appears to urge the position the Court explicitly rejected. The availability of federal funding was considered in lieu of providing the districts supplemental aid, in addition to fully funded formula aid, during the three year look-back period, and was not envi-

---

[52] Of the total Ed Jobs funds available, 52.83% are allocated to Abbott districts which represent 20% of the population.

sioned as a substitute for the State aid. *Ibid.* Accordingly, while the court permitted evidence of available funding for completeness of record, as previously discussed herein, the same does not assist the State in meeting its burden of showing current levels of SFRA funding are sufficient to permit districts to provide a thorough and efficient education to their students. Whether such funding should be considered is left to the Court's best discretion.

### d. *Plaintiffs' Case*

The plaintiffs called three witnesses; two of the witnesses were educators, and one was an expert in the field of educational funding. The plaintiffs called Walter Wesley Whitaker, Jr. ("Whitaker"), superintendent of the Buena Regional school district, Richard Tardalo ("Tardalo"), superintendent of the Clifton school district, and Melvyn Wyns ("Wyns"), as the plaintiffs' expert.

The two educators called by the plaintiffs also appeared to be forthright and competent. While the two school districts have vastly different characteristics, both have concentrations of over 40% of at-risk students. Buena Regional school district, located in Cumberland County, is designated as DFG "A." Whitaker, 9 T 25:24–25. The district has 2,082 resident enrolled students, of which 48.7% are at risk, and 21% are enrolled either with an IEP or classified as special education students. *See* D–106; Whitaker, 9 T 29:12. For FY 11, pursuant to the original formula the school district would have received $22,837,518, but by way of the modifications received $17,971,409, a reduction of $4,866,109, or 21.3%. *See* D–124 at 6. Comparatively, Clifton City, located in Passaic County, is designated as a DFG "CD." Tardalo, 11 T 18:12. The district has 11,262 resident enrolled students, of which 42.58% are at-risk, 7% are limited English proficiency, and 11.5% are classified as special education students. *See* D–106; Tardalo, 11 T 23:12–24:2. The Clifton City school district would have received $33,412,583 pursuant to the original SFRA parameters, and received $20,704,783 under the modified formula, a reduction of $12,707,800, or 38%. *See* D–124 at 12.

Without delineating the testimony of each educator, their concerns and identified difficulties in providing the CCCS to their students were much the same as those of the educators called by the defendants. Essentially, both educators called by the plaintiffs testified the loss of teaching staff caused increased class sizes, and, more importantly, the loss of academic support, necessary for struggling students, had put those students at a greater disadvantage in meeting proficiency than they were already. The two superintendents recounted the various efficiency measures implemented by their districts, including saving on cafeteria services, transportation costs, health care plans, and legal services. However, it was clear from their testimony the obstacles to cost savings were much the same as those identified by the defendants' district witnesses: collective bargaining agreements, teacher tenure, including the high costs associated with removal of a tenured teacher for inefficiency, the school district's board of education's decision to abide by voter rejection of increased tax levies, and the unfortunate rejection of pay freezes by teachers' associations. *See* Whitaker, 10 T 45:11–25 (noting teachers' association refusing to accept pay freeze); Tardalo 11 T 80:20–81:1 (testifying collective bargaining groups rejected pay freeze). Pursuant to the SFRA formula, the adequacy budget for each district was meant to cost out the monies required to deliver the CCCS to the students in each district. Absent a showing by the defendants the decisions undertaken by the superintendents in dealing with the reductions were inefficient or were not carried out in a manner least affecting the delivery of the CCCS to the students, it appeared from the educators' testimony a conscientious attempt was made to effectuate the cuts in a reasonable and responsible manner. Without further proof a different method of implementing the allocated funds, even with the reductions, would have achieved the significantly better results, these educators cannot be faulted for utilizing the funds as they did.

The plaintiffs' only expert, Wyns, had worked with New Jersey school funding formulas for the past 31 years before retiring, first on behalf of the State of New Jersey and thereafter as an expert

for the plaintiffs, and has continually reviewed data concerning the SFRA formula since its implementation. Essentially, Wyns testified concerning the cumulative effects of reductions from FY 10 and FY 11, the effects of the reductions on districts with high concentrations of at-risk pupils and lastly, had the aid been distributed differently, there could be enough monies to bring nearly all districts to their adequacy levels.

First, Wyns opined the reductions in State aid made in FY 10 and FY 11 had a cumulative effect, particularly on districts spending under adequacy by keeping them further away from adequacy. Wyns testified two series of "reductions" to State aid funding were made in FY 10. First, SFRA formula funding had been modified for 2009–2010 year, by way of the FY 2010 Appropriations Act, which limited the State aid growth limits to zero for districts over adequacy and to five percent for districts under adequacy. Wyns, 15 T 21:22–22:11. As a result of the growth limit modifications, the allocated State aid was reduced by $302.9 million for FY 10. *Id.* at 27:21–24; *see also* P–133 at 7. Of the reduced amount, districts spending under adequacy were underfunded by $228.4 million, or 75.41%, and districts spending over their adequacy budgets were underfunded by $74.49 million, or 24.59%. Wyns, 15 T 28:19–29:18; *see also* P–133 at 4 & 7. Second, within the same fiscal year, in addition to reducing State aid by way of the modified formula, pursuant to Executive Order No. 14 (2010) the State withheld $476 million in aid distributions during the middle of FY 10.[53] Wyns, 15 T 29:21–25. The withholding of the remaining payments of aid to each district was equal to the amount of surplus each district had set aside for use in the following year, FY 11.[54] *Id.* at 30:3–22. In other words, the

---

[53] State aid payments are provided to districts twice a month for 10 months. Wyns, 15 T 33:24–34:1.

[54] As a part of their budget process, districts retain a two percent surplus of their general fund budget to be used two years in the future. Wyns, 14 T 64:13–

districts were advised, if there was a need for additional funds, then the surplus should be used as a replacement of the withheld State aid. However, to use the surplus, districts with needs for additional monies were required to make an application to the DOE to request permission to use the surplus funds. *Id.* at 34:9–20. Wyns opined the reductions in FY 10 resulted in districts which were under adequacy, to be kept further from adequacy as their aid was not permitted to grow by twenty percent as required by the original SFRA.[55] *Id.* at 35:10–19. Based on Wyns' analysis and the definition of the SFRA formula, it is possible to cost out the resources necessary to provide the requisite education. Wyns concluded, by definition, districts below adequacy cannot provide a thorough and efficient education. Wyns, 16 T 29:11–18.

As a result of the reductions, 181 school districts out of 560 [56] were spending below adequacy in FY 10. *Id.* at 82:22–24. The number of districts spending below adequacy increased to 205, or 36.6% of school districts, following the reductions made in FY 11. *Id.* at 90:21–22; *see also* P–126. Wyns identified 31 school districts which were above adequacy in FY 10 had moved below adequacy in FY 11, while seven districts which were below adequacy moved to adequacy. *Id.* at 91:5–16; *see also* P–126. He analyzed the 205 districts below adequacy in the 2010–2011 fiscal year, which would require $1,071,287,484 to bring them up to adequacy, were underfunded from the original SFRA formula by $972,930,819. Wyns, 13 T 96:3–19; *see also* P–126 at 5. In other words, had the formula been fully funded, the districts currently under adequacy by

---

19. In other words, districts put away a two percent surplus in 2008–2009 for use in 2010–2011. *Ibid.* Anything above the two percent is deemed excess surplus. *Ibid.*

[55] As previously noted, to determine spending to adequacy levels for FY 11, the sum of a district's Adequacy Budget, Special Education Categorical Aid, and Security Aid for FY 11 was compared with the district's spending in FY 10.

[56] Wyns excluded vocational school districts in his analysis.

$1.071 billion would have been under SFRA defined adequacy levels by only $98 million. Wyns, 13 T 96:15–19.

Of the 205 districts below adequacy in FY 11, 71 are high concentration districts, 64 are medium concentration districts, and 70 are low concentration districts. Wyns, 13 T 91:17–92:8; *see also* P–136 at 24. Wyns further testified, overall, there are 93 "high need" districts within the State, as defined by the aforementioned *N.J.A.C.* 6A:13–3.3, which include all former Abbott districts, requiring additional academic support programs and which must maintain specific class sizes by statute. Wyns, 13 T 54:9–55:2–4; *see also* P–2. The districts currently under adequacy include 59 high need school districts, or 66%. Wyns, 13 T 100:12–15. Of these high need districts, 18 former Abbott districts are currently under adequacy, two of which, Millville City and Neptune Township, fell below adequacy as a result of the State aid reductions for the current year. Wyns, 13 T 101:19–22; *see also* P–126 at 3–4. Furthermore, the students residing in the districts below adequacy for FY 11 represent 54% of the total student resident enrollment for the current school year, and also represent 72% of all the at-risk students residing within the State. *Id.* at 100:12–23; P–126 at 5.

Wyns opined, by utilizing the definition in the SFRA formula, districts below adequacy cannot provide a constitutionally mandated education, and accordingly, the 205 districts below adequacy for FY 11 cannot be providing the CCCS. Wyns, 16 T 29:11–18. To bring districts up to adequacy, the formula explicitly provided for Educational Adequacy Aid to be allocated to the former Abbott districts, however, for all other districts the formula implied, if it was fully funded, then the twenty percent aid growth limits would allow all districts below adequacy to be at adequacy in three years from the SFRA's implementation. Wyns, 13 T 98:7–24. In other words, had the formula been fully funded each year since its implementation, almost all the districts currently below adequacy would be at adequacy. Wyns, 13 T 97:6–17.

Despite the State's best efforts, Wyns demonstrated the reductions fell more heavily on districts with higher concentrations of at-risk pupils and on the children educated within those districts. Wyns, 13 T 74:12–17. The FY 11 aid reductions were allocated to the various concentration districts as follows: high concentration districts had $687 million of their aid, or $1,530 per pupil, reduced; medium concentration districts had $329 million of their aid, or $1,158 per pupil, reduced; and low concentration districts had $585 million of their aid, or $944 per pupil, reduced.[57] Wyns, 13 T 68:3–18; P–131. The 93 high need districts, which include former Abbott districts, had a reduction of $627.2 million, or $1,529 per pupil from SFRA required levels for FY 10, while districts with low concentrations of at-risk students were reduced $944 per pupil. *Id.* at 68:12–18; *see also* P–131. The apparent anomaly in this conclusion was the districts with the lowest DFGs and the former Abbott districts experienced the smallest percent cuts of SFRA formula aid for FY 11. *See* P–128. However, Wyns explained the districts with the highest needs received the greatest amount of State aid, as compared to districts with lesser needs. Wyns, 14 T 28:3–29:5. Therefore, reducing even a small percentage amount of aid from the districts with substantial funding would result in greater per pupil reductions than in districts which

---

[57] Wyns analyzed the revenues per pupil available to districts from both State and local resources using "weighted student enrollment." He testified, normally, the per pupil revenues, the amount of money available in a district to spend on a student, are determined by dividing the available monies, from State aid and the general fund, by the total number of enrolled students. However, a more accurate outcome would occur if the each student included in the total student enrollment for the districts was "weighted" by the same factors used in the SFRA formula in order to better account for student needs. Wyns' analysis demonstrated when the available monies are divided by the total "weighted" student enrollment, the districts with the most at-risk concentrations have the least revenue because the needs of each individual student are so high, as follows: $9,917 per-pupil in former Abbott districts, $9,617 in high need districts, and $10,317 in non-Abbott districts. Wyns, 14 T 25:3–25; *see also* P–136 at 28–29, 31, 34.

have small State aid allocations. *Ibid.* Accordingly, despite the overall reductions in State aid to districts with high concentrations of at-risk pupils being a smaller percentage of their total State aid allocation, on a per-pupil basis the reduction amounts were greater than for districts with lower concentrations of at-risk students.

Interestingly, it should be mentioned, the plaintiffs' expert opined enough State aid funds were provided in FY 11 to bring all districts to adequacy had the funds been allocated in a different matter. As a result, the current levels of State aid could have provided a thorough and efficient education as measured by the CCCS. However, as discussed hereinafter, redistributing funds in the manner suggested by the expert would run afoul of the very definition of SFRA. Essentially, Wyns testified the districts under adequacy would require $1.071 billion to bring them up to adequacy, however, there were also 355 districts which were spending in excess of their adequacy limits by $1.05 billion. Wyns, 13 T 106:2–190:1. Had the funds been redistributed differently, by removing all State aid in excess of adequacy from those districts above adequacy, and allocating those funds to districts below adequacy, the $1.08 billion reduction resulting from the 4.994% decrease could have been effectuated, mathematically, without affecting the school districts ability to provide the CCCS, as defined by the SFRA formula. Wyns, 14 T 37:2–7 & 43:5–19. While this proposition could have made the resolution of the issues before this court that much simpler, the expert's position is problematic and was rejected by both parties. First, as the expert conceded, to achieve near adequacy for all districts, 355 school districts would have to be stripped of any aid in excess of adequacy and the excess aid would then have to be redistributed to the districts below adequacy. Significantly, in order for his proposition to work, this redistribution would not only apply to aid allocated for FY 11, but also to any monies a district has in excess of its adequacy budget.

To illustrate the effects by way of example, two districts, Mendham Borough, a DFG J district and Asbury Park City, a

former Abbott district, both identified by the expert as being over adequacy in FY 11 will be compared. *See* D–126 at 6 & 14. Mendham Borough has $55,932 in excess of its adequacy level, P–126 at 6, and its State aid of $410,182 due under the original SFRA parameters was reduced by 100% in the current year pursuant to the FY 11 Appropriations Act. *See* D–124 at 19. In comparison, Asbury Park City has $16,853,343 in excess of its adequacy budget, P–126 at 14, and its State aid was reduced by $3,277,442, or 5.7%, from the fully funded SFRA for FY 11. *See* D–124 at 1. To achieve near adequacy levels for all districts, both Mendham Borough and Asbury Park City would have to give up the $55,932 and the $16,853,343, respectively, as those amounts are part of the $1.050 billion Wyns calculated as the excess of adequacy. The inequity which would result from such actions is clear. Furthermore, the SFRA formula accounted for those districts which were spending above their adequacy budgets at the time the formula was implemented. The formula provided Adjustment Aid as a transition tool to permit the districts spending above adequacy to maintain their expenditure levels, at their 2007–2008 spending levels plus two percent, which was meant to prevent significant increases in the tax levies for those districts and substantial cuts to their academic programs as a consequence of the sudden loss of funds. *See Abbott XX, supra,* 199 *N.J.* at 157 [971 *A.*2d 989]. In other words, the formula specifically considered districts which were spending above adequacy, and may require additional funds to ease the transition process. To now suggest those excess funds accumulated by the districts can be taken and redistributed goes against the very SFRA formula.

## XI. *Conclusion*

New Jersey's commitment to its young students is constitutionally mandated and steadfast.

School funding is a matter of enormous complexity and importance. This Master has already noted its concern that funding, in and of itself, can never be sufficient to ensure our students will

perform as it is thought they must. Rather, enabling our youth to surmount successfully the challenges they will face requires the cooperation and dedication of administrators, teachers, support staff, and possibly most importantly, the family. As Dr. Hanushek aptly noted, higher achieving students are the future of our nation and the fulcrum upon which we will determine whether our students can successfully compete in a global marketplace.

Although this court agrees with Dr. Hanushek how money is spent is much more important than how much money is spent, the focus of this remand is a narrow one. The Supreme Court directed the remand hearing address whether current levels of funding for FY 11, through the SFRA formula, can permit our school districts to provide a thorough and efficient education to the children of our State. Given the proofs adduced as heretofore related, the answer to this limited inquiry can only be "no." The more daunting questions have been reserved by and for our Supreme Court.

The core objective of SFRA was to create a unitary funding scheme to ensure all students are provided with a thorough and efficient education, not just those students who by happenstance resided in the Abbott districts. There were a significant number of at-risk students in non-Abbott districts who were deprived of the benefits of the Abbott remedial measures. To address this inequity, the State proposed the SFRA formula. Professionals, capable educators, and community leaders came together to determine what was fiscally necessary to deliver a thorough and efficient education to all the school children of New Jersey, not just those in Abbott districts. The result was the "costing out" approach which is the essence of the SFRA formula. The same is premised on the principal by thoughtfully reviewing all relevant factors and determining their costs it is possible to come up with the "bottom line" amount required to deliver a thorough and efficient education as mandated by the State Constitution.

The State, on behalf of the Legislature and the Governor, petitioned for approval of the new formula and abandonment of the long-standing parity remedy.[58] The State successfully convinced the Supreme Court in *Abbott XX* to permit the evolution from parity to SFRA. To now apparently suggest the formula is ill conceived and therefore need not be fully funded cannot successfully be urged before this Master, regardless of fiscal conditions.

Having had the opportunity to review thousands of pages of exhibits, having heard from ten witnesses, and having allowed counsel the fervor of advocacy, the hearing can be distilled to these essential components:

1. If the SFRA formula had been fully funded for FY 11 an additional $1.6 billion would have been required;

2. Despite the State's best efforts, the reductions fell more heavily upon our high risk districts and the children educated within those districts;

3. The aid reductions have moved many districts further away from "adequacy"; and

4. The greatest impact of the reductions fell upon our at risk students.

SFRA was enacted in 2008. It was constructed with the intention of attempting to bring districts to adequacy by FY 11. Its plan remains unfulfilled given the spending reductions effectuated in FY 10 and FY 11. Despite spending levels that meet or exceed virtually every state in the country, and that saw a significant increase in spending levels from 2000 to 2008, our "at-risk" children are now moving further from proficiency. Our Court has recognized, as it must, it cannot and should not run our school system. That responsibility must repose with the other branches of government, and thereafter with the Department of Education and the various districts in the prudent utilization of funding provided. That said, the Court cannot abandon or waiver

---

[58] The "parity remedy" was mandated by the Supreme Court in *Abbott IV* as an interim remedial relief which increased per-pupil expenditures for poor special needs districts (later referred to as Abbott districts) to be on par with the budgeted average expenditures of the more affluent DFG I and J districts. 149 *N.J.* at 189 [693 *A.2d* 417].

from its constitutional commitment. Although discretion had been afforded to the individual districts to spend their allocated monies in a manner that best serves those districts' needs, it was painfully obvious important support and ancillary programs have been eliminated in effectuating the imposed reductions. These programs had helped bring our at-risk and underperforming students closer to the mandated standards.

The irony of the parties' current position is too obvious to note. Two years ago, the State came before this court and the New Jersey Supreme Court urgently petitioning for an abandonment of parity funding, and an acceptance and implementation of a fairer funding formula which was structured to ensure all students in New Jersey, not just those who by happenstance resided in the Abbott districts, receive a thorough and efficient education as measured by the Comprehensive Core Curriculum Standards. The plaintiffs, with equal fervor, argued the formula inadequately cared for our disadvantaged youth and implored the Court to retain the parity remedy, at least until a more equitable formula could be enacted. Now, less than two years thereafter, the State seeks to abandon the formula it fought so strenuously to support, and the plaintiffs insist the formula must be supported. The wisdom of the SFRA formula is not within the ambit of this remand hearing. Rather, this court is solely to address, utilizing the SFRA formula, whether the reduced spending levels for FY 11 can enable the districts to provide their students the education required by the New Jersey Constitution. Thirty-six percent of our districts were funded at a level below adequacy for FY 11; seventy-two percent of our at-risk students reside in those districts. The Legislature proposed and the Governor signed into law, the FY 2011 Appropriations Act thereby reducing the aid called for by the SFRA formula in the amount of $1.601 billion. The aid reduction was formulated with the specific intention not to disadvantage districts most reliant upon State aid. Generally, those districts have the highest concentration of at risk students. Despite this laudatory goal, the nineteen percent reduction in

SFRA funding from FY 10 to FY 11 fell, most significantly, on those districts least able to withstand the reductions.

The difficulty in addressing New Jersey's fiscal crisis and its constitutionally mandated obligation to educate our children requires an exquisite balance not easily attained. Fair and equitable education funding is a conundrum that has been addressed by our Court for almost forty years and, one might imagine, is not soon to conclude. Progress has been made; how to maintain that progress in light of daunting fiscal realities, reposes with our highest Court and the other coordinate branches. Something need be done to equitably address these competing imperatives. That answer, though, is beyond the purview of this report. For the limited question posed to this Master, it is clear the State has failed to carry its burden.

During the course of this hearing various issues arose which are of moment, but could not be the focus of the remand hearing. Questions concerning the viability and advisability of tenure, how future contracts with teachers should best be addressed, required time to teach on a daily basis, a fair teacher evaluation process, appropriate pay scales for our administrators, encouragement of pre and post school programs for our students who are falling further from proficiency, how to further assist the districts in effectuating efficiencies, appropriate class size, what consideration should be given to existing federal funding, and the like, are all worthy of review and consideration. These issues, though, must be left to others as they are beyond the narrow ambit of this remand.

The court wishes to acknowledge the honor the Supreme Court has afforded to its Master and recognize, with appreciation, the assistance of all counsel, without which this report could not have been timely rendered.

Justice ALBIN, concurring.

The school children of this State possess the "fundamental right" to a thorough and efficient system of public education.

*Robinson v. Cahill,* 69 *N.J.* 133, 147, 351 *A.*2d 713 (1975) (*Robinson IV*). That right is guaranteed by the New Jersey Constitution and, like other fundamental rights, cannot be denied based on "the vicissitudes of political controversy" or the outcome of a poll. *See W. Va. State Bd. of Educ. v. Barnette,* 319 *U.S.* 624, 638, 63 *S.Ct.* 1178, 1185, 87 *L.Ed.* 1628, 1638 (1943). Whether the children before us receive the benefit of their right to a thorough and efficient education may determine their future, indeed whether they "may reasonably be expected to succeed in life" itself. *See Brown v. Bd. of Educ. of Topeka,* 347 *U.S.* 483, 493, 74 *S.Ct.* 686, 691, 98 *L.Ed.* 873, 880 (1954).

Because the judiciary's obligation to protect individual rights is as old as the republic, *see Marbury v. Madison,* 5 *U.S.* 137, 1 *Cranch* 137, 170, 2 *L.Ed.* 60, 71 (1803), the challenge to our Court is not a new one. It is a challenge not to sacrifice the rights of some affected group—here, the disadvantaged children of this State—because of the felt necessities of the moment. If the children before us are denied their right to a constitutionally adequate education, it is not a right that can be reclaimed after they drop out of school or graduate without having received the learning and skills they need to succeed as citizens.

At the direction of this Court, a Special Master, the Honorable Peter E. Doyne, A.J.S.C., conducted a hearing to determine whether the State's failure to meet the funding requirements of the School Funding Reform Act of 2008 (SFRA), *L.* 2007, *c.* 260 (*N.J.S.A.* 18A:7F–43 to –63), is denying disadvantaged children throughout this State a thorough and efficient education as measured by the Core Curriculum Content Standards mandated by state law. At the hearing, the Education Law Center, counsel for the children in the former Abbott districts, served in effect as the equitable representative of all at-risk children in the State. Based on the testimony and evidence before him, Judge Doyne held that the State's underfunding of SFRA, particularly in school districts operating below their "adequacy" budgets, is depriving disadvantaged children of their right to a constitutionally adequate edu-

cation. The record before us amply supports Judge Doyne's conclusion.

In Fiscal Year (FY) 2011, 72% of the State's at-risk students lived in the 205 school districts that were funded below their adequacy budgets. The six school superintendents who testified before Judge Doyne were representative of those school districts, districts with high, medium, and low concentrations of disadvantaged children. Those school districts were constitutionally shortchanged in the amount of $972,930,819 for FY 2011 under SFRA. We cannot undo the past for the affected at-risk children; we can remediate their future. I would order funding at the levels required under SFRA for the coming school year for those 205 school districts.

I agree with Justice LaVecchia that this Court in *Abbott v. Burke*, 199 *N.J.* 140, 971 *A.*2d 989 (2009) (*Abbott XX*), would not have relieved the State of its obligations to the Abbott districts if it knew that the State would not honor its funding commitments to those districts under SFRA.[1] Therefore, I concur that those districts are entitled to funding as promised under SFRA. However, I believe that Justice LaVecchia's remedy—fully funding just the 31 former Abbott districts—is not sufficient to meet the constitutional violations found by Judge Doyne. The at-risk children in the 187 underfunded non-Abbott districts suffer from the same disadvantages of poverty as the children in the former Abbott districts. Based on the charge given to him by this Court, Judge Doyne adjudicated the rights of all the disadvantaged children in the below-adequacy-funded districts.

My viewpoint, however, does not command a majority. I will not deny the remedy of a constitutionally adequate education to at-risk children in 31 districts because I believe the same remedy should be provided to at-risk children in 187 other districts. I

---

[1] With full knowledge of the "dire fiscal circumstances" facing the State in 2009, the Attorney General suggested that this Court order full funding to the Abbott districts to ensure the constitutionality of SFRA.

therefore must join the remedy advanced in Justice LaVecchia's opinion.

## I.

### *Constitutional Guarantee of a Thorough and Efficient Education*

The rights guaranteed in the New Jersey Constitution do not rise and fall with popular opinion; they do not flourish in the best of times and perish in the worst of times. The framers of our constitutional charters made the courts the guarantors of those rights, even when it may not be fashionable to do so. We cannot escape our constitutional responsibilities. Judicial review requires the courts, from time to time, to sit in judgment of the acts of another branch of government. A core judicial function is to construe the meaning of the Constitution and to make meaningful the rights given our citizens by the Constitution. That is a key piece in the structural framework of a constitutional democracy.

The drafters of the New Jersey Constitution made the provision of a public education a "fundamental right." *See Robinson IV,* *supra,* 69 *N.J.* at 147, 351 *A.*2d 713. The Constitution's Education Clause requires that "[t]he Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years." *N.J. Const.* art. VIII, § 4, ¶ 1. For more than thirty years, this Court has ruled that the poorest and most vulnerable children of this State, those mostly living in financially strapped urban areas, have a right to a constitutionally adequate education. *See Abbott XX,* *supra,* 199 *N.J.* at 144, 971 *A.*2d 989; *Robinson v. Cahill,* 62 *N.J.* 473, 481, 303 *A.*2d 273 (1973) (*Robinson I* ). The litigation that bears the name *Abbott v. Burke* first came before this Court in the mid–1980s when children attending schools in Jersey City, Camden, East Orange, and Irvington filed suit, successfully challenging the constitutionality of the Public School Education Act of 1975. *See Abbott v. Burke,* 100 *N.J.* 269, 277–78 & n.1, 495 *A.*2d

376 (1985) (*Abbott I* ). Over time, the Abbott litigation expanded to include children in 31 school districts who demanded a thorough and efficient education. *See Abbott v. Burke,* 196 *N.J.* 544, 555 n.5, 960 *A.*2d 360 (2008) (*Abbott XIX* ). Decades of school-funding litigation led this Court to issue "numerous remedial orders to enforce the constitutional rights of the pupils in the Abbott districts." *Abbott XX, supra,* 199 *N.J.* at 148, 971 *A.*2d 989.

But the rights of children outside the 31 Abbott school districts—also poor and disadvantaged—were not addressed in the Abbott litigation because they were not involved in the case. That seemed unfair to many. In 2009, on motion by the State, this Court upheld the constitutionality of SFRA—an Act "designed[ ] as a state-wide unitary system of education funding" to address the needs of at-risk children everywhere in the State, not just those in the Abbott districts. *Id.* at 147, 971 *A.*2d 989. In doing so, we relieved the State of having to adhere to the remedial orders that provided special funding to the Abbott children. *Id.* at 175, 971 *A.*2d 989. Indeed, the new Act abolished the designation of Abbott districts. *See id.* at 168–69, 971 *A.*2d 989.

This Court found SFRA constitutional "premised on the expectation that the State [would] continue to provide school funding aid during this and the next two years at the levels required by SFRA's formula each year." *Id.* at 146, 971 *A.*2d 989. The State committed that SFRA would enable schools to deliver the Core Curriculum Content Standards (sometimes referred to as CCCS) to their students and thus provide a thorough and efficient education. *See id.* at 170–71, 971 *A.*2d 989.

All three branches of government acknowledge that the benchmark for providing a thorough and efficient education is the teaching of the Core Curriculum Content Standards. *See N.J.S.A.* 18A:7F–44(q) (stating that students' "access to a constitutional education [is] defined by the core curriculum standards"); *N.J.A.C.* 6A:8–1.3 (stating that CCCS, as adopted by State Board of Education, are standards "established for the provision of a thorough and efficient education pursuant to *N.J.S.A.* 18A:7F–4");

*Abbott XIX, supra,* 196 *N.J.* at 562, 960 *A.*2d 360 (stating that CCCS "provide[ ] a constitutionally acceptable definition of a thorough and efficient education").

The Core Curriculum Content Standards "describe the knowledge and skills all New Jersey students are expected to acquire by benchmark grades." *N.J.A.C.* 6A:8–1.3. These standards—identified by the State Board of Education, *ibid.*—comprise nine academic areas: "the visual and performing arts, comprehensive health and physical education, language arts literacy, mathematics, science, social studies, world languages, technological literacy, and 21st century life and careers." *N.J.A.C.* 6A:8–1.1(a)(1). The constitutionality of SFRA hinged on the State "ensuring that the formula provide[d] those resources necessary for the delivery of State education standards across the State." *Abbott XX, supra,* 199 *N.J.* at 170, 971 *A.*2d 989.

Having found SFRA's funding formula constitutional, it appeared that this Court's long intercession in the school-funding controversies brought before us had come to an end. The following year, however, in balancing the budget, the Legislature enacted an appropriations bill that cut 1.601 billion dollars from the school-funding formula set forth in SFRA. The Education Law Center (ELC) then filed an action in aid of litigant's rights, seeking an order requiring the State to fund SFRA, as promised. The ELC argued that the short-funding of SFRA constituted a deprivation of the constitutional right to a thorough and efficient education to all at-risk children throughout the State—not just Abbott children. The State countered that dire fiscal circumstances—one of the reasons it advanced for our holding SFRA constitutional—was now a compelling reason not to fully fund the Act.

After initially hearing oral argument on the ELC's motion, the Court decided that the record before it was inadequate to rule on so important an issue. Based on argument alone, without the presentation of facts, we could not assess whether the underfunding of SFRA violated the constitutional guarantee of a thorough

and efficient education. We therefore remanded the matter to a Special Master, the Honorable Peter E. Doyne, A.J.S.C., to determine "whether school funding through SFRA, at current levels, can provide for the constitutionally mandated thorough and efficient education for New Jersey school children." Our remand Order to Judge Doyne specifically noted: "[T]he Court's determination that SFRA's funding formula was constitutional, on its face, [was] predicated on the express assumption that SFRA would be fully funded and adjusted as its terms prescribed, *Abbott XX, supra,* 199 *N.J.* at 170, 971 *A.*2d 989."

The remand Order further stated that,

because our previous holding expressly was based on the assumption of full funding, *see Abbott XX, supra,* 199 *N.J.* at 175 [971 *A.*2d 989], the State must bear the burden of demonstrating that the present level of school funding distributed through the SFRA formula can provide for a thorough and efficient education as measured by the comprehensive core curriculum standards in districts with high, medium, and low concentrations of disadvantaged pupils.

No school district was permitted to intervene in this action, although we did grant amicus-curiae status to a number of districts, including Piscataway and Montgomery Townships.[2]

## II.

### *Remand Hearing*

Our remand Order charged the Special Master with the task of determining whether the FY 2011 funding of SFRA at 1.601 billion dollars below the statutory formula met the constitutional mandate of a thorough and efficient education for New Jersey school districts with high, medium, and low concentrations of disadvantaged children. Judge Doyne took testimony from six school superintendents, whose school budgets were all below the "ade-

---

[2] School boards from Bridgeton, Burlington, East Orange, Jersey City, Perth Amboy, Phillipsburg, and Trenton (all former Abbott districts) were denied permission to intervene, although they were permitted to argue as amici curiae. Based on a separate motion, the Court granted amicus status to school boards from Newark (a former Abbott District) as well as Montgomery Township and Piscataway Township, neither of which are former Abbott districts.

quacy" level set forth in SFRA.[3] He also heard the opinion of three experts and reviewed thousands of documents. Judge Doyne concluded that the underfunding of SFRA denied disadvantaged children, in at least 205 school districts, a constitutionally adequate education. This is the testimony that led him to that conclusion.

Richard Tardalo, the superintendent of the City of Clifton school district, testified that the 38% reduction in state aid from the SFRA formula (approximately 13 million dollars) in a district where 42% of the students are at risk made it impossible to deliver the CCCS to all its students. The district was forced to eliminate: basic-skills instructors who assisted students not achieving proficiency in math or literacy; administrative aids who ensured student safety; supervisors for science, physical education, and social studies; and all guidance counselors in the elementary schools, and two in the high school. These reductions led to increased class sizes in the elementary and secondary schools and adversely affected the ability to provide the CCCS to students, according to the superintendent.

Tardalo explained that in more than one half of the schools in Clifton, a large percentage of students were not meeting proficiency in the CCCS. For example, in one elementary school less than 50% of the students reached proficiency level, and at the middle-school level approximately 50% did not achieve that level. Roughly 30% of students failed the High School Proficiency Assessment examination. Tardalo concluded that the district was not providing a "21st century education for all of our students."

---

[3] Statutory law and administrative regulations make a direct connection between a school district's adequacy budget and the ability to deliver a thorough and efficient education to students. *Cf. N.J.S.A.* 18A:7F–6(a), –44(i); *N.J.A.C.* 6A:23A–9.4, –9.5. An adequacy budget is calculated by determining the cost per pupil based on grade level and other significant characteristics. *See N.J.S.A.* 18A:7F–50 to –51. For example, SFRA accounts for the greater cost of educating at-risk students (those eligible for free or reduced-price lunch, *N.J.S.A.* 18A:7F–44(j), –45) and children with limited English proficiency. *See N.J.S.A.* 18A:7F–44(i), –51.

Harry Victor Gilson, the superintendent of the City of Bridge-ton school district, testified that a total of forty-five teacher positions were eliminated in this former Abbott district where 89.3% of the children are classified as at risk. Bridgeton received 18% less in state aid (over 13 million dollars) than under the SFRA formula. The loss of teachers resulted in increased class sizes, decreased course offerings, and interfered with the district's ability to provide the CCCS. Because Bridgeton has a high concentration of students mired in poverty, Gilson maintained that students were hobbled with disadvantages that required additional staffing. Gilson reported that Bridgeton cannot deliver the CCCS to its students, and has been unable to do so for several years. The budget cuts, he reasoned, are widening the achievement gap.

Walter Whitaker, the superintendent of Buena Regional school district, testified that the 21% reduction in state aid (almost 5 million dollars) required the elimination of five high-school, four middle-school, and four elementary-school teachers. The at-risk population of students in the district is 48%. The budget cuts have led to a "horrific" increase in class sizes, according to Whitaker. He explained that Buena was failing to deliver the CCCS for its disadvantaged children for the current year and that although the district had failed to do so in past years, the achievement gap was worsening. In short, Buena was falling further behind in enabling its students to acquire proficiency in the CCCS.

Robert L. Copeland, the superintendent of the Piscataway Township school district, testified that twenty-one teacher posi-tions were eliminated in a district where 27% of the students are at risk. Piscataway received 40% less in state aid (approximately 8 million dollars) than under the SFRA formula. Given the cuts, Copeland indicated that it would be "incredibly difficult" for many of his students to achieve proficiency in one of the subject areas of the CCCS. In a graphic illustration, Copeland alluded to the budget cuts falling most heavily on the disadvantaged children: "[T]here are some kids who are ... born on third base. They

walk in and they're able to do everything they're supposed to do. I have a bunch of kids having a hard time getting out of the dugout. I'm worried about the kids who it doesn't come easy for and what we're not able to do for them."

John A. Crowe, the superintendent for the Woodbridge Township school district—30% of whose children are at risk—testified that as a result of the 44% reduction in state aid from the SFRA formula (14 million dollars), five elementary-school guidance counselors, all elementary-school computer teachers, and three district-wide substance-abuse counselors were terminated. Moreover, there are no longer librarians and security guards in the middle schools. Business technology and social-studies course offerings were reduced, and students from grades six to eight only received instruction in world languages for just part of the year—an approach inconsistent with proficiency requirements of the CCCS. Crowe concluded that due to lack of resources, Woodbridge could not deliver the CCCS to many of its students, despite the district's best efforts.

Earl Kim, the superintendent for Montgomery Township school district, testified that the district received 71% less in state aid (approximately 4.5 million dollars) than under the SFRA formula. Montgomery has an at-risk student population of 2.5%, smaller than the other districts. Nevertheless, the budget cuts still directly affected disadvantaged students. The program that helped failing students make progress toward proficiency in the CCCS was reduced. Although the number of students in need of academic support almost tripled in one year to 120, those students are no longer receiving the support they received in past years due to the cuts in state aid. Kim concluded that the loss of state aid affected the district's ability to deliver the CCCS and provide a thorough and efficient education, and that the district would feel the deleterious effects in the years to come.

The ELC presented as an expert witness Melvyn Wyns, who served for thirteen years as Director of the Office of School Finance in the New Jersey Department of Education. He testi-

fied that the 205 districts funded below their adequacy budgets were not financially capable of providing their students with proficiency in the CCCS.

Based on the testimony and documents presented at trial,[4] Judge Doyne observed that "despite the best effort of the superintendents, the [Core Curriculum Content Standards] are not being met at existing funding levels. The loss of teachers, support staff and programs is causing less advanced students to fall farther behind and they are becoming demonstrably less proficient." He did not find that the districts were misallocating the limited monies available to them. Indeed, to the contrary, the district superintendents "attempted to resolve the difficulties of instituting reductions as fairly as possible while still complying with their mandate to provide a thorough and efficient education consistent with the CCCS."

Judge Doyne found that the 1.601 billion-dollar reduction in state aid contained in the FY 2011 Appropriations Act—a 19% reduction from the previous year—fell most "significantly" on the most vulnerable districts. Judge Doyne held that the extensive cuts in state aid—the underfunding of SFRA—denied disadvantaged children their constitutional right to a thorough and efficient education as measured by the Core Curriculum Content Standards.

## III.

### *Constitutional Violation*

The 581 school districts in New Jersey teach 1,366,271 students. In all, 205 school districts—36.6% of all the State's school districts—were funded below adequacy in FY 2011. Those districts teach 54% of the students in the State. Of all the at-risk students in the State, 72% reside in those 205 districts. Judge Doyne

---

[4] Judge Doyne rejected the testimony of the State's two experts, who suggested a lack of correlation between funding toward an adequacy budget and the attainment of a thorough and efficient education.

credited the testimony of the six superintendents, all of whom served in districts that were funded below their adequacy budgets. All six described how cuts in state aid in violation of the SFRA formula impaired—and, in most cases, rendered impossible—their school districts' ability to meet the CCCS. These six school-district superintendents represented a fair cross-section of districts with high, medium, and low concentrations of at-risk children funded below their adequacy budgets. Judge Doyne also credited the testimony of Melvyn Wyns, the State's long-time Director of School Finance, who stated that the 205 districts funded below their adequacy budgets cannot provide a thorough and efficient education to their students.

In his findings of fact, Judge Doyne concluded that school districts that were funded under their adequacy budgets were not able to provide proficiency in the CCCS to at-risk children. The educational deprivations detailed by Judge Doyne were not trivial or inconsequential; they were systemic. This Court is required to defer to the factual determinations of the Special Master so long as they are "supported by substantial credible evidence in the record." *Abbott XX, supra,* 199 *N.J.* at 146 n.2, 971 *A.*2d 989 (quotation and citation omitted); *accord State v. Chun,* 194 *N.J.* 54, 93, 943 *A.*2d 114 (2008).[5] Judge Doyne's factfindings are supported by credible evidence in the record.

Based on those factfindings, the State is in violation of its constitutional obligation to provide a thorough and efficient education to the at-risk children in 205 school districts statewide. *Cf. Robinson I, supra,* 62 *N.J.* at 513, 303 *A.*2d 273 ("A system of instruction in any district of the State which is not thorough and efficient falls short of the constitutional command."). Neither the State nor the ELC provided any testimony from school superintendents representing districts funded above their adequacy budgets. The record, therefore, cannot support a finding that state-

---

[5] The dissent does not faithfully adhere to this deferential standard of review. We are not permitted to cherry pick bits and pieces of testimony that, when viewed in isolation, might suggest a different or preferred outcome.

aid cuts in violation of the SFRA formula for districts above adequacy (excepting the former Abbott districts) amounted to a constitutional violation.

The fiscal problems facing the State were not addressed by Judge Doyne. Those problems are real and daunting. But they do not transform a constitutionally inadequate education into a constitutionally adequate one. More than three decades ago, it was suggested that the State could not remedy the unequal funding of education in poor urban districts because of "depressed economic conditions." *See Robinson IV, supra,* 69 *N.J.* at 173, 351 *A.*2d 713 (Pashman, J., dissenting). Two years ago, the State successfully urged the Court to find the unitary funding formula of SFRA constitutional and not to order supplemental funding to the Abbott districts, in part, because of the dire fiscal troubles confronting the State. *See Abbott XX, supra,* 199 *N.J.* at 172–73, 971 *A.*2d 989. Now, also based on economic circumstances, we are asked to approve a breach of the SFRA formula that will deny at-risk children a constitutionally adequate education.

The State counsels that we stay our hand in deference to the other branches of government. That would be a proper approach had Judge Doyne found that the reduction in school funding did not significantly diminish the ability of the State to provide a constitutionally adequate education. But Judge Doyne found otherwise, based on credible testimony and documentary evidence. The record reveals that the constitutional rights of tens of thousands of children are being violated. In these circumstances, the Constitution does not permit this Court to stay its hand.

Children go to school for a finite number of years. They have but one chance to receive a constitutionally adequate education. That right, once lost, cannot be reclaimed. The loss of that right will have irreparable consequences, particularly for the disadvantaged children to whom SFRA was intended to give a fair chance at a thorough and efficient education.

This Court has recognized that "there is a significant connection between the sums expended and the quality of the educational

opportunity . . . notwithstanding that the impact upon students may be unequal because of other factors, natural or environmental." *Robinson I, supra,* 62 *N.J.* at 481, 303 *A.*2d 273. SFRA itself was premised on the correlation between spending per student—in particular the spending necessary to educate at-risk students—and the delivery of a thorough and efficient education. *See Abbott XX, supra,* 199 *N.J.* at 152–53, 971 *A.*2d 989. We are long past saying that money does not matter.

Moreover, this Court has rejected the argument that the State Constitution's Appropriation Clause trumps a fundamental right in general, and the Education Clause in particular. *Robinson IV, supra,* 69 *N.J.* at 154, 351 *A.*2d 713; *cf. City of Camden v. Byrne,* 82 *N.J.* 133, 148–49, 411 *A.*2d 462 (1980) (stating that judiciary cannot compel funding of *statutorily* created rights). The securing of fundamental rights may, in certain circumstances, require the appropriation of funding. The State conceded at oral argument that the constitutional right to the assistance of counsel requires the State to appropriate monies for the representation of indigent criminal defendants. *See Gideon v. Wainwright,* 372 *U.S.* 335, 344, 83 *S.Ct.* 792, 796, 9 *L.Ed.*2d 799, 805 (1963); *Rodriguez v. Rosenblatt,* 58 *N.J.* 281, 285–86, 277 *A.*2d 216 (1971) (citations omitted). The implementation of *Brown v. Board of Education,* which brought tumbling down the walls of state-sponsored segregation in public education, came at a price—the expenditure of public funds. *See* 347 *U.S.* at 493–95, 74 *S.Ct.* at 691–92, 98 *L.Ed.* at 880–81.

Likewise, the Appropriation Clause cannot render a nullity "the mandate of the Education Clause"—the fundamental right to a constitutionally adequate education. *See Robinson IV, supra,* 69 *N.J.* at 154, 351 *A.*2d 713. The Constitution's Education Clause begins with the language, "The Legislature *shall* provide . . . ." *N.J. Const.* art. VIII, § 4, ¶ 1 (emphasis added). Accordingly, the Legislature cannot decide to withhold that which the Constitution mandates it must provide. Because a constitutionally adequate education is a fundamental right, "it follows that the court must

afford an appropriate remedy to redress a violation" of the Education Clause. *See Robinson IV, supra,* 69 *N.J.* at 147, 351 *A.2d* 713 (quotation and citation omitted). "To find otherwise would be to say that our Constitution embodies rights in a vacuum, existing only on paper." *Ibid.* (quotation and citation omitted).

The New Jersey Constitution is the supreme law of this State. Every branch of government, including the judiciary, is subordinate to its command. It is the judiciary's unique responsibility, however, to be the final expositor of the Constitution's meaning and the ultimate protector of the rights conveyed by the Constitution to the people. This is not a new concept. Alexander Hamilton in *The Federalist Papers* recognized that it is the duty of courts "to declare all acts contrary to the manifest tenor of the Constitution void" and that the failure to do so would mean that "particular rights or privileges would amount to nothing." *See The Federalist Papers* No. 78, at 505 (Alexander Hamilton) (Robert B. Luce, Inc., 1976); *accord Marbury, supra,* 5 *U.S.* at 177–78, 2 *L.Ed.* at 73–74. At the time of the drafting of New Jersey's modern Constitution, Governor Alfred E. Driscoll echoed Hamilton's vision of the role of the judiciary, noting that "independent courts" were necessary "to curb any tendency on the part of the other two branches of government to exceed their constitutional authority." 4 *Proceedings of the Constitutional Convention of 1947,* at 428–29.

In ordering that the State comply with our Constitution's mandate under the Education Clause, our Court—although at odds with coordinate branches of government to which we ordinarily accord great deference—is fulfilling its historical role as the guarantor of fundamental rights.

## IV.

### *Remedy*

In *Abbott XX,* the legal landscape was forever altered when this Court upheld SFRA's constitutionality. SFRA did not speak

about Abbott districts, but about at-risk children, wherever they might reside in this State. *See Abbott XX, supra,* 199 *N.J.* at 168–69, 971 *A.*2d 989. SFRA's constitutionality was "premised on the expectation that the State [would] continue to provide school funding aid during this and the next two years at the levels required by SFRA's formula each year." *Id.* at 146, 971 *A.*2d 989. There are no longer Abbott districts; there are only at-risk children, and they reside in every district.

The remedy in this case should flow naturally from the charge given to Judge Doyne by this Court. We have a finding that 205 school districts funded below their adequacy budgets under the SFRA formula are not able to provide a thorough and efficient education. Those school districts, therefore, should receive funding as required under the SFRA formula. That would accord with the mandate of our State Constitution's Education Clause.[6] I would go further than Justice LaVecchia and give relief beyond the 31 former Abbott districts.

At every stage in the present proceedings, the issue has been the constitutionality of the underfunding of SFRA with respect to at-risk children in school districts everywhere in the State. When the ELC filed its motion in aid of litigant's rights, it sought an order "enjoining the State Defendants from ... providing State school funding aid to New Jersey school districts for [FY 2011]

---

[6] Full compliance with SFRA in the current year would not have brought every school district to the objective of an adequacy budget, but would have moved underfunded districts closer to that goal. When we upheld the constitutionality of SFRA, we understood that it was a work in progress. *See Abbott XIX, supra,* 196 *N.J.* at 558, 960 *A.*2d 360. That SFRA in its first year would not have achieved an adequacy budget for every district did not render it unconstitutional. But here, the withholding of state aid has driven some districts below adequacy and other districts further from adequacy. Accordingly, I would only require the State to abide by the SFRA formula with respect to the 205 districts under adequacy. Having found SFRA constitutional, this Court does not have the power to remodel SFRA to require that every district, all at once, be funded to adequacy. Had the State complied with its own SFRA formula, those 205 districts would have received $972,930,819 in state aid during FY 2011. To bring all those districts to adequacy would have required $1,071,287,484.

that is less than the aid levels required by" SFRA. At oral argument before this Court, the ELC indicated that, although it represented "Abbott plaintiffs," under SFRA those plaintiffs were now "at-risk students," and that the short-funding of SFRA violated the constitutional rights of all at-risk students in the State.

Clearly, with the Abbott designation stripped from our law, the ELC had the standing to assert the rights of these at-risk students. The at-risk children in the former Abbott districts share the same exact characteristics of at-risk children in other districts, particularly those with high concentrations of disadvantaged children. With the Abbott designation gone, and based on the remand Order of this Court, the ELC in my view became the equitable representative of all at-risk children in the State.

Our remand Order asked Judge Doyne to determine "whether school funding through SFRA, at current levels, can provide for the constitutionally mandated thorough and efficient education . . . in districts with high, medium, and low concentrations of disadvantaged pupils." In light of our remand Order, no school official could reasonably have understood that the present action involved only the 31 former Abbott districts. Of the six superintendents called to testify at the remand hearing by both the State and the ELC, only one represented a former Abbott district. If the interests of only former Abbott districts were at issue, it was a terrible waste of time for Judge Doyne to hear from superintendents representing the school districts of Clifton, Piscataway, Woodbridge, Montgomery, and Buena and to render a ruling addressing all school children, not just children in the former Abbott districts.[7]

---

[7] The dissenters joined the Order remanding for factfindings by Judge Doyne. Implicit in the Order's language was the understanding that this Court had the authority to decide whether the State was fulfilling its constitutional obligations under *Abbott XX* and to correct any constitutional deficiencies. Now the dissenters take the position that this Court, in the present action, is powerless to enforce both the Constitution and one of our opinions.

Finding a constitutional violation of the rights of at-risk children in the former Abbott districts, while acquiescing to the violation of the constitutional rights of tens of thousands of similarly situated students in districts funded below their adequacy budgets, to my mind, is not a just solution. The redress of the rights of those students now must await a day when it may be too late for them to enjoy their right to a constitutionally adequate education.

## V.

### Conclusion

To remedy the constitutional violation to the children in the 205 schools districts that were funded under their adequacy budgets, I would require the State to abide by the SFRA formula. However, my viewpoint does not command a majority of the Court. I will not sacrifice relief for at-risk children in 31 school districts because I cannot bring relief—a constitutionally adequate education—to at-risk children in 187 other districts. I therefore join Justice LaVecchia's remedy.

Justice RIVERA–SOTO, dissenting.

This motion in aid of litigants' rights should be denied for the substantive reasons elegantly and cogently expressed in the separate dissenting opinion of Justice Hoens and in which I join. I write separately, however, to underscore a procedural concern today's decision glaringly brings to the fore. First, some context.

## I.

Starting with *Robinson v. Cahill*, 62 *N.J.* 473, 303 *A.*2d 273 (1973), this Court embarked on an initially well-intentioned but

---

Moreover, the dissenters hold fast to the view that majority rules—except when they are in the minority. Two weeks ago, when the dissenters were part of a three-person majority, they spoke for the five-person Court. *See He v. Miller*, —— *N.J.* ——, —— *A.*3d —— (2011). Now that the dissenters are in the minority, suddenly a super majority must speak for a five-person Court. I concur with Justice LaVecchia's refutation of the dissenters' account today of what constitutes a majority to decide a motion.

now fundamentally flawed and misguided approach to addressing the New Jersey Constitution's promise that "[t]he Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years." *N.J. Const.* art. VIII, § IV, ¶ 1.

After a number of fits and starts, interspersed with seemingly endless litigation, in 2008 the Legislature adopted, and the Governor signed into law the School Funding Reform Act of 2008 (SFRA), *N.J.S.A.* 18A:7F–43 to –63. Two years ago, in gauging the constitutionality of the then recently enacted SFRA, this Court determined that "SFRA satisfies the requirements of the thorough and efficient clause of Article VIII, section 4, paragraph 1 of the New Jersey Constitution and that the funding formula may be implemented in the Abbott districts," thereby leading the Court to "reliev[e] the State from this Court's prior remedial orders concerning funding to the Abbott districts," *Abbott v. Burke,* 199 *N.J.* 140, 175, 971 *A.2d* 989 (2009) (*Abbott XX*).[1] As *Abbott XX* recognized, SFRA represented a sea change in how

---

[1] Although commonly referred to as *Abbott XX,* that opinion in fact is the twenty-first time this Court has issued a reported decision in this now more than a quarter-century-old litigation. *See* (1) *Abbott v. Burke,* 100 *N.J.* 269, 495 *A.2d* 376 (1985); (2) *Abbott v. Burke,* 119 *N.J.* 287, 575 *A.2d* 359 (1990); (3) *Abbott v. Burke,* 136 *N.J.* 444, 643 *A.2d* 575 (1994); (4) *Abbott v. Burke,* 149 *N.J.* 145, 693 *A.2d* 417 (1997); (5) *Abbott v. Burke,* 153 *N.J.* 480, 710 *A.2d* 450 (1998); (6) *Abbott v. Burke,* 163 *N.J.* 95, 748 *A.2d* 82 (2000); (7) *Abbott v. Burke,* 164 *N.J.* 84, 751 *A.2d* 1032 (2000); (8) *Abbott v. Burke,* 170 *N.J.* 537, 790 *A.2d* 842 (2002); (9) *Abbott v. Burke,* 172 *N.J.* 294, 798 *A.2d* 602 (2002); (10) *Abbott v. Burke,* 2003 *N.J. LEXIS* 461 (*N.J.* Apr. 29, 2003); (11) *Abbott v. Burke,* 177 *N.J.* 578, 832 *A.2d* 891 (2003); (12) *Abbott v. Burke,* 177 *N.J.* 596, 832 *A.2d* 906 (2003); (13) *Abbott v. Burke,* 181 *N.J.* 311, 857 *A.2d* 173 (2004); (14) *Abbott v. Burke,* 182 *N.J.* 153, 862 *A.2d* 538 (2004); (15) *Abbott v. Burke,* 185 *N.J.* 612, 889 *A.2d* 1063 (2005); (16) *Abbott v. Burke,* 187 *N.J.* 191, 901 *A.2d* 299 (2006); (17) *Abbott v. Burke,* 196 *N.J.* 348 (2006) (inadvertently withdrawn from bound volume but reposted at 203 *N.J.* 157, 1 *A.3d* 602 (2006)); (18) *Abbott v. Burke,* 193 *N.J.* 34, 935 *A.2d* 1152 (2007); (19) *Abbott v. Burke,* 196 *N.J.* 451, 956 *A.2d* 923 (2008); (20) *Abbott v. Burke,* 196 *N.J.* 544, 960 *A.2d* 360 (2008); (21) *Abbott v. Burke,* 199 *N.J.* 140, 971 *A.2d* 989 (2009). Applying that rather straightforward methodology and for accuracy's sake, this decision should be designated as *Abbott XXII.*

New Jersey endeavored to provide the constitutionally required "thorough and efficient system of free public schools[.]" *N.J. Const.* art. VIII, § IV, ¶ 1. It did so by "enact[ing] a funding formula that is designed to achieve a thorough and efficient education for every child, regardless of where he or she lives[,]" *Abbott XX, supra,* 199 *N.J.* at 175, 971 *A.*2d 989. At its core, SFRA operates by reaching certain funding milestones in a reasoned, thoughtful and informed manner, and then "grossing up" those milestones to provide yet additional funding comfort.

In *Abbott XX,* this Court held that the SFRA funding process was constitutional but, foreshadowing the economic crisis that shortly thereafter would engulf our entire Nation, it acknowledged that "[t]here is no absolute guarantee that SFRA will achieve the results desired by all." *Ibid.* Mindful of that concern, the Court took care to emphasize that "[t]he political branches of government, however, are entitled to take reasoned steps, even if the outcome cannot be assured, to address the pressing social, *economic,* and educational challenges confronting our state." *Ibid.* (emphasis supplied). The Court concluded that the executive and legislative branches "should not be locked in a constitutional straitjacket" and that "SFRA deserves the chance to prove in practice that, as designed, it satisfies the requirements of our constitution." *Ibid.*

## II.

That context informs today's decision where, by a 3–to–2 vote, this Court grants relief in aid of litigants' rights. It is critical to re-emphasize that, procedurally, this matter is before the Court not as a petition for certification or any other application on appeal, but, specifically, as a motion. Although the *Rules of Court* explicitly define how many judges of the Appellate Division are required to grant a motion,[2] the *Rules* are silent as to the number of Justices needed to grant motion relief. That silence is particu-

---

[2] *R.* 2:8–1(c) (providing that "[u]nless the court otherwise directs, all motions in the Appellate Division shall be decided by a single judge except that motions

larly poignant, as the *Rules* specifically provide that less than a majority of the Justices—only three—are required to vote affirmatively in order to grant a petition for certification, the vehicle by which the overwhelming majority of appeals arrive at this Court. *See R.* 2:12–10 (providing that "[a] petition for certification shall be granted on the affirmative vote of 3 or more justices").

As a result and particularly in the context of a Court constituted by fewer than its full compliment of seven, the requirements for granting a motion before this Court have been the subject of extensive internal discussion and have evolved as a matter of practice. Based on those discussions and evolution, the rule of practice in fact and consistently applied in this Court has been that, to be granted, a motion requires the affirmative vote of four, regardless of the number of Justices voting. Although unwritten, that practice is borne out by the relevant empirical data. In the period between June 24, 1987 and April 11, 2011, this Court determined and ruled in a total of 38,170 motions,[3] of which between one-half and two-thirds were determined administratively.[4] Of the remaining motions decided by the Court, 3,736 motions were determined by a less-than-unanimous vote; of those,

---

for bail, stay of any order or judgment, summary disposition, and leave to appeal shall be decided by a panel of at least two judges. Insofar as practicable, motions for reconsideration and motions for counsel fees for work performed in the Appellate Division shall be decided by the judges who decided the original matter.").

[3] The Clerk of the Supreme Court advises that, because data concerning motions prior to June 24, 1987 was not maintained electronically, the task of compiling information for prior to that date would be overwhelming. Although data concerning the entire universe of motions decided by this Court after it was constituted pursuant to the 1947 Constitution would represent the most complete survey, a sample size spanning almost twenty-four years and over 38,000 motions appears sufficiently significant.

[4] Data concerning Court Terms prior to 1994 is unavailable due to recordkeeping limitations. However, for the 1994–to–2006 Court Terms, there were a total of 18,877 motions filed. Of these, 11,748 or 62.2% were decided administratively, while 7,126 or 37.8% were decided by the Court. The trend of the earlier

forty-seven, or 1.25 percent, were decided by a five-member Court, and of those forty-seven, all of four—or one-one hundredth of one percent (0.01%) of all motions decided, one-one tenth of one percent (0.1%) of non-unanimously-decided motions, and barely 8.5 percent of the far smaller subset of all non-unanimous motions decided by a five-member Court—were granted by a 3-to-2 margin.[5]

Tellingly, not one of the motions that were granted by a 3-to-2 margin was a dispositive motion, but instead were motions seeking only *interim* procedural relief: they consisted of two motions seeking a stay,[6] one motion applying for bail during the pendency of an appeal,[7] and one motion seeking leave to file as within time.[8]

In stark contrast, the matter presently before the Court is of a radically and fundamentally different species than those everyday motions seeking interim procedural relief either by way of a stay, bail pending appeal, or leave to file as within time. As a practical matter, plaintiffs' motion in aid of litigants' rights seeks a disposition on the merits: the relief it requests is to have the State of New Jersey held in contempt for failing to fund the State's system

---

decisions was more weighted towards a 50–50 split; more recently, the trend has been towards a two-thirds-administratively-determined/one-third-Court-decided split.

[5] It is ironic that, of the forty-five non-unanimous motions decided by a five-member Court, thirteen, or almost twenty-nine percent, have been in the seemingly never-ending *Abbott* litigation; of those five-member non-unanimous-Court-granted *Abbott* motions, *none*—not one—was granted by less than a 4-to-1 vote.

[6] *Marchell v. Marchell*, M–1672–88, stay pending accelerated appeal granted (July 13, 1989); *In re the Contest of the November 8, 2005 General Election for the Office of Mayor of the Township of Parsippany–Troy Hills*, M–558–06, stay pending appeal granted (Dec. 12, 2006).

[7] *State v. Kingsberry*, M–908–90, bail pending appeal granted (Apr. 5, 1991).

[8] *Ballinger v. Delaware River Port Auth.*, M–589–01, motion for leave to file as within time granted (Jan. 23, 2002).

of public education in strict accordance with SFRA.[9] That fact is made patent by no less a source than plaintiffs' notice of motion that triggered this dispute, which sought mandatory relief in the form of an order from this Court "enjoining the State defendants from ... providing State school funding aid to New Jersey school districts for 2010–11 that is less than the aid levels required by the provisions of [SFRA.]"[10]

That application—one that seeks to hold the State and its constitutional officers in contempt unless an additional $1.74 billion is earmarked for school funding—is of a character so different from the tiny group of garden-variety motions this Court has granted on a 3-to-2 margin that it is simply incomprehensible that any impartial observer would give them equal dignity. The matters at issue here—and the resulting constitutional clash that will arise from this Court ordering additional public school district funding the 3-to-2 majority studiously avoids quantifying, yet which likely will approach $1 billion, a sum admittedly absent from the State's treasury—demand of this Court far more than simply

---

[9] In New Jersey's jurisprudential regime, the underlying application brought by plaintiffs—a motion in aid of litigants' rights—is a species of contempt and is codified in the same *Rule* as governs contempt proceedings. *Compare R.* 1:10–1 (addressing direct contempt), *and R.* 1:10–2 (addressing indirect contempt) *with R.* 1:10–3 (providing that "[n]otwithstanding that an act or omission may also constitute a contempt of court, a litigant in any action may seek relief by application in the action"). *See also* Pressler & Verniero, *Current N.J. Court Rules*, Comments 4.4.1 and 4.4.2 to *R.* 1:10–3 (2011) (noting that "sanctions under *R.* 1:10–3 are intended to be coercive, not punitive" but that "[w]hile monetary penalties are the more usual method by which the court attempts to compel compliance, incarceration may be ordered").

[10] Plaintiffs titled their application as a "notice of motion in aid of litigants' rights[,]" stated that the application was brought "pursuant to *R.* 1:10–3 and *R.* 2:8–1," and also included a request that the State be enjoined from "conducting the review of the SFRA formula and its operative parts and making recommendations to the Legislature [pursuant to SFRA] until such time as the State can demonstrate that the formula has been fully implemented as intended, designed and enacted." Plaintiffs have abandoned that latter request, leaving only their request that the State be ordered to fund fully the public school districts in strict accord with SFRA.

ignoring overwhelming practice and granting substantive relief for the temporary advantage of issuing relief on a customarily insufficient 3–to–2 vote. New Jersey's citizenry and the blueprint of government that is our State Constitution deserve more, much more.

## III.

Even if the issuance of relief on a 3–to–2 margin is appropriate in respect of this motion, the facts underlying the motion cry out for the exercise of judicial restraint—or, better yet, judicial humility—that should be the hallmark of every decision of this Court. In light of the majority's unspoken but nonetheless clear assumption that one constitutional right must predominate over another, prudence dictates that when, as here, the effect of that choice is fiscal suicide that becomes the catalyst of a crisis of constitutional proportions, the proper course for this Court is to heed the State's reasonable request and stay its hand. Otherwise, this Court risks entering an area better suited to the genre of fantasy: how can one have SFRA-defined fully funded public school districts when, given limited funds, that result only can come at the expense of other equally constitutionally worthy items or categories? In that respect, we are well-served to remember that the Constitution "is not a suicide pact[,]" *Kennedy v. Mendoza–Martinez*, 372 *U.S.* 144, 160, 83 *S.Ct.* 554, 563, 9 *L.Ed.*2d 644, 656 (1963); *Haig v. Agee*, 453 *U.S.* 280, 309–10, 101 *S.Ct.* 2766, 2783, 69 *L.Ed.*2d 640, 664 (1981) (same); *Aptheker v. Secretary of State*, 378 *U.S.* 500, 509, 84 *S.Ct.* 1659, 1665, 12 *L.Ed.*2d 992, 999 (1964) (same), a recognized principle of constitutional adjudication New Jersey likewise has embraced. *State v. Golotta*, 178 *N.J.* 205, 221, 837 *A.*2d 359 (2003) (holding that "the Constitution 'is not a suicide pact[,]' " (quoting *Kennedy, supra* )); *State v. Jahr*, 114 *N.J.Super.* 181, 186, 275 *A.*2d 461 (Law Div.1971) (same).

## IV.

I add only the following. The rejoinder on the reasoning and factual underpinnings of this dissent by those who proclaim victo-

ry by a 3-to-2 margin, *ante* at 371–76, 20 *A.*3d at 1043–45, has precious little to do with the rationale of this dissent and everything to do with the result they reach. As well-intentioned as they may be, however, they proceed at the peril of failing to respect the primacy of our established procedures. Those long-established practices and procedures, forged on the anvil of time and careful consideration, command that motions are *not* carried by a simple majority but require the affirmative vote of four.

By abandoning that time-honored practice today, regardless of the reasons for that choice, they leave unexplained why, over time, others were denied relief on motion because they failed to garner the up-until-now required four votes. At a minimum, an explanation is due and owing from those who today discard our well-established rule of practice.[11]

---

[11] A different, but corollary consideration also is implicated by today's substantive determination of a dispositive motion by a 3-to-2 margin. In acting as it has, this Court has abandoned the salutary practice of unanimity almost universally followed by courts of last resort: they often have spoken through unanimous rulings in contentious cases in order to avoid likely criticism and, more to the point, to encourage compliance. Indeed, that practice has been the hallmark of the more controversial of our own *Abbott* cases, starting with the first one. *See Abbott v. Burke*, 100 *N.J.* 269, 495 *A.*2d 376 (1985) (6–0 vote); *Abbott v. Burke*, 119 *N.J.* 287, 575 *A.*2d 359 (1990) (7–0 vote); *Abbott v. Burke*, 136 *N.J.* 444, 643 *A.*2d 575 (1994) (7–0 vote); *Abbott v. Burke*, 153 *N.J.* 480, 710 *A.*2d 450 (1998) (7–0 vote); *Abbott v. Burke*, 163 *N.J.* 95, 748 *A.*2d 82 (2000) (6–0 vote); *Abbott v. Burke*, 164 *N.J.* 84, 751 *A.*2d 1032 (2000) (5–0 vote); *Abbott v. Burke*, 2003 *N.J. LEXIS* 461 (N.J. Apr. 29, 2003) (5–0 vote); *Abbott v. Burke*, 177 *N.J.* 578, 832 *A.*2d 891 (2003) (5–0 vote); *Abbott v. Burke*, 181 *N.J.* 311, 857 *A.*2d 173 (2004) (5–0 vote); *Abbott v. Burke*, 182 *N.J.* 153, 862 *A.*2d 538 (2004) (6–0 vote); *Abbott v. Burke*, 185 *N.J.* 612, 889 *A.*2d 1063 (2005) (7–0 vote); *Abbott v. Burke*, 187 *N.J.* 191, 901 *A.*2d 299 (2006) (7–0 vote); *Abbott v. Burke*, 193 *N.J.* 34, 935 *A.*2d 1152 (2007) (7–0 vote); *Abbott v. Burke*, 196 *N.J.* 451, 956 *A.*2d 923 (2008) (6–0 vote); *Abbott v. Burke*, 196 *N.J.* 544, 960 *A.*2d 360 (2008) (5–0 vote); *Abbott v. Burke*, 199 *N.J.* 140, 971 *A.*2d 989 (2009) (5–0 vote). The notion that unanimity—or something akin to it—is a jurisprudentially sound goal in controversial cases also has been followed in so-called "blockbuster" cases in the Supreme Court of the United States. *See, e.g., Brown v. Board of Education,* 347 *U.S.* 483, 74 *S.Ct.* 686, 98 *L.Ed.* 873 (1954) (unanimously ordering school desegregation and holding unconstitutional "separate but equal" policy); *United States v. Nixon,* 418 *U.S.* 683, 94 *S.Ct.* 3090, 41 *L.Ed.*2d 1039 (1974) (unanimous-

## V.

When, with the perspective of time seasoned by thoughtful and reasoned deliberation, the scales of justice are calibrated in respect of this motion and its disposition, the result observed will not be true to any fair system of weights and measures; this Court will have placed its not inconsiderable thumb on those scales and thus skewed the results. Further, when, as here, there is grave doubt concerning the propriety of a procedural maneuver employed, it ill-becomes the Judiciary—the unelected branch of government—to engage in an unseemly power-grab under the guise of unnecessary constitutional adjudication. Far greater virtue lies in allowing the political branches of government—those directly elected by the citizenry to give voice to their views—to engage in a democratic discourse and seek solutions consonant with their constitutional obligations. Because, in my view, this Court usurps that choice and errs grievously in employing a procedurally suspect means to ramrod a billion dollar remedy this State can ill-afford, I must dissent.

Justice HOENS, dissenting.

My dissenting colleague has ably explained the evolution of this Court's tradition requiring four votes to grant relief when it is sought by motion. And he has well expressed how, using that time-honored and previously unquestioned approach, plaintiffs' motion for an order directing that the State fully fund the formula embodied in the School Funding Reform Act of 2008 (SFRA), *N.J.S.A.* 18A:7F–43 to –63, which garnered only three affirmative votes, should have failed. I leave it to my dissenting colleague to opine further about the sweeping decision issued today by those whose votes, although comprising a simple majority, fall short of the requisite number of four. Instead, I limit this dissent to the

---

ly rejected sitting President's claim of executive privilege to disclosure of Oval Office tape recordings pursuant to grand jury subpoena). That today's decision will be the source of great controversy is an understatement, which additionally militates against the extreme action today taken.

substantive defects in plaintiffs' application that, in my view, demand a different outcome.

There are three principal reasons why plaintiffs' motion must be denied. First, the motion must fail because it cannot, and does not suggest that it can, meet the standard set forth in *Rule* 1:10–3, which is the basis on which relief was demanded. Second, the motion must fail because it is based on findings made by the Special Master that lack sufficient support in the narrowly-focused record that was compiled during the remand proceedings. Third, it must fail because implicit in the decision to grant the motion is an exercise of authority by this Court that treads on time-honored constitutional principles governing the power vested in our two coordinate branches of government to raise revenue and make appropriations. Any one of those reasons alone would suffice to deny relief, but taken together they make any contrary choice both unwise and unprecedented.

## I.

First, plaintiffs based their application on *Rule* 1:10–3, a vehicle through which they sought what is commonly known as an order in aid of litigant's rights. In truth, theirs is a request for extraordinary relief, because the order in aid of litigant's rights is a device that springs from the Court's contempt power. As such, it employs coercion in response to a specific kind of wrong, one that "consists of a defiance of governmental authority." *Dep't of Health v. Roselle*, 34 *N.J.* 331, 337, 169 *A.*2d 153 (1961).

Because it is a form of punishment for an act of contempt, its exercise must rest, fundamentally, on three findings. Before issuing an order in aid of litigant's rights, the court must find: (1) that the party against whom relief is sought has been the subject of an order of the court; (2) that the party has failed and refused to comply with that order; and (3) that the party has done so although fully capable of complying with the order in question. *See, e.g., Pasqua v. Council*, 186 *N.J.* 127, 141 n. 2, 892 *A.*2d 663 (2006) (noting prerequisite finding that litigant was capable of

compliance "but willfully refused to do so"); *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 392, 658 *A.*2d 1230 (1995) (observing that " 'before ordering any sanction, [the court] must determine that defendant has the ability to comply with the order [that] he has violated' " (quoting *Essex County Welfare Bd. v. Perkins,* 133 *N.J.Super.* 189, 195, 336 *A.*2d 16 (App.Div.1975))). The sort of behavior that typically supports issuance of an order in aid of litigant's rights is an act or acts that bespeak "clear defiance of [a court's] specific and unequivocal orders." *Abbott v. Burke (Abbott VIII),* 170 *N.J.* 537, 565, 790 *A.*2d 842 (2002) (LaVecchia, J., concurring in part and dissenting in part).

Nothing in this record supports any of those essential findings. To begin with, there is no "specific and unequivocal order" of this Court, *ibid.,* directing that the SFRA formula be fully funded. Our decision concerning the facial constitutionality of SFRA and our conclusion that SFRA could supplant the prior funding scheme, *see Abbott v. Burke (Abbott XX ),* 199 *N.J.* 140, 175, 971 *A.*2d 989 (2009), included references to anticipated future funding of that formula, *see id.* at 146, 170, 971 *A.*2d 989, but nothing whatsoever in *Abbott XX* elevated that language to the force of a constitutional mandate.

Apparently aware of the rather glaring absence in the record of a "specific and unequivocal order," the majority instead rearticulates *Abbott XX* in terms more suitable to its current purpose. Lacking the direct and specific order needed to support relief pursuant to *R.* 1:10–3, the majority instead recites selected explanatory phrases that were used in *Abbott XX* and determines that they should be understood as constituting "relief [that] ... was clear and ... exacting[,] ... with the express caveat[ ] of required full funding...." *Ante* at 341, 20 *A.*3d at 1024; *see also id.* at 360, 20 *A.*3d at 1036 (describing decision in terms of "express mandates"). In stark contrast to that attempt to transform the words used in *Abbott XX* into an order of sufficient clarity to support the

extraordinary relief demanded, the fact remains that the language that the Court actually, and deliberately, chose was limited.

The final paragraph of the opinion expressed precisely what we did:

The State's motion, seeking declarations that SFRA satisfied the requirements of the thorough and efficient clause of Article VIII, section 4, paragraph 1 of the New Jersey Constitution and that the funding formula may be implemented in the Abbott districts, and further seeking an order relieving the State from this Court's prior remedial orders concerning funding to the Abbott districts, is granted. [*Abbott XX, supra,* 199 *N.J.* at 175, 971 *A.*2d 989.]

That clear and simple declaration contains no "express caveat[ ] of required full funding" or any other "specific and unequivocal" directive.

Nor is there, contrary to the majority's view, support for the proposition that there was such an order found in the colloquy with the Attorney General that occurred during the *Abbott XX* oral argument. *Ante* at 352–53, 20 *A.*3d at 1031–32. Even giving that exchange its most generous reading, it was a suggestion by the Attorney General about an approach that the Court could take, but it was not in fact an approach that we embraced. Notwithstanding the Attorney General's invitation to us to premise our holding on full funding of SFRA, we intentionally did not issue an order that directed full funding, either to the former Abbott districts or to the larger complement of "at-risk" students that SFRA identified. In light of the fact that the Court did not directly mandate full funding in spite of the Attorney General's suggestion, the State could not have surmised that our otherwise plain order somehow included it.

Moreover, the assertion made by my concurring colleague that this Court's remand order, issued two years after *Abbott XX,* can in some way serve as the basis for this extraordinary remedy, *see ante* at 480–83, 20 *A.*3d at 1108–09 (Albin, J., concurring), misses the point entirely. The motion in aid of litigant's rights relates, as it must, to the decision we rendered in *Abbott XX,* not to any subsequent order. That is, if an order of sufficient clarity cannot be found in *Abbott XX* itself, it would be fundamentally unfair for

this Court to rearticulate that decision and then use that subsequent language as its basis for an order in aid of litigant's rights. Resorting to the language of the remand order only serves to support the conclusion that *Abbott XX* itself included no "specific order" that the State can be said to have "clearly" defied, and that there is no basis on which to grant an order in aid of litigant's rights.

Further, even if there were a "specific and unequivocal order," the relief demanded by plaintiffs would only be appropriate if there were proof that the State willfully refused to comply with it, although fully capable of compliance. Again, there is no such evidence in this record. Although the Special Master was not permitted to consider the effect of the State's current fiscal crisis, there can be no doubt that, in a budget based on greatly diminished revenues that required considerable belt-tightening and shared sacrifice both generally and in education funding specifically, the funds designated for plaintiffs bore the smallest cuts of all. Indeed, only by asking this Court to close its collective eyes to the reality of an unprecedented and unforeseen fiscal calamity, with its attendant effects on budgeting decisions that affected numerous constituents, can plaintiffs hope to find a basis for the relief that they seek.

To be sure, the intentionally narrow focus of our remand order required the Special Master to make his findings in a vacuum, but this Court made clear that it remained our role to evaluate the impact of the enormous fiscal crisis, among other things, on the dispute plaintiffs have brought before us. The reality of the fiscal crisis facing our State is that it forced our two co-equal branches of government to make hard choices requiring reduction of funding affecting numerous and diverse interests, including those of constitutional dimension. The fact that these plaintiffs were not completely spared from the impact of the State's fiscal crisis is insufficient to meet the high threshold for the relief they seek.

In point of fact, that fiscal crisis, analytically, must bear first and foremost on the threshold questions of whether plaintiffs can

demonstrate either "defiance" of a court mandate or a refusal to comply when compliance is possible, both of which are essential prerequisites for an order in aid of litigant's rights. But, having essentially precluded the State from offering its evidence about the impact of the fiscal crisis for consideration by the Special Master, and having promised instead that this Court would evaluate the implications of that crisis, the majority simply proceeds as if the fiscal reality is of no constitutional moment. How there can be a finding of defiance or of defiance by a party fully capable of complying in the context of that fiscal crisis remains unexplained.

## II.

Second, the ultimate conclusion of the Special Master, that the funding levels in Fiscal Year 2011 do not "enable the districts to provide their students [with] the education required by the New Jersey Constitution," *Appendix* at 465, 20 *A.*3d at 1099, finds only limited support in the record. The Special Master concluded that the overall cuts in educational funding fell disproportionately on the at-risk districts and that the overall effect of those cuts, as evidenced by teacher layoffs, increased class sizes, and the like, prevented those districts from being able to provide a thorough and efficient education for the children. The majority adopts those factual findings and conclusions, describing them as "provid[ing] necessary support for [its] conclusion." *Ante* at 360, 20 *A.*3d at 1036. In accepting the conclusion that the funding has fallen short of that required for the provision of a thorough and efficient system of education, however, the majority has overlooked the fact that it is based on reasoning that is fundamentally flawed in two respects.

The first flaw arises because the analysis ignored the fact that SFRA included generous cushions in its funding formula and thus does not represent the minimum funding needed. The second flaw arises because the evidence that the districts presented in their effort to demonstrate that reduced funding prevented them from providing a constitutionally thorough and efficient education

represents impacts that are largely the results of individualized choices they made about spending.

### A.

The SFRA formula came about because the State decided, for the first time, to move away from a system that essentially enshrined existing funding levels as a floor for future funding decisions. Rather than simply continuing to assume that past funding levels, merely because they were in place, must be necessary, the State, through SFRA, adopted a new approach. In place of the old system, the State created a way to calculate, for the first time, what it should cost a district to provide the Core Curriculum Content Standards (CCCS), which this Court had equated with a constitutionally-defensible system of education. *Abbott v. Burke (Abbott IV)*, 149 *N.J.* 145, 168, 693 *A.*2d 417 (1997). At the same time, however, SFRA moved from reliance on the funding directed to the few districts that had been the focus of this litigation, those historically designated as the Abbott districts, to an effort to calculate those costs and provide a funding formula on a state-wide basis.

Stated more simply and directly, SFRA moved boldly away from a funding system based on providing the Abbott districts with what they wanted to one that quantified what any school district with at-risk children actually needed to comply with the constitutional mandate embodied in the CCCS. Relying on multiple levels of panels of educators and other experts, called Professional Judgment Panels (PJPs), the State devised the SFRA formula that we concluded passed constitutional muster. *Abbott XX, supra,* 199 *N.J.* at 174–75, 971 *A.*2d 989.

However, as the record we there reviewed made plain, the SFRA formula did not create funding that was minimal or that could be regarded as a floor. Rather, the process of developing the formula began by eliciting assumptions about costs from the PJPs. The development of the SFRA formula then continued with the State increasing, or "enhancing," many of the calculations that

arose out of those assumptions to create a formula more generous than any of the professional panelists had suggested. *See, e.g., id.* at 154 & n. 8, 971 *A.*2d 989 (acknowledging that PJPs suggested base at-risk weights for special-needs students between .42 and .46 but formula used a uniformly-enhanced weight of .47); *id.* at 154, 971 *A.*2d 989 (recognizing that "although the PJP . . . suggested [a weight of] .47 [for each Limited English Proficiency (LEP) student], SFRA applies a weight of .50"); *id.* at app. 217, 971 *A.*2d 989 (pointing out that for students who qualify as both at-risk and LEP, SFRA used 25% rather than recommended 22.6% to account for non-overlapping resources); *id.* at app. 219, 971 *A.*2d 989 (explaining that because New Jersey's special education population significantly exceeds national average, actual rather than average expenditures and classification rates were utilized, which were higher than those recommended in PJP model).

All of those enhancements resulted in a formula for funding that was neither modest nor miserly, but that was instead well in excess of what the PJP process had identified as needed to deliver a thorough and efficient system of education to all of the at-risk children in this State. That it was more than adequate, even for the former Abbott districts, is demonstrated by the fact that school districts were able to amass significant surpluses during the first two years of the formula's implementation. As a result of the process by which it was developed, the SFRA formula is unquestionably generous and, by design, can sustain downward adjustments as needed. That being so, the majority's conclusion that anything less than full funding of that formula so offends the constitution that it cannot be countenanced is a dubious proposition at best.

### B.

Perhaps even more important, a reduction in SFRA funding, in and of itself, does not equate with a constitutional deprivation. That is, a reduction in funding, standing alone, tells nothing about the manner in which funds are spent and thus cannot serve as the

sole basis for a conclusion of constitutional magnitude. The point is illustrated by the testimony of the State's witnesses, which the Special Master found not only to be credible, but "thought-provoking." *Appendix* at 450, 20 *A.*3d at 1089. Although the Special Master largely overlooked that testimony as beyond the scope of his mandate, *Appendix* at 403, 20 *A.*3d at 1061–62, our review of his recommendations cannot be similarly constrained.

The concurring opinion takes great pains to recite each statement in the record that lends support to the majority's conclusion that the failure to fully fund the SFRA formula has deprived the at-risk children of a constitutionally-adequate education. In electing that approach, it ignores the significant evidence in this record that undercuts both the Special Master's conclusions and the result the majority reaches based thereon. Although the concurring opinion's individual recitations are not inaccurate, there is much evidence in this record to the contrary. Viewing the evidence as a whole, this Court should conclude that "[w]e are compelled to reject [the Special Master's] recommendation because there is insufficient support in the record for the factual findings on which it is based." *State v. Chun*, 194 *N.J.* 54, 106, 943 *A.*2d 114 (2008) (rejecting Special Master's recommendation that the State be compelled to utilize additional temperature sensor in breath testing device).

The testimony of the Piscataway superintendent, for example, demonstrated that a district faced with severe cuts in funding nonetheless was able to provide educational services that meet the CCCS. That district did so by aggressively seeking creative ways to achieve efficiencies and to save money without adversely affecting the classroom to the greatest extent possible. Through sharing of services with neighboring districts, creating new revenue sources that included making its special education programs available to surrounding districts in exchange for tuition, achieving greater energy efficiency, and outsourcing some support services, Piscataway was able to provide a constitutionally adequate education in spite of being funded at a level "under adequacy." By

and large, that district avoided making the sorts of cuts that other districts chose to make, working to curb spending in ways other than reducing teaching staff and increasing class sizes. Likewise, the superintendent from Woodbridge conceded that his district also had been able to avoid spending cuts that would have adversely impacted student performance.

In contrast, other districts that decried the significant adverse impacts on their students brought about by the reduced funding made different choices, deciding to allocate spending in ways that were questionable when tested against a genuine desire to protect students' educational opportunities. Clifton, for example, elected to fund eighty sports teams rather than pay to keep a basic skills supervisor even though its superintendent pointed to the loss of the basic skills supervisor as having an adverse impact on the ability to provide the CCCS. Buena Regional made a similar decision, spending more than the statewide average on its extra-curricular activities while cutting an after-school instructional program that its superintendent testified had been of significant educational benefit to the students.

That sports teams and extracurricular activities are important to the growth and development of all of the children in this State cannot be questioned and, in a perfect world, there is no doubt that all children would have access to a wide array of such opportunities. The unfortunate reality, however, is that our world is far from perfect and all too often there are difficult choices that must be made. In the realm of funding for education, the constitutional mandate is not one that demands creation of absolute equality, but one that, as this Court has held, is tested against funding that is matched to creating the ability to comply with the CCCS. *See Abbott IV, supra,* 149 *N.J.* at 168, 693 *A.*2d 417. In this record, there is evidence that some districts confronted the tough choices about how to utilize reduced funding consistent with that goal while others avoided stepping up to that challenge. But our constitution does not mandate that the State provide a perfect system, or even one in which districts are shielded from having to

make difficult choices. Instead, our constitution requires only funding for a system of education that is thorough and efficient.

It is striking that the Special Master, although finding all of those witnesses credible, nonetheless focused on the conclusory testimony about reduced teaching staff and increased class sizes to support his conclusions. To be sure, eliminating teachers and increasing class sizes could indeed undercut the ability to provide educational opportunities consistent with CCCS, but the larger point is that all of the cuts that were made were the product of conscious choices made by individual school districts. Whether the districts merely chose to make cuts that were easier to achieve than the ones that their more creative counterparts selected, there is ample evidence in the record to suggest that the cuts that directly affected ability to deliver CCCS were far from unavoidable.

All of that testimony is consistent with the State's expert's opinion, which the Special Master also found to be both credible and thought-provoking, that the key lies not in how much money is spent but in how that money is spent. *Appendix* at 449, 463, 20 A.3d at 1089, 1097. To the extent that the Special Master disregarded the force of that logic, ignored the creative cost-saving techniques implemented by some districts and that were equally available to all districts, overlooked the questionable choices made by other districts, and instead embraced the notion that reduced funding forced school districts to make cuts that directly and adversely impacted their ability to deliver the CCCS, his conclusion that the FY 2010–11 funding levels are insufficient to meet the constitutional mandate is flawed because it lacks the required support in the record.

### III.

Third, the reasoning underpinning plaintiffs' demand that this Court order full funding of SFRA going forward and the majority's decision instead to limit relief solely to the former Abbott

districts are both constitutionally unsound and significantly at odds with our decision in *Abbott XX.*

## A.

Plaintiffs essentially demand that this Court direct the State to make a particular level of funding available to particular parties for a particular purpose. They cloak their demand in the language of a constitutional imperative, pointing to the clause that requires "maintenance and support of a thorough and efficient system" of education. *N.J. Const.* art. VIII, § 4, ¶ 1. To their way of thinking, there are no other constitutional considerations and no other concerns.

There are, of course, other considerations, some of constitutional dimension, but plaintiffs ask this Court to proceed with blinders on. Indeed, plaintiffs would have us ignore the effect that acceding to their demand will have on the rights of the unrepresented school districts and of any other person, program, or interest, including those of potentially equivalent constitutional dimension. They ask us to likewise ignore the effect of massive added funds from the federal government that were designed to avoid the very cuts they insist were forced upon them by last year's budget. *See Abbott XX, supra,* 199 *N.J.* at 173, 971 *A.*2d 989 ("We cannot ignore the State's estimation that the Abbott districts will receive cumulatively over the next two years, approximately $630 million in federal funds."). They ask us to ignore the fiscal crisis and its effects except, that is, for the effects that they argue touched them.

Plaintiffs' approach also overlooks key provisions in our Constitution, including the requirement that the budget be balanced, *see N.J. Const.* art. VIII, § 2, ¶ 3, and the provision assigning to the Legislature the exclusive authority to appropriate funds, *N.J. Const.* art. VIII, § 2, ¶ 2, albeit with "a vital constitutional role in the budget process" vested in the Governor, *see Karcher v. Kean,* 97 *N.J.* 483, 489, 479 *A.*2d 403 (1984). In asking us to sidestep

these provisions, plaintiffs seek to elevate their interpretation of their funding needs above and ahead of all others.

The majority's approach, although recognizing the existence of countervailing constitutional provisions, pronounces that plaintiffs are now "akin to ... wards of the state," *ante* at 340, 20 *A.*3d at 1023, apparently finding in that rather remarkable view of their status sufficient reason to proclaim those other constitutional considerations to be of lesser import. The majority's expression of its belief that plaintiffs should be treated as if they are wards of the state is all the more remarkable when compared to this Court's observations in *Abbott XX* acknowledging the enormous strides made over the past several decades. *Abbott XX, supra,* 199 *N.J.* at 171–72, 971 *A.*2d 989 ("It was previous indifference to a constitutional deprivation that started us down the *Robinson/Abbott* path. Although that may have been our point of embarkation, today we are in a different place.").

Having adopted that view of plaintiffs' status, however, the majority rejects the State's Appropriations Clause argument out of hand, announcing that "the Appropriations Clause creates no bar to judicial enforcement[.]" *Ante* at 363, 20 *A.*3d at 1038. In part, that conclusion rests on the majority's recitation of a single set of circumstances narrowly tailored to mirror what the majority sees as being those that surround this application for relief. *Id.* at 363–64, 20 *A.*3d at 1038. Apart from that pronouncement, and the reiteration of its view that these plaintiffs have suffered "a real, substantial, and consequential blow to the achievement of a thorough and efficient system of education," *id.* at 364, 20 *A.*3d at 1038, the majority offers no rationale for its approach.

## B.

Nor is the majority's election to limit its mandate today to a directive that only the former Abbott districts will benefit from full funding in the next budget defensible. Indeed, even one of the others who comprise the three votes in favor of relief does not

agree that there is anything left to that historical designation. *Ante* at 352–55, 20 *A*.3d at 1031–33 (Albin, J., concurring).

That we eliminated the distinction between the former Abbott districts and all others in favor of a focus on at-risk children wherever they reside cannot be doubted. Clear evidence of that is found in our order in *Abbott XX* itself. There, we expressly denied plaintiffs' motion seeking to preserve the status quo that would have entitled them to supplemental funding in the form of continued parity funding, thus completely replacing all of the Court's earlier orders and decrees. *Abbott XX, supra,* 199 *N.J.* at 175, 971 *A.*2d 989. Those prior orders, as the majority notes, were binding, *ante* at 347–48, 20 *A*.3d at 1027–28, but in *Abbott XX*, we swept them away entirely through our determination to grant the relief requested by the State while denying that urged upon us by plaintiffs.

Nonetheless, the distinction that we eliminated in *Abbott XX* between the school districts where the original plaintiffs went to school and all others, *see Abbott XX, supra,* 199 *N.J.* at 147, 971 *A.*2d 989 (holding that "[t]he State shall not be required to continue separate funding streams mandated under past remedial orders"), is now inexplicably revived by two of those who comprise the majority today. And it is revived in spite of the fact that the logic underlying the SFRA funding formula itself rendered that distinction meaningless.

Regardless of what others might suggest, the truly remarkable step embodied in SFRA had little to do with its funding formula. The great beauty of SFRA was that it recognized that at-risk children live in many school districts, not just in the former Abbott districts in which the original plaintiffs resided. The clear recognition of SFRA that a truly constitutional funding formula must be tethered to the needs of school children wherever they live took us well beyond the outmoded distinctions between the few who could claim Abbott status and the many who could not. To proclaim, as does the majority, that the remedy is limited to a

group of students not recognized in SFRA is to take a step backward to the inadequate approaches of the past.

### IV.

The method of funding schools has come a long way from the days when this Court was compelled to act. *See generally Abbott XX, supra,* 199 *N.J.* at 171–72, 971 *A.*2d 989; *Abbott v. Burke (Abbott II),* 119 *N.J.* 287, 297, 575 *A.*2d 359 (1990); *Robinson v. Cahill,* 62 *N.J.* 473, 303 *A.*2d 273 (1973). In recent years, our Legislature and our Governor have worked diligently to create a funding mechanism that meets not only this Court's numerous directives, but that secures the right to a "thorough and efficient system" of education for all of our State's school children. By any objective measure, funding for all school children and particularly for the "at-risk" children is more than adequate; over time that funding has reached levels that might best be described as generous.

Merely because our co-equal branches of government stepped up to the challenges presented by the State's recent fiscal crisis in a manner that requires plaintiffs to shoulder some reduction in funding does not mean that the careful and thoughtful efforts undertaken by those branches of government were unconstitutional. Indeed, the majority's decision today ignores our recognition in *Abbott XX* that "[t]he political branches of government . . . are entitled to take reasoned steps, even if the outcome cannot be assured, to address the pressing social, economic, and educational challenges confronting our State." *Abbott XX, supra,* 199 *N.J.* at 175, 971 *A.*2d 989. In doing so, the majority likewise does precisely what we cautioned against in *Abbott XX* by effectively locking our co-equal branches in a "constitutional straitjacket." *Ibid.*

Because there is no evidence in this record sufficient to meet the high standard imposed as a prerequisite for the extraordinary relief of an order in aid of litigant's rights, because there is insufficient support for the Special Master's findings that less than

full funding of the SFRA formula prevented school districts from delivering a constitutionally adequate education, because the relief demanded of this Court treads on the constitutional prerogatives of the Legislature and the Executive branch, because the remedy fashioned today finds no basis in SFRA itself, and because the majority has turned the clock back to a time very different from the one in which we find ourselves today, I respectfully dissent.

*For grant*—Justices LaVECCHIA and ALBIN and Judge STERN (temporarily assigned)—3.

*For dissent*—Justices RIVERA–SOTO and HOENS—2.

*Not Participating*—Chief Justice RABNER and Justice LONG—2.